No. 23-30480

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

TESLA, INCORPORATED; TESLA LEASE TRUST; TESLA FINANCE, L.L.C.,

*Plaintiffs-Appellants*,

*v.*

LOUISIANA AUTOMOBILE DEALERS ASSOCIATION, In itself and on behalf of its members, executive committee, and board of directors; GREGORY LALA, In his official capacity as Chairman of the Louisiana Motor Vehicle Commission;

**(CAPTION CONTINUED ON INSIDE COVER)**

On Appeal from the United States District Court
for the Eastern District of Louisiana, No. 2:22-cv-02982

**BRIEF FOR PLAINTIFFS-APPELLANTS**

MARK R. BEEBE (#19487)
DIANA COLE SURPRENANT (#33399)
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139

ARI HOLTZBLATT
ANDRES C. SALINAS
ANDREW K. WAKS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
ari.holtzblatt@wilmerhale.com

DAVID GRINGER
TONY J. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

October 12, 2023

ALLEN O. KRAKE, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; V. PRICE LEBLANC, JR., In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; ERIC R. LANE, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; KENNETH MIKE SMITH, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; P.K. SMITH MOTORS, INCORPORATED; KEITH P. HIGHTOWER, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; KEITH M. MARCOTTE, In his Official Capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; WESLEY RANDAL SCOGGIN, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; SCOTT A. COURVILLE, In his Official Capacity as a Commissioner of the Louisiana Motor Vehicle Commission; DONNA S. CORLEY, In her Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and her private capacity; TERRYL J. FONTENOT, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; T & J FORD, INCORPORATED; MAURICE C. GUIDRY, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; GOLDEN MOTORS, L.L.C.; RANEY J. REDMOND, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission; JOSEPH W. WESTBROOK, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity, also known as Bill Westbrook; STEPHEN GUIDRY, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; JOYCE COLLIER LACOUR, In her Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission; THOMAS E. BROMFIELD, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission; EDWIN T. MURRAY, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; FORD OF SLIDELL, L.L.C., doing business as Supreme Ford of Slidell; GERRY LANE ENTERPRISES, INCORPORATED, doing business as Gerry Lane Chevrolet; HOLMES MOTORS, L.L.C., doing business as Holmes Honda; AIRLINE CAR RENTAL, INCORPORATED, doing business as Avis Rent-A-Car; SHETLER-CORLEY MOTORS, LIMITED; LEBLANC AUTOMOBILES. L.C., incorrectly named as Leblanc Automobiles, Inc.; MORGAN BUICK GMC SHREVEPORT, INCORPORATED, incorrectly named as Morgan Pontiac, Inc.; P.K. SMITH MOTORS, INCORPORATED, in his private capacity; COMMISSIONERS OF THE LOUISIANA MOTOR VEHICLE COMMISSION AND THEIR DEALERSHIPS; STEPHEN L. GUIDRY, JR,

*Defendants-Appellees.*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case.  These representations are made so that members of this Court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellants | Counsel |
|---|---|
| Tesla, Incorporated<br>Tesla Lease Trust<br>Tesla Finance, L.L.C. | Ari Holtzblatt<br>David Gringer<br>Andres C. Salinas<br>Andrew K. Waks<br>Tony J. Lee<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br><br>Mark R. Beebe<br>Diana Cole Surprenant<br>ADAMS AND REESE LLP |

| Defendants-Appellees | Counsel |
|---|---|
| Louisiana Automobile Dealers Association | Paul D. Clement<br>Matthew Rowen<br>CLEMENT & MURPHY, P.L.L.C.<br><br>Jeanne C. Comeaux<br>Claude Favrot Renaud, Jr.<br>BREAZEALE, SACHSE & WILSON, L.L.P. |

| Commissioners of the Louisiana Motor Vehicle Commission | Timothy W. Hassinger<br>GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH |
|---|---|
| Gregory Lala<br>*(Chairman of the Louisiana Motor Vehicle Commission)* | Lamont P. Domingue<br>VOORHIES & LABBÉ, A.P.L.C.<br><br>Harry Joseph Philips, Jr.<br>John Parham Murrill<br>TAYLOR, PORTER, BROOKS & PHILLIPS, L.L.P. |
| Allen O. Krake<br>*(In his private capacity and as Commissioner of the Louisiana Motor Vehicle Commission)* | Chloe Marie Chetta<br>Richard E. Sarver<br>Robert A. Waldrup<br>BARRASSO, USDIN, KUPPERMAN, FREEMAN & SARVER, L.L.C.<br><br>Harry Joseph Philips, Jr.<br>John Parham Murrill<br>TAYLOR, PORTER, BROOKS & PHILLIPS, L.L.P. |
| V. Price Leblanc, Jr.<br>Keith P. Hightower<br>Keith M. Marcotte<br>Wesley Randal Scoggin<br>Donna S. Corley<br>Terryl J. Fontenot<br>Maurice C. Guidry<br>*(In their private capacities and as Commissioners of the Louisiana Motor Vehicle Commission)* | Patrick Shaw McGoey<br>Andrea V. Timpa<br>SCHONEKAS, EVANS, MCGOEY & MCEACHIN, L.L.C.<br><br>Harry Joseph Philips, Jr.<br>John Parham Murrill<br>TAYLOR, PORTER, BROOKS & PHILLIPS, L.L.P. |

| | |
|---|---|
| Scott A. Courville<br>Raney J. Redmond<br>Joyce Collier LaCour<br>Thomas E. Bromfield<br>*(Commissioners of the Louisiana Motor Vehicle Commission)*<br><br>Edwin T. Murray<br>Kenneth Mike Smith,<br>Joseph W. Westbrook<br>Stephen Guidry<br>*(In their private capacities and as Commissioners of the Louisiana Motor Vehicle Commission)* | Harry Joseph Philips, Jr.<br>John Parham Murrill<br>TAYLOR, PORTER, BROOKS & PHILLIPS, L.L.P. |
| P.K. Smith Motors, Incorporated | William Raley Alford, III, Esq.<br>Patrick M. Bollman<br>STANLEY, REUTER, THORNTON & ALFORD, L.L.C. |
| T & J Ford, Incorporated<br>Golden Motors, L.L.C.<br>Holmes Motors, L.L.C. (doing business as Holmes Honda)<br>Airline Car Rental, Incorporated (doing business as Avis Rent-A-Car)<br>Shetler-Corley Motors, Limited<br>Leblanc Automobiles. L.C.<br>Morgan Buick GMC Shreveport, Incorporated | Patrick Shaw McGoey<br>Andrea V. Timpa<br>SCHONEKAS, EVANS, McGOEY & McEACHIN, L.L.C. |
| Ford of Slidell, L.L.C. (doing business as Supreme Ford of Slidell) | Chloe Marie Chetta<br>Richard E. Sarver<br>Robert A. Waldrup<br>BARRASSO, USDIN, KUPPERMAN, FREEMAN & SARVER, L.L.C. |

| | |
|---|---|
| Gerry Lane Enterprises, Incorporated (doing business as Gerry Lane Chevrolet) | Colin D. Sherman<br>SHERMAN & LACEY |
| Stephen L. Guidry, Jr. | Lamont P. Domingue<br>VOORHIES & LABBÉ, A.P.L.C. |

/s/ Ari Holtzblatt
_____
ARI HOLTZBLATT

*Attorney of Record for Plaintiff-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants Tesla, Inc., Tesla Lease Trust, and Tesla Finance LLC respectfully request oral argument.  Oral argument is warranted because it would assist the Court in resolving the major constitutional and antitrust questions presented by this appeal.  Indeed, without the benefit of oral argument, the district court below made several fundamental errors that counsel could have addressed with the benefit of argument.  Furthermore, given the large number of appellees, it may not be feasible for Tesla to comprehensively address every argument raised by appellees on reply.  Oral argument would enable the Court to fully assess the parties' positions as to the key issues on appeal.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS .................................................. i

STATEMENT REGARDING ORAL ARGUMENT ............................................. v

TABLE OF AUTHORITIES ................................................................... viii

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT .............................................................. 5

RELEVANT STATUTES AND CONSTITUTIONAL PROVISIONS .................. 5

ISSUES PRESENTED ............................................................................. 5

STATEMENT OF THE CASE ................................................................... 6

    A.    Tesla's Direct-To-Consumer Model .................................... 6

    B.    Tesla's Operations In Louisiana ......................................... 7

    C.    The Dealer Cartel's Control Of The Commission ................. 9

    D.    The Agreement To Exclude Tesla ...................................... 10

    E.    Procedural History ......................................................... 14

SUMMARY OF ARGUMENT .................................................................. 15

STANDARD OF REVIEW ...................................................................... 17

ARGUMENT ...................................................................................... 17

I.    TESLA PLAUSIBLY ALLEGED AN ANTITRUST VIOLATION ................. 17

    A.    Tesla Plausibly Alleged An Illegal Agreement .................... 17

        1.    Tesla Plausibly Alleged An Agreement That, At Minimum, Encompassed The Commissioners ......................... 18

        2.    Tesla Plausibly Alleged That The Non-Commissioner Defendants Were Parties To The Agreement ................................................................ 23

        3.    The District Court's Ruling Rested On Several Legal Errors ................................................................ 25

B.  *Noerr-Pennington* Does Not Apply ..................................... 29

II.  TESLA PLAUSIBLY ALLEGED A VIOLATION OF THE DUE PROCESS
CLAUSE .................................................................................... 36

A.  The Due Process Clause Does Not Permit One Segment
Of An Industry To Use Its Control Of A State Board To
Exclude Competitors .......................................................... 36

B.  The District Court Erred By Dismissing Tesla's Claims
As Implausible .................................................................... 39

C.  Cases Permitting Industrial Self-Regulation Are
Distinguishable .................................................................. 43

1.  *Chrysler Corporation v. Texas Motor Vehicle
Commission* .............................................................. 43

2.  *Friedman v. Rogers* ................................................ 44

3.  Traditional Industry Self-Regulation ....................... 45

III.  TESLA PLAUSIBLY ALLEGED A VIOLATION OF THE EQUAL
PROTECTION CLAUSE ................................................................ 48

A.  Banning Non-Franchising Manufacturers From Directly
Selling Or Performing Warranty Service Violates The
Equal Protection Clause Because It Serves No Purpose
But Protectionism ............................................................... 48

B.  The District Court Erred In Dismissing Tesla's Equal
Protection Claim On The Pleadings ................................... 54

1.  The Direct-Sales Ban ................................................ 56

2.  The Warranty-Servicing Ban .................................... 59

CONCLUSION ....................................................................................... 61

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abraham & Veneklasen Joint Venture v. American Quarter Horse Association*, 776 F.3d 321 (5th Cir. 2015) ..................................17

*Abramson v. Gonzalez*, 949 F.2d 1567 (11th Cir. 1992) ........................................44

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988)........................................................................30, 32, 34, 35

*Arizona Automobile Dealers Association v. Arizona Department of Transportation*, 2017 WL 9753918 (Ariz. Super. Ct. Mar. 3, 2017) .......................................................................................58

*Associated Press v. United States*, 326 U.S. 1 (1945) ...........................................20

*Association of American Railrods v. United States Department of Transportation*, 821 F.3d 19 (D.C. Cir. 2016) ...................................3, 36, 44

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)................................18, 24, 26

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ....................................................37

*Chrysler Corp. v. Texas Motor Vehicle Commission*, 755 F.2d 1192 (5th Cir. 1985) ................................................................43, 44

*City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991)..................................................................................33, 35

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962)......................................................... 3, 25, 26, 28, 30, 31, 35

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 289 F.2d 86 (9th Cir. 1961) ..............................................................................31

*Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) .................................................49

*Duke v. North Texas State University*, 469 F.2d 829 (5th Cir. 1972).....................42

*Ford Motor Co. v. Texas Department of Transportation*, 264 F.3d 493 (5th Cir. 2001) .......................................................................4, 37, 53

*Friedman v. Rogers*, 440 U.S. 1 (1979)............................................................44, 45

*FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986)................................20

*General Land Office v. Biden*, 71 F.4th 264 (5th Cir. 2023)...................................41

*Gibson v. Berryhill*, 411 U.S. 564 (1973)........................................................37, 47

*Greater New York Automobile Dealers Association v. Department of Motor Vehicles*, 969 N.Y.S.2d 721 (Sup. Ct. 2013)......................................59

*Groden v. City of Dallas*, 826 F.3d 280 (5th Cir. 2016)..........................................17

*Hardwick v. Wall*, 419 U.S. 888 (1974)................................................................38

*In re Flat Glass Antitrust Litigation*, 385 F.3d 350 (3d Cir. 2004)........................24

*In re Murchison*, 349 U.S. 133 (1955)..................................................................42

*In re Pool Products Distribution Market Antitrust Litigation*, 988 F. Supp. 2d 696 (E.D. La. 2013)....................................................18

*In re Text Messaging Antitrust Litigation*, 630 F.3d 622 (7th Cir. 2010)...........................................................................................................23

*International Truck & Engine Co. v. Bray*, 372 F.3d 717 (5th Cir. 2004)...........................................................................................................4, 53

*Jeanty v. Big Bubba's Bail Bonds*, 72 F.4th 116 (5th Cir. 2023)............................17

*Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010)...............................................51

*Lucid Group USA, Inc. v. Johnston*, 2023 WL 5688153 (W.D. Tex. June 21, 2023)......................................................................................58

*Mahone v. Addicks Utility District of Harris County*, 836 F.2d 921 (5th Cir. 1988)....................................................................................55, 56

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980)......................................................41

*Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368 (5th Cir. 2014)............................26

*Massachusetts State Automobile Dealers Association v. Tesla Motors, M.A., Inc.*, 15 N.E.3d 1152 (Mass. 2014)........................................59

*Matter of Superior Court Trial Lawyers Association*, 107 F.T.C. 510 (1986) ................................................................................................ 30, 35

*Megill v. Board of Regents State of Florida*, 541 F.2d 1073 (5th Cir. 1976) ........................................................................................................ 42

*Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008) ................................. 49

*New York State Dairy Foods, Inc. v. Northeast Dairy Compact Commission*, 198 F.3d 1 (1st Cir. 1999) .................................................. 45, 46

*NHL Players Association v. Plymouth Whalers Hockey Club*, 419 F.3d 462 (6th Cir. 2005) .......................................................................... 25

*North Carolina State Board of Dental Examiners v. FTC*, 574 U.S. 494 (2015) ........................................................... 2, 21, 32, 33, 36

*North Carolina State Board of Dental Examiners v. FTC*, 717 F.3d 359 (4th Cir. 2013) ............................................................. 19, 22, 28

*Osborn v. Visa Inc.*, 797 F.3d 1057 (D.C. Cir. 2015) ............................... 20

*Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278 (4th Cir. 2012) ................ 20

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) ................ 18

*SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110 (9th Cir. 2022) ... 3, 19, 22, 27, 28, 29

*St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013).. 4, 48, 49, 50, 51, 55, 56

*Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010) ................ 24

*Stivers v. Pierce*, 71 F.3d 732 (9th Cir. 1995) ................................... 45, 46

*Tesla Inc. v. Delaware Division of Motor Vehicles*, 297 A.3d 625 (Del. 2023) ........................................................................................ 58

*Tunica Web Advertising v. Tunica Casino Association*, 496 F.3d 403 (5th Cir. 2007) .......................................................... 18, 24

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965) ................ 30, 31, 32

*United States v. General Motors Corp.*, 384 U.S. 127 (1966) ................ 1, 17, 27

*United States v. United States Gypsum Co.*, 438 U.S. 422 (1978) ........................26

*Video International Product, Inc. v. Warner-Amex Cable
    Communications, Inc.*, 858 F.2d 1075 (5th Cir. 1988)..................................29

*Wall v. American Optometric Association*, 379 F. Supp. 175 (N.D. Ga.
    1974) ........................................................................................................38

*Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*,
    648 F.3d 452 (6th Cir. 2011) .....................................................................29

*Wilkerson v. Johnson*, 699 F.2d 325 (6th Cir. 1983) ...............................................46

*Withrow v. Larkin*, 421 U.S. 35 (1975) ...................................................................42

## STATUTES AND RULES

28 U.S.C.
    §1291 .........................................................................................................5
    §1331 .........................................................................................................5
    §1332 .........................................................................................................5
    §1337 .........................................................................................................5
    §1343 .........................................................................................................5

La. R.S.
    §32:1253 ....................................................................................................9
    §32:1261 .........................................................................................8, 11, 52
    §32:1270 ..................................................................................................10

Fed. R. App. P. 4 ......................................................................................................5

## LEGISLATIVE MATERIALS

2017 La. Act 45 (S.B. No. 107) ...............................................................................7

## OTHER AUTHORITIES

Areeda, Phillip E. & Herbert Hovenkamp, *Antitrust Law* (2022) ...........................33

Carey, Nick, et al., *EV Broken? Finding a Technician to Fix It May
    Take a While*, Reuters (Sept. 6, 2023),
    https://www.reuters.com/business/autos-transportation/ev-
    broken-finding-technician-fix-it-may-take-while-2023-09-06/ ...................59

Crane, Daniel A., *Tesla, Dealer Franchise Laws, and the Politics of Crony Capitalism*, 101 Iowa L. Rev. 573 (2016) .......................................... 53

Elhauge, Elner, *Making Sense of Antitrust Petitioning Immunity*, 80 Calif. L. Rev. 1177 (1992) .................................................................. 30, 32

Kreps, David M., *Microeconomics for Managers* (2d ed. 2019) ........................... 49

Lao, Marina, et al., *Direct-to-consumer auto sales: It's not just about Tesla*, FTC (May 11, 2015), https://www.ftc.gov/ enforcement/competition-matters/2015/05/direct-consumer- auto-sales-its-not-just-about-tesla .................................................................. 54

Letter from FTC Directors of Bureaus of Economics and Competition and Office of Policy Planning to Michigan State Senator Darwin L. Booher (May 7, 2015), https://www.ftc.gov/ system/files/documents/advocacy_documents/ftc-staff- comment-regarding-michigan-senate-bill-268-which-would- create-limited-exception-current/150511michiganautocycle.pdf .......... 56, 57

Muller, Joann, *Tesla's Dominance Fades as EV Adoption Grows*, Axios (Apr. 5, 2023), https://www.axios.com/2023/04/05/tesla- ev-electric-vehicle-adoption ......................................................................... 57

Weber, Peter, *How Tesla's Direct Sales Model Is Roiling The Car Dealership Industry*, The Week (June 21, 2023), https://theweek.com/us/1024416/tesla-vs-car-dealerships ........................... 47

## INTRODUCTION

In an earlier case involving auto dealers who conspired to eliminate competition from rivals to protect their profit margins, the Supreme Court held that the conspiracy was "so inconsistent with the free-market principles embodied in the Sherman Act," that it could not be "saved" by other arguments. *United States v. General Motors Corp.*, 384 U.S. 127, 146 (1966). This is another such case. Here, a group of should-be competing car dealers face a perceived existential threat to their businesses: Tesla and other electric car makers do not sell, lease, or provide warranty service to their vehicles through franchise dealers. By declining to use commission-driven middlemen, Tesla eliminates dealer mark-ups, add-ons, and other unnecessary fees—saving its customers hundreds (sometimes thousands) of dollars per vehicle.

The antitrust laws are clear about what businesses must do when faced with innovative threats: compete on the merits. Dealers in Louisiana have taken a different—and illegal—approach. They have agreed with one another to harass Tesla with baseless investigations and drive it out of the state, while discouraging other innovative competitors from entering in the first place. Making this conspiracy especially pernicious is that these dealers have effectuated their illegal agreement by wielding the role some of the conspirators maintain as Commissioners on the Louisiana Motor Vehicle Commission. As the Supreme

Court has recognized, "prohibitions against" this kind of "anticompetitive self-regulation by active market participants are an axiom of federal antitrust policy." *North Carolina State Bd. of Dental Examiners v. FTC (Dental Examiners II)*, 574 U.S. 494, 505 (2015).

To end this harassment campaign before being driven from the Louisiana market, Tesla filed suit under the Sherman Act against the Commissioners in both their official and individual capacities, as well as the trade association (the Louisiana Automobile Dealers Association or "LADA") that represents auto dealers in the state. The complaint alleged an illegal antitrust conspiracy among a "Dealer Cartel" composed of the dealers serving as Commissioners, the other dealers who are members of LADA, and LADA itself. The object of that conspiracy was and still is to limit competition from Tesla's innovative business model.

In dismissing Tesla's claim with prejudice, the district court misapplied the law. As other circuits have held, a plaintiff plausibly alleges an unlawful agreement under Section 1 of the Sherman Act where financially-interested market participants (like the Louisiana dealers) vote to wield their control of a government entity (like the Commission) to thwart competition. Thus, the Commissioners' vote itself is direct evidence of an agreement. The district court held otherwise only by improperly assuming the good faith of the conspirators because some of

them had a governmental role, ignoring those conspirators' status as market
participants who actively compete with Tesla.  And the district court dismissed
communications among members of the Dealer Cartel as mere "one sided
complaints," even though those two-way exchanges provided further direct
evidence of the conspiracy.  In short, Tesla's complaint alleged that the defendants
"acted together to use the [Commission] to inflict anticompetitive injury on [the
cartel's] behalf."  *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1118-1119 (9th
Cir. 2022).  That suffices to establish a plausible antitrust conspiracy.

The district court further held that Tesla's antitrust claim against the private
defendants was barred by *Noerr-Pennington*, but that too was error.  *Noerr-
Pennington* protects petitioning of financially-disinterested government actors.  It
does not protect agreements among financially-interested market participants to
use their own governmental power to exclude a competitor. As the Supreme Court
has held, that is "private commercial activity" subject to antitrust scrutiny.
*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962).

Separately, the district court was wrong to dismiss Tesla's due process and
equal protection claims.  The Due Process Clause ordinarily prohibits "a self-
interested entity" from exercising "regulatory authority over its competitors."
*Association of Am. Railroads v. U.S. Department of Transp.* ("*Amtrak III*"), 821
F.3d 19, 27 (D.C. Cir. 2016).  Yet that is precisely what Tesla alleged the

Commission has done here: wield its government authority to protect its members'
narrow economic interests against a disruptive competitor. The district court
dismissed that obvious danger largely by wrongly equating a competitor's control
over the entry of its direct rivals to run-of-the-mill industrial self-regulation. And,
compounding its errors, the district court improperly demanded record evidence of
partiality at the pleading stage, while overlooking that Tesla had provided precisely
such evidence (even though it was not required).

As for Tesla's equal protection claim, this Circuit has rejected the idea "that
mere economic protection of a particular industry is a legitimate government
purpose." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 222 (5th Cir. 2013). But
that is the only possible purpose that could be served by Louisiana banning non-
franchising manufacturers from directly selling or providing non-fleet warranty
service. Indeed, economists and policy experts uniformly agree that such laws
serve only to restrict competition and hurt consumers. The district court rested its
contrary conclusion on *Ford Motor Co. v. Texas Department of Transportation*,
264 F.3d 493 (5th Cir. 2001), and *International Truck & Engine Co. v. Bray*, 372
F.3d 717 (5th Cir. 2004). But those cases involved *franchising* manufacturers, and
hinged on the danger that such manufacturers might abuse their unique relationship
with their own dealers. Tesla and other non-franchising-manufacturers, by
contrast, have no franchise dealers (in Louisiana or elsewhere) that they could

possibly take advantage of.  They therefore lack the sole feature that has ever—or *could* ever—justify a protectionist law like Louisiana's.

The judgment should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331-1332, 1337, and 1343.  It dismissed the complaint with prejudice on June 26, 2023.  ROA.2396.  Tesla filed a timely notice of appeal on July 14, 2023.  ROA.2397; Fed. R. App. P. 4(a)(1)(A).  This Court has jurisdiction under 28 U.S.C. §1291.

## RELEVANT STATUTES AND CONSTITUTIONAL PROVISIONS

Relevant provisions are set forth in an addendum.

## ISSUES PRESENTED

1.     Whether the district court erred in dismissing Tesla's Sherman Act claim with prejudice for failure to state a claim.

2.     Whether the district court erred in dismissing Tesla's due process claim with prejudice for failure to state a claim.

3.     Whether the district court erred in dismissing Tesla's equal protection claim with prejudice for failure to state a claim.

## STATEMENT OF THE CASE

### A.    Tesla's Direct-To-Consumer Model

Tesla is an American manufacturer of all-electric vehicles.  ROA.1604 (¶119).  Tesla's four models are among the best-selling electric vehicles in the country, and its Model 3 and Model Y are among the best-selling vehicles, period.  ROA.1605-1606 (¶¶124-127).

Tesla has achieved its disruptive success, in part, by providing sales, leasing, and warranty repair services directly to consumers.  ROA.1607 (¶¶130-132).  Unlike franchising manufacturers who use third-party dealers, Tesla sells and leases cars itself, at uniform and transparent prices.  ROA.1589 (¶3).  Tesla's salespeople are primarily salaried and aim to educate consumers, rather than push for same-day sales to receive commissions.  ROA.1608 (¶137).  And in providing direct warranty service, Tesla primarily compensates employees by the hour, eliminating dealerships' incentive to upsell unnecessary "repairs."  ROA.1608 (¶137).  Tesla's direct-to-consumer model eliminates the add-ons, mark-ups, and other unnecessary fees imposed by third-party dealers—passing savings to consumers.  ROA.1608 (¶136).

For these same reasons, franchise dealers view Tesla as an existential competitive threat to their businesses.  ROA.1613, ROA.1616, ROA.1630 (¶¶169, 181-187, 248).  If Tesla and other non-franchising manufacturers continue to

expand, many consumers will choose those options instead of using franchise

dealers. ROA.1614 (¶172). That in turn could cause other manufacturers to

reevaluate their dealer-centric business models. ROA.1614 (¶172). Hyundai, in

fact, recently sent a letter to its dealerships noting that "our customers around the

country are voicing displeasure with certain [dealer] pricing practices which, if left

unchecked, will have a negative impact on the health of our brand." ROA.1609

(¶141). And Ford's CEO stated recently, "We've got to go to non-negotiated

price" and to "100 percent online," because Ford's current dealer-distribution

model adds around $2,000 in extra costs per car compared to Tesla. ROA.1614

(¶172). Dealers recognize this competitive pressure and the "threat to the[ir] cozy

profits." ROA.1630 (¶248).

### B.  Tesla's Operations In Louisiana

Tesla's efforts to serve Louisiana customers have been met with great

resistance. Much of that difficulty comes from the actions of the Dealer Cartel, but

part of it comes from the legislature, through its irrational enactment (at the Dealer

Cartel's behest) of laws banning non-franchising manufacturers, like Tesla, from

selling vehicles directly and restricting their ability to perform warranty services.

Before 2017, Tesla would have been permitted to directly sell its vehicles in

Louisiana, because state law then only prohibited franchising manufacturers from

competing with their own franchise dealers. 2017 La. Act 45 (S.B. No. 107)

(Amendment Notes to 2017 Amendments, La. R.S. §32:1261).  In 2017, however, the state legislature amended the law so that non-franchising manufacturers like Tesla generally may not sell cars directly to consumers without using an in-state dealer.  La. R.S. § 32:1261(A)(1)(k)(i).  Tesla consequently has not sought a license to sell vehicles in Louisiana.

Tesla does, however, through Tesla Lease Trust (TLT), hold a license authorizing it to lease vehicles in Louisiana.  ROA.1593 (¶27).  Louisiana law also authorizes Tesla to perform warranty repairs, though Tesla's ability to do so is threatened by the illegal agreement at issue.  Although manufacturers are generally prohibited from "authoriz[ing] a person to perform warranty repairs … who is not a motor vehicle dealer," La. R.S. §32:1261(A)(1)(t)(i), that prohibition is subject to an exception that Tesla falls within:  A manufacturer may authorize a "fleet owner" to perform warranty repairs "if the manufacturer determines that the fleet owner has the same basic level of requirements that are required of a franchise dealer." *Id.* §32:1261(A)(1)(t)(ii).  "Fleet owner" is defined (in relevant part) as a "renting or leasing company that rents, maintains, or leases vehicles to a third party."  *Id.* §32:1261(A)(1)(t)(i).  Tesla (operating through the three plaintiffs to this lawsuit) meets the definition of "fleet owner" as a lessor of vehicles and thus currently provides warranty services at a New Orleans service center.  ROA.1615 (¶¶176,

180).  If, however, the fleet-owner provision were improperly construed to exclude Tesla, Tesla would be barred from performing warranty services in Louisiana.

By offering leasing and fleet-warranty services (though not selling), Tesla has competed in Louisiana against the long-entrenched franchise dealers. ROA.1610 (¶¶145-147); *see* ROA.1625 (¶241).  Instead of responding to Tesla's entry by improving and innovating their business models—by competing with each other and with Tesla in the free market—the Dealer Cartel's members have conspired to exclude Tesla from Louisiana and keep other innovative electric-vehicle manufacturers from ever entering the market.  ROA.1589 (¶¶5-6).

## C.    The Dealer Cartel's Control Of The Commission

The Dealer Cartel has pursued this conspiracy through its control of the Louisiana Motor Vehicle Commission.  ROA.1590-1591 (¶¶13-14).  The Commission regulates the distribution and sale of motor vehicles in Louisiana, including the licensing of dealers, manufacturers, and distributors.  La. R.S. §32:1253.

Of the eighteen members of the Commission, fifteen exercise the power at issue here.  *See* La. R.S. §32:1253(A)(3)(a).[1]  All fifteen of those Commissioners must be appointed "licensee[s]" of the Commission and retain those licenses while

---

[1] The other three are consumers serving as "public member[s]" whose "sole function" is "hearing and deciding matters" unrelated to this case.  La. R.S. §32:1253(A)(3)(a).

they serve on the Commission. *Id*. § 32:1253(A)(2). Nine of the fifteen—a controlling majority—are franchise automobile dealers who directly compete with Tesla. ROA.1596-1601 (¶¶47, 57-94). The remaining six are involved in other parts of the motor-vehicle industry (like "motorcycle" or "marine product" sales), but they may still be franchise dealers, and they may affiliate as business partners with franchise dealers who directly compete with Tesla. ROA.1601-1602 (¶¶95-106); *see* La. R.S. §32:1270(E). Thus, the Commission's votes are controlled by active market participants who not only compete with Tesla, but who perceive Tesla as an existential threat to their businesses.

The nine automobile-dealer Commissioners are all members of the Louisiana Automobile Dealers Association (LADA). ROA.1594 (¶¶36-37). LADA is a trade association that "represent[s] nearly 350 new motor vehicle car and heavy truck dealers" in the state. ROA.1593 (¶30). A revolving door exists between LADA leadership and the Commission that LADA has used to facilitate the challenged illegal agreement. ROA.1594 (¶¶36-38).

### D.    The Agreement To Exclude Tesla

The Dealer Cartel's members have, working with and through LADA and the Commission, sought to drive Tesla from the state. ROA.1594 (¶¶33-34); ROA.109. Defendant-Commissioner Allen Krake acknowledged that over "five

years," LADA "met numerous times" with the Commission to discuss excluding Tesla from the market. ROA.1594 (¶38); ROA.98.

The result of those "numerous" meetings was an agreement to wield the Commission's power to target Tesla with a baseless investigation aimed at increasing Tesla's business costs, creating a cloud over the legality of its existing operations in Louisiana, and harassing and intimidating it out of Louisiana. ROA.1630 (¶¶247-248). This campaign targeted Tesla's warranty servicing operations as a fleet owner, even though "[t]he commission has no authority over a fleet owner." La. R.S. §32:1261(A)(1)(t)(v). The Dealer Cartel knows that the ability to provide warranty servicing is fundamental to effective competition in this market. ROA.1628 (¶242(b)-(c)). Consumers need assurances that warranty service work will be available when they need it, and they are unwilling to travel long distances to obtain it. ROA.1628 (¶242(b)-(c)). Thus, if Tesla were unable to offer warranty servicing in Louisiana, it would impair its ability to compete. ROA.1632 (¶253). In fact, simply clouding Tesla's warranty service operations with legal uncertainty discourages consumers from leasing Tesla cars, out of concern about the ability to access warranty services during their leases. ROA.1632 (¶253).

The Dealer Cartel agreed to target Tesla's warranty service operations at least as early as when Tesla announced plans to open a New Orleans service

center.  On July 17, 2018, upon learning of those plans, Paul Stodred, a member of the Dealer Cartel from Louisiana's largest dealer group, emailed Defendant-Commissioner Joseph Westbrook, stating that "this is not good for the future of our business if the state lets this happen."  ROA.1616 (¶186).  When Commissioner Westbrook forwarded Mr. Stodred's email to Lessie House, the Commission's Executive Director, with the clear implication that she needed to act, Ms. House responded:  "On top of it."  ROA.1616 (¶187).  The same day, Mat Baer of Bohn Brothers Investments, another Dealer Cartel member, also brought the New Orleans service center to Ms. House's attention, to which House responded:  "We are on top of this."  ROA.1616 (¶¶184-185).[2]

The Commission initiated its "investigation" of Tesla—the result of this illegal agreement—on August 5, 2020, when it agreed to issue a subpoena to TLT for records relating to its activities in Louisiana.  ROA.1619-1620 (¶¶204-205).  Unaware of the illegal conspiracy, and given the subpoena's narrow scope, TLT responded.  ROA.1620 (¶205).  A month later, the Commission agreed to issue a second subpoena, seeking records back to October 2013.  ROA.1620 (¶205).  In February 2021, the Commission replaced the second subpoena with a third

---

[2] These communications were obtained as part of a (clearly incomplete) response to Tesla-submitted public records requests.  ROA.1621 (¶¶212-216)).  Tesla anticipates that discovery will reveal additional, similar communications.

subpoena demanding records identifying vehicles leased in Louisiana and

"identifying and/or referencing warranty service and/or warranty repair performed

on any and all motor vehicles" in Louisiana from June 2019 to present.  ROA.119.

Tesla objected to the subpoena as exceeding the Commission's jurisdiction

because, again, the Commission "has no authority" over fleet owners.  ROA.1620-

1621 (¶¶207, 209-210).

The Commission then initiated motion-to-compel proceedings before itself.

During those proceedings, the Commissioners agreed to reject multiple requests by

Tesla to continue the hearing, and agreed to reject Tesla's request for a decision on

whether TLT is a fleet owner—even though that question determines jurisdiction.

ROA.1622-1623 (¶¶218-227).  Instead, the Commissioners agreed that Tesla must

respond to the subpoena.  ROA.1623 (¶222).  Tesla sought rehearing on multiple

grounds, but the Commissioners agreed to reject those arguments.  ROA.1623

(¶¶225-226).  At least nine of the Commissioners who voted on (and thereby

agreed to) these decisions were Tesla's direct competitors and members of the

Dealer Cartel.  ROA.1623-1624 (¶¶227-230).  Each vote was the byproduct of an

illegal agreement.  ROA.1623 (¶224); ROA.1630 (¶247).

Tesla subsequently petitioned for judicial review in state court seeking

reversal of the Commission's decision to enforce the subpoena or a remand to

determine jurisdiction.  ROA.1624 (¶232).  Those proceedings are ongoing.

### E.    Procedural History

Tesla filed this lawsuit on August 26, 2022 against all eighteen Commissioners in their official capacities; the fifteen non-consumer, licensee Commissioners in their individual capacities; those fifteen Commissioners' affiliated dealerships; and LADA.  ROA.38; ROA.1593-1603 (¶¶30-109).  The operative first amended complaint (ROA.1588-1660) asserts (among other claims): (1) a claim under Section 1 of the Sherman Act related to the illegal agreement to exclude Tesla; (2) a claim that the Commission's adjudicatory authority over Tesla violates the Due Process Clause; and (3) a claim that Louisiana's laws banning non-franchising manufacturers from direct-sales and non-fleet warranty-servicing violate the Equal Protection Clause.

The district court dismissed Tesla's complaint with prejudice.  ROA.2396. As to the Sherman Act claim, the district court held that the private defendants (including the Commissioners in their individual capacities) were shielded by the *Noerr-Pennington* doctrine.  ROA.2333-2334.  The court dismissed the claim against the official-capacity Commissioners on the basis that Tesla's allegations did not adequately allege a conspiracy.  ROA.2353-2356.  With respect to the due process claim, the court held that Tesla failed to plausibly allege that the Commissioners had an economic stake in regulating Tesla's leasing and servicing activities sufficient to establish a constitutional violation.  ROA.2375.  And with

respect to the equal protection claim, the district court upheld both the direct-sales and warranty-servicing bans, finding that they could conceivably be understood as protecting consumers and preventing monopolies by manufacturers.  ROA.2384.

## SUMMARY OF ARGUMENT

I.      The district court erred in dismissing Tesla's Sherman Act claim.  The court misunderstood Tesla's allegations as involving an illegal agreement merely between the Commissioners on the one hand and LADA on the other, when in fact, Tesla alleged an agreement among all dealers (i.e., among the entire Dealer Cartel), including the dealer-Commissioners.  That conspiracy is supported by direct evidence in the form of the Commissioners' votes against Tesla and by "smoking-gun" exchanges between cartel members that discuss the conspiracy (which the district court inaccurately characterized as one-sided complaints).  The conspiracy was also supported by circumstantial evidence because the members of the Dealer Cartel (including the dealer-Commissioners) are all financially-interested market participants with a clear motive to exclude Tesla and the opportunity to conspire through LADA and Commission meetings.  Nothing more is needed.

The district court committed several additional errors.  It required Tesla to prove an "intention 'to achieve an unlawful objective,'" ROA.2356, even though evidence of an agreement and anticompetitive effect suffices.  And it assumed that

the Commissioners had a good-faith law-enforcement purpose, which is both legally irrelevant and implausible given that the majority of Commissioners are franchise dealers who compete with and have strong financial incentives to exclude Tesla.

Further, the district court incorrectly held that the private defendants (including the Commissioners in their individual capacities) were shielded by *Noerr-Pennington*. *Noerr-Pennington* does not protect agreements among financially-interested market participants to use their own governmental power to exclude a competitor.

II.    The district court erred in dismissing Tesla's due process claim.  By wielding its government authority to protect its members' narrow economic interests against a disruptive competitor, the Commission's actions violate the Due Process Clause.  In holding otherwise, the district court incorrectly equated the Commissioners' direct and substantial bias against Tesla with run-of-the-mill forms of industrial self-regulation lacking any similar bias, and incorrectly demanded evidence of actual partiality at the pleading stage—while overlooking Tesla's allegations of such partiality.

III.    Finally, the district court erred in dismissing Tesla's equal protection claim.  The only conceivable purpose for Louisiana to ban non-franchising manufacturers from direct-sales and non-fleet warranty-servicing is economic

- 16 -

protection of franchise dealerships.  This Court has held that such industry

protectionism is not a legitimate purpose for rational-basis review.  The district

court relied on cases involving laws protecting franchise dealerships from potential

abuses by their own franchising manufacturers.  But the rationales supporting such

laws cannot justify banning *non-franchising* manufacturers like Tesla who have no

franchises at risk of abuse.

<div align="center">

**STANDARD OF REVIEW**

</div>

A district court's order granting a motion to dismiss for failure to state a

claim is reviewed de novo.  *Jeanty v. Big Bubba's Bail Bonds*, 72 F.4th 116, 119

(5th Cir. 2023).  This Court accepts all well-pleaded factual allegations as true and

views them in the light most favorable to the plaintiff.  *Groden v. City of Dallas*,

826 F.3d 280, 283 (5th Cir. 2016).

<div align="center">

**ARGUMENT**

</div>

I. **TESLA PLAUSIBLY ALLEGED AN ANTITRUST VIOLATION**

A. **Tesla Plausibly Alleged An Illegal Agreement**

Section 1 of the Sherman Act prohibits conspiracies that threaten to exclude

competitors from a relevant market.  *See United States v. General Motors Corp.*,

384 U.S. 127, 148 (1966).  To establish a Section 1 violation, "plaintiffs must show

that the defendants (1) engaged in a conspiracy (2) that produced some anti-

competitive effect (3) in the relevant market." *Abraham & Veneklasen Joint Venture v. American Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015).

The district court concluded that Tesla failed to plausibly plead the first element, but the court mistakenly analyzed Tesla's allegations as involving an agreement between the Commissioners on the one hand and LADA on the other. ROA.2356.  In fact, Tesla alleged an agreement among the entire Dealer Cartel, including the dealer-Commissioners.  The complaint included more than enough facts to plausibly allege such an agreement:  The consistent votes against Tesla are alone enough to establish a plausible agreement among at least the Commissioners, and the other cartel members' communications about excluding Tesla establish that they were parties to the agreement as well.

> **1.    Tesla Plausibly Alleged An Agreement That, At Minimum, Encompassed The Commissioners**

To allege a conspiracy at the pleading stage, antitrust plaintiffs need only provide "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Plaintiffs may do so by pleading "either direct or circumstantial evidence." *Tunica Web Advert. v. Tunica Casino Ass'n*, 496 F.3d 403, 409 (5th Cir. 2007). Circumstantial evidence may include, among other things, "a motive to conspire," "an opportunity to conspire," or "market concentration and structure conducive to collusion." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696,

711 (E.D. La. 2013); *see also SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 431-432 (4th Cir. 2015).

A plaintiff plausibly alleges an unlawful agreement where financially-interested market participants vote to use their control of a government body to weaken or harass a competitor. Such a vote is direct evidence of an illegal agreement, and no further evidence is required at the pleading stage. In *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110 (9th Cir. 2022), for example, the Ninth Circuit reversed the dismissal of an antitrust claim under which "the Dental Board of California—largely made up of traditional dentists and orthodontists who have a financial motive to view … newcomers as competition—allegedly conspired to harass" direct-to-consumer teeth aligners "with unfounded investigations and an intimidation campaign." *Id.* at 1115. The dentist board members' "governance role [was] sufficient, when coupled with the congruence between the Board's actions and their own self-interest, to allow a plausible inference of active participation" in an anticompetitive conspiracy. *Id.* at 1119. Similarly, in *North Carolina State Board of Dental Examiners v. FTC* (*Dental Examiners I*), 717 F.3d 359 (4th Cir. 2013), the Fourth Circuit found direct evidence of a conspiracy (on a full evidentiary record) when a regulatory board controlled by financially-interested, practicing dentists "'discussed teeth whitening

services provided by non-dentists and then voted to take action to restrict those services.'" *Id.* at 373.

The rule applied in *SmileDirectClub* and *Dental Examiners*—that an anti-competitive vote alone evidences an agreement—aligns with similar, longstanding precedent involving trade associations. The Supreme Court and lower appellate courts have repeatedly held that the adoption of an anticompetitive policy by a trade association constitutes legally sufficient direct evidence of an agreement. *E.g.*, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (federation policy constituted "horizontal agreement among the participating dentists"); *Associated Press v. United States*, 326 U.S. 1, 8-12 (1945) (association's adopted "By-Laws in and of themselves were contracts in restraint of commerce"); *Osborn v. Visa Inc.*, 797 F.3d 1057, 1066-1067 (D.C. Cir. 2015) (allegations that defendants "fixed an element of access fee pricing through bankcard association rules" sufficient to plead agreement). In these cases, the "very passage" of the association's anti-competitive rules "establishes that the defendants convened and came to an agreement." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289 (4th Cir. 2012).

The law is no different when private market participants wield governmental authority to adopt an anticompetitive policy. As the Supreme Court has explained, "[i]n important regards, agencies controlled by market participants are more

similar to private trade associations" than "prototypical state agencies," and the "similarities … are not eliminated simply because [they] are given a formal designation by the State, vested with a measure of government power." *Dental Examiners II*, 574 U.S. 494, 511 (2015).

As in *SmileDirectClub* and *Dental Examiners*, the Commissioners' consistent votes against Tesla in this case are direct evidence of an illegal agreement. ROA.1623-1624 (¶¶224, 227-230). Like the dental boards, the Commission is controlled by financially-interested market participants who voted to wield their governmental power to harass a competitor with the ultimate goal of exclusion. ROA.1594-1596 (¶¶36, 47). The Commissioners agreed to issue three subpoenas to Tesla requesting large swaths of information as part of an unfounded and harassing investigation. *See* ROA.1615, ROA.1619-1620 (¶¶175, 204-208). And when Tesla objected to one of those subpoenas, the Commissioners agreed to (1) deny Tesla a continuance for lack of jurisdiction, (2) uphold the Commission's subpoena authority, and (3) enforce Tesla's compliance. ROA.1623-1624 (¶¶224-230). Those votes are, contrary to the district court's conclusion, critical "allegations related to the conduct of … individual commissioners." ROA.2336.

The Commissioners' financial interest in excluding Tesla supplies an obvious motive to conspire—again like the financial interest of the government actors in *SmileDirectClub* and *Dental Examiners*. As the complaint explained, the

controlling majority of Commissioners perceive Tesla as an existential threat. ROA.1594-1596 (¶¶34, 36, 47). Tesla's innovative direct-to-consumer model eliminates the add-ons, mark-ups, and upsells "that make the franchise-dealer model profitable for dealers." ROA.1607-1610 (¶¶135-143). Given those consumer benefits, "[i]f Tesla and future entrants continue to compete in Louisiana, … consumers will … choose Tesla vehicles" and other direct-to-consumer options, which in turn "will cause other vehicle manufacturers to reevaluate their dealer-centric business models." ROA.1614 (¶172). The Commissioners therefore have a strong financial interest in protecting their entrenched business model by excluding Tesla. ROA.1594-1596 (¶¶34, 36, 47). The "congruence" between the Commissioners' actions against Tesla "and their own self-interest" further establishes a plausible conspiracy. *SmileDirectClub*, 31 F.4th at 1119; *see Dental Examiners I*, 717 F.3d at 373.

No further allegations are necessary to support a plausible agreement among the Commissioners. By instead construing *SmileDirectClub* to require additional evidence of "false statements" or "misconduct" (ROA.2356), the district court committed reversible error.

**2.    Tesla Plausibly Alleged That The Non-Commissioner Defendants Were Parties To The Agreement**

Tesla also plausibly alleged that the illegal agreement extended to the non-Commissioner members of the Dealer Cartel—that is, to the private dealership defendants, all other members of LADA, and LADA itself.

As just explained (pp.19-22), the dealer-Commissioners' consistent votes against Tesla constitute direct evidence of an illegal agreement.  And additional direct evidence tying the non-Commissioner cartel members to the agreement is found in their communications about excluding Tesla.  One of the dealer-Commissioners acknowledged that the broader Dealer Cartel (including the Commissioners) "met numerous times" over a five-year period to discuss the conspiracy and the competitive threat posed by Tesla.  ROA.1594-1595 (¶38); *see In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (plausible conspiracy evidenced by allegations that defendants "exchanged … information directly at association meetings").  That admission alone refutes the district court's determination that the Commissioners' relationship with LADA amounted to "mere membership."  ROA.2350.

Additional communications uncovered in the (facially incomplete) response Tesla received to its public records request showed that multiple members of the Dealer Cartel emailed Commissioners about how Tesla's entry was "not good for … our business."  ROA.1616 (¶¶181-187).  The district court characterized these

communications as "one-sided complaints," ROA.2350-2351, but that is wrong because the Commission's Executive Director's consistent response was, "We are on top of this." ROA.1616 (¶¶184-185). These "'exchanged assurances of common action'" are recognized evidence of an illegal agreement. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004).

This Court has confirmed, in fact, that such statements constitute "direct evidence" of a conspiracy. *Tunica*, 496 F.3d at 410. In *Tunica*, this Court reversed summary judgment to defendants, concluding that the district court had overlooked evidence that one defendant's employee had informed the plaintiffs of a "'gentlemen's agreement' to not do business with" them. *Id.* at 407-408. Those statements alone "create[d] a fact issue about whether the [defendants] engaged in concerted action." *Id.* at 410. Here, Tesla's evidence is at least as strong as in *Tunica* because it depicts communications *between* the co-conspirators about the alleged conspiracy. If such evidence suffices to avoid summary judgment, it necessarily "raise[s] a reasonable expectation that discovery will reveal" further "evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

Tesla also plausibly alleged facts demonstrating the Dealer Cartel's shared motive and opportunity to conspire. With respect to motive, the private and official-capacity defendants alike have strong financial incentives to exclude Tesla and other direct-to-consumer manufacturers because they are perceived as an

existential threat to the franchise-dealership model.  ROA.1607-1610 (¶¶135-143); *see Starr v. Sony BMG Music Enter.*, 592 F.3d 314, 324 (2d Cir. 2010) (fear of lost profits provided plausible motive to conspire).  As for opportunity, Tesla provided extensive allegations about the private defendants' intermingled relationship with the Commissioners, facilitated by LADA.  *E.g.*, *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 476 (6th Cir. 2005) (opportunity to exchange information supports inference of agreement).  Indeed, all nine dealer-Commissioners are members of LADA, and some have served on LADA's board.  ROA.1597-1601 (¶¶60-61, 65, 69, 73, 77, 81, 85, 89, 93).  And those nine dealer-Commissioners control the Commission's agenda.  ROA.1594-1596 (¶¶36, 47).  Taking all this direct and circumstantial evidence together, Tesla alleged a plausible conspiracy among the entire Dealer Cartel.

### 3.    The District Court's Ruling Rested On Several Legal Errors

The district court committed multiple legal errors in finding Tesla's allegations insufficient.

*First*, the district court improperly assessed each category of evidence in isolation—addressing and dismissing, one by one, the Commissioners' investigation, LADA's role, and the cartel's communications.  ROA.2350-2355.  This enabled the court to assume the Commissioners' good faith, despite all plausible evidence to the contrary.  But antitrust plaintiffs are entitled to the "full

- 25 -

benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id.* Viewing the allegations "as a whole," Tesla plausibly alleged an agreement.

*Second*, the district court erred in requiring Tesla to "demonstrate an intention … to engage in a conspiracy *for the purpose of unreasonably restraining trade*." ROA.2355-2356 (cleaned up) (emphasis added). The district court relied on *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368 (5th Cir. 2014), but *Marucci* never held that antitrust plaintiffs must plead an "intention to 'achieve an unlawful objective.'" *Contra* ROA.2356. Rather, *Marucci* held that plaintiffs must "independent[ly] allege … actual agreement," 751 F.3d at 375, as opposed to mere "parallel conduct," *Twombly*, 550 U.S. at 564. When (as here, *supra* pp.19-25) such an agreement has been alleged, an antitrust violation can then "be established by proof of *either* an unlawful purpose *or* an anticompetitive effect." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436 n.13 (1978) (emphasis added).

Here, Tesla's allegations were more than adequate to plead anticompetitive effect: As explained (*supra* p.11), if Tesla and other direct-to-consumer manufacturers cannot offer warranty servicing in Louisiana free from unwarranted

legal scrutiny, their ability to compete will be impaired because consumers require assurances that warranty services will be readily (and locally) available before they buy or lease a new vehicle.  ROA.1632 (¶253).

And even if Tesla *were* required to plead an intent to achieve an unlawful purpose, it did so.  The complaint alleged that the conspiracy's "purpose [is] to restrain trade by eliminating Tesla from the relevant market and discouraging new entry."  ROA.1629 (¶244).  That purpose is certainly plausible given the extensive allegations (*supra* pp.21-25) about the cartel's economic self-interest to safeguard its imperiled business model.  This reflects paradigmatic anticompetitive intent. *General Motors*, 384 U.S. at 145-148.

***Third***, the district court improperly demanded allegations foreclosing the possibility that the Commissioners had acted lawfully.  For example, the court expressed its belief that the Commissioners' investigation was "consistent with the Commission's … interpretation" of the fleet-owner provision because it sought "to ascertain whether Tesla's warranty work was provided only on vehicles in its own fleet."  ROA.2354.

That is irrelevant.  As *SmileDirectClub* explained, requiring allegations inconsistent with regulatory purpose "effectively grant[s] [defendants] antitrust immunity without holding them to the strictures of the state-action immunity doctrine."  31 F.4th at 1117.  No such requirement exists because a regulatory

board's "concerted action can be unreasonable under the Sherman Act—even if [it] seek[s] to achieve [its] anticompetitive aims through the exercise of valid regulatory authority." *Id.* at 1120.  It is "well settled that acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." *Continental Ore*, 370 U.S. at 707.  Thus, even if the Commissioners' conduct were authorized under Louisiana law, they would violate the Sherman Act if they agreed to exercise their regulatory discretion with the objective or effect of excluding Tesla (both of which the complaint plausibly alleged). *See SmileDirectClub*, 31 F.4th at 1118-1120.

In any event, Tesla alleged that bona fide enforcement of the fleet-owner provision was not the Commissioners' *only* plausible objective, by alleging that the Commissioners' investigation was pretextual cover for an anticompetitive agreement.  ROA.1620 (¶205).  The district court therefore missed the point in focusing heavily on its belief that the Commission adopted a reading of the fleet-owner provision "more favorable to Tesla than the interpretation advanced by LADA," ROA.2354.  Tesla alleged that difference in the parties' publicly-claimed positions is illusory, because the Commissioners' stated position is a sham designed to "credibly … remove Tesla."  ROA.1620 (¶¶205, 208).  Given the Commissioners' status as active market participants and their obvious interest in excluding direct-to-consumer competitors, that allegation was certainly *plausible*.

*See SmileDirectClub*, 31 F.4th at 1118-1119; *Dental Examiners I*, 717 F.3d at 373.

To the extent genuine law enforcement is a plausible *additional* or *alternative*

explanation for the Commissioners' concerted action, "[f]erreting out the most

likely reason for the defendants' actions is not appropriate at the pleadings stage."

*Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*, 648 F.3d 452,

458 (6th Cir. 2011).  By requiring Tesla to disprove the possibility of lawful

purpose and independent conduct, the district court "applied a standard more

appropriate at the summary judgment stage."  *SmileDirectClub*, 31 F.4th at 1118,

1121.

### B.     *Noerr-Pennington* Does Not Apply

The district court held that Tesla's antitrust claim against LADA, the

dealership defendants, and the Commissioners in their individual capacities was

barred by the *Noerr-Pennington* doctrine, which the court understood as protecting

those defendants' efforts to "encourage the government" (i.e., the Commission) "to

investigate their competitors."[3]  ROA.2333-2341.  *Noerr-Pennington* does not

apply, however, when, as here, the government body is controlled by active market

participants with a financial stake in the anticompetitive restraint.  In those

---

[3] The official-capacity defendants never argued below that they were protected by
*Noerr-Pennington*.  Any such defense would have failed anyway, because "it is
impossible" for the Commission "to petition itself."  *Video Int'l Prod., Inc. v.
Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1086 (5th Cir. 1988).

circumstances, because "private individuals generated the restraint," *Matter of Superior Ct. Trial Lawyers Ass'n*, 107 F.T.C. 510, 583 (1986), "the decisionmaking process …, while nominally public, is actually private within the meaning of the antitrust doctrine," Elhauge, *Making Sense of Antitrust Petitioning Immunity*, 80 Calif. L. Rev. 1177, 1200 (1992).  As a result, "no immunity applies." *Id.* at 1201.

This is precisely what Tesla alleged here.  The complaint alleged that the Commission is controlled by active dealers who share their co-conspirators' financial interest in excluding a competitor.  The complaint alleged, moreover, that all dealers in the cartel (both those currently serving on the Commission and those who are not) agreed to exclude Tesla by exercising the governmental power already under their shared control.  Indeed, because the conspiracy already controlled the requisite governmental power, there was no need to petition.  In those circumstances, the Supreme Court has on multiple occasions confirmed that *Noerr-Pennington* does not apply.  *See Continental Ore*, 370 U.S. 690; *United Mine Workers v. Pennington*, 381 U.S. 657, 671 (1965); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988).

1.     First, in *Continental Ore*, the Supreme Court held that antitrust claims could be brought against a vanadium producer that excluded competitors through use of a corporate subsidiary that had been appointed an agent of the Canadian

government and given "discretionary agency power to purchase and allocate to Canadian industries all vanadium products." 370 U.S. at 702-704 & n.11. The Ninth Circuit below had, citing *Noerr*, ruled that the producer's efforts "to persuade and influence the Canadian Government through its agent" were not "within the purview of the Sherman Act." 289 F.2d 86, 94 (9th Cir. 1961). The Supreme Court reversed, finding *Noerr* "plainly inapposite." 370 U.S. at 707. Although the subsidiary had—like the dealers here—been conferred discretionary governmental authority, it had allegedly exercised that authority "under the control and direction" of its parent company, with the purpose of excluding competitors. *Id.* at 703, 706. On that basis, the Court concluded that the defendants were engaged in "private commercial activity" unprotected by *Noerr*. *Id.* at 707. Subjecting the defendants "to liability under the Sherman Act for eliminating a competitor from the Canadian market by exercise of the discretionary power conferred upon [the defendant subsidiary] by the Canadian Government would effectuate the purposes of the Sherman Act and would not remotely infringe upon any of the constitutionally protected freedoms spoken of in *Noerr*." *Id.* at 707-708.

Three years later, in *Pennington*, the Court reinforced that holding. As in *Continental Ore*, the *Pennington* defendants sought to exclude competitors by influencing a governmental purchasing decision (this time, the purchase of coal). The difference, though, was that the government-appointed purchaser in

*Pennington* was the Tennessee Valley Authority (381 U.S. at 660-661), an entity *not* controlled by financially-interested market participants. The Court therefore barred liability, explaining that *Continental Ore* was "wholly dissimilar." *Id.* at 671 n.4. The "operative difference," was that "in *Continental Ore* the public official imposing the challenged restraint was financially interested in the anticompetitive consequence of that restraint, whereas in *Pennington* the public official was not." Elhauge, 80 Calif. L. Rev. at 1201.

2.  The Supreme Court's recent decision in *Dental Examiners II* further confirms that *Noerr-Pennington* is inapplicable when the anticompetitive restraint is imposed by a government entity controlled by financially-interested market participants. *Dental Examiners II* denied *Parker* state-action immunity to a regulatory board comprising practicing dentists who had sought to exclude non-dentist teeth whitening providers. In doing so, the Court emphasized that "active market participants cannot be allowed to regulate their own markets free from antitrust accountability." 574 U.S. at 505. "[A]gencies controlled by market participants," the Court explained, "are more similar to private trade associations," where "'[t]here is no doubt that the members … often have economic incentives to restrain competition.'" *Id.* at 511 (quoting *Allied Tube*, 486 U.S. at 500). Given those incentives and the "risk of self-dealing," *Dental Examiners II* held that "[w]hen a State empowers a group of active market participants to decide who can

participate in its market, and on what terms, the need for supervision [by the State] is manifest." *Id.* at 510-511.  Because such supervision was lacking over the dental board, *Parker* was inapplicable.

The same interests underlying the decision in *Dental Examiners II* apply equally here.  *Parker* and *Noerr-Pennington* "are complementary expressions of the principle that the antitrust laws regulate business, not politics; [*Parker*] protects the States' act of governing," while *Noerr-Pennington* protects "citizens' participation in government."  *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 383 (1991).  The two doctrines therefore "generally present two faces of the same coin."  *Id.*  To be sure, as the district court observed (ROA.2340), the doctrines may not always apply in tandem; *Noerr-Pennington* might protect petitioning of government action "that turns out later to be insufficiently authorized" under *Parker*.  Areeda & Hovenkamp, *Antitrust Law* ¶229 (2022).  But that is irrelevant here, where the critical fact is that those imposing the anticompetitive restraint financially benefit from that restraint.  If, under *Parker*, it is "an axiom of federal antitrust policy" to "prohibit[]" such "anticompetitive self-regulation," *Dental Examiners II*, 574 U.S. at 505, then the same should be true under *Noerr-Pennington*.  When should-be competitors with shared financial interest band together to harm competition, they are subject to antitrust liability.

3.     The Supreme Court's other cases involving *Noerr-Pennington* further confirm that immunity is inapplicable when the anticompetitive restraint is imposed by financially-interested market participants.  In *Allied Tube*, the Court declined to extend *Noerr-Pennington*'s protection to efforts to influence votes of the National Fire Protection Association (NFPA), whose product standards were "widely adopted into law by state and local governments."  486 U.S. at 495.

Looking to the "source, context, and nature of the anticompetitive restraint", the Court determined that the defendant's conduct was (like in *Continental Ore*) best characterized as "commercial activity" that was unprotected by *Noerr-Pennington*.  *Allied Tube*, 486 U.S. at 499, 505.  The NFPA, the Court noted, was a "private association" rather than a "'quasi-legislative' body."  *Id*. at 500-501.  But contrary to the district court's reading (ROA.2339), that is not the only reason why the Supreme Court rejected *Noerr-Pennington* immunity.  After all, the Court recognized that "efforts to influence the Association's standard-setting process" were likely "the most effective means of influencing legislation," and that the defendant targeted the NFPA's standards in a "genuine effort to influence governmental action."  486 U.S. at 502-503.  The Court nonetheless refused to apply *Noerr-Pennington* because, similar to *Continental Ore*, the "restraint [was] imposed by persons unaccountable to the public and without official authority, many of whom [had] financial interests in restraining competition."  *Id.* at 502; *see*

*also id.* at 501 (citing *Continental Ore* in stressing that NFPA was "composed, … of persons with economic incentives to restrain trade"). The restraint therefore "involve[d] the exercise of market power" and "resulted from private action." *Id.* at 502, 507.

So too here. The entity imposing the challenged restraint—the Commission—is "under the control and direction" of market participants with a direct financial interest in restraining competition. *Continental Ore*, 370 U.S. at 703; ROA.1596 (¶47). As in *Allied Tube*, the private defendants "did not confine" themselves to "persuad[ing] …an independent decisionmaker," but rather combined with other similarly self-interested market actors to directly impede competition. 486 U.S. at 507; *see also Superior Ct. Trial Lawyers,* 107 F.T.C. at 596 (*Noerr-Pennington* generally applicable where "government has played the role of an independent decision maker"). That is "commercial activity"—the exercise of "market power"—subject to the antitrust laws. *Allied Tube*, 486 U.S. at 505, 507.

4. The district court believed that *City of Columbia* compelled *Noerr-Pennington*'s application (ROA.2334-2335), but that ignored the distinction drawn in *Continental Ore*, *Pennington*, *Allied Tube*, and *Dental Examiners II* between financially-interested and financially-disinterested decisionmaking bodies. *City of Columbia* applied *Noerr-Pennington* to efforts to influence an electorally-

accountable city council, 499 U.S. at 368, which was not made up of any

financially-interested market participants and had "no private price-fixing agenda,"

*Dental Examiners II*, 574 U.S. at 511. The city council was accordingly "more

like prototypical state agencies, not specialized boards dominated by active market

participants." *Id.* Nothing in *City of Columbia* addressed whether *Noerr-*

*Pennington* applies to private agreements among market participants to use their

governmental authority to act anticompetitively.

## II.    TESLA PLAUSIBLY ALLEGED A VIOLATION OF THE DUE PROCESS CLAUSE

Tesla alleged that the Commission has wielded its authority to protect its

Commissioners' narrow economic interests against a disruptive competitor. The

Due Process Clause prohibits such a biased exercise of government power.

### A.    The Due Process Clause Does Not Permit One Segment Of An Industry To Use Its Control Of A State Board To Exclude Competitors

The fundamental guarantee of the Due Process Clause is a neutral decision

maker. Few things threaten that guarantee more than granting self-interested

economic actors the government authority to decide the rights of their direct

competitors. But that is precisely what Louisiana's laws do.

In the context of economic regulation, the quintessential due process

violation occurs when the government "giv[es] a self-interested entity regulatory

authority over its competitors." *Association of Am. Railroads v. U.S. Department*

*of Transp.* ("*Amtrak III*"), 821 F.3d 19, 27 (D.C. Cir. 2016).  The reason is simple: due process, at its core, means that "those with substantial pecuniary interest in legal proceedings should not adjudicate" such proceedings.  *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973); *see also Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 511 (5th Cir. 2001) (applying same principle to "proceedings before an administrative agency").  And as the Supreme Court first explained nearly one hundred years ago, the delegation of regulatory power "to private persons whose interests may be and often are adverse to the interests of others in the same business"—i.e., their "competitor[s]"—is "clearly a denial of rights safeguarded by the due process clause."  *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

The Supreme Court has long applied that principle to invalidate adjudications conducted under regulatory arrangements like Louisiana's.  *Gibson v. Berryhill* addressed the constitutionality of actions taken by Alabama's Board of Optometry, a regulatory entity on which only independent optometrists in private practice were eligible to serve.  *See* 411 U.S. at 578-579.  The Court held that the Board's disciplinary actions against *commercial* optometrists (optometrists affiliated with retail stores) were unconstitutional because the Board members had a "substantial pecuniary interest" in the outcome of the relevant proceedings.  *Id.* at 579.  Specifically, "the aim of the Board was to revoke the licenses of all optometrists in the State who were employed by business corporations"—a

business model antithetical to the Board members' private-practice model. *Id.* at 578. Put simply, businesses are unlikely to fairly wield the legal power to exclude their own competition—and optometrists were no exception to that rule.

When presented with competitor-exclusion schemes after *Gibson*, the Supreme Court has summarily affirmed decisions declaring them unconstitutional. In *Wall v. American Optometric Association*, a three-judge court barred a state optometry board composed of "dispensing" optometrists (optometrists who also distribute lenses and frames) from exercising "complete control" over the market entry of "prescribing" optometrists (who affiliate with other business to dispense lenses and frames). 379 F. Supp. 175, 178-179 (N.D. Ga. 1974). The district court found "it inconceivable that" the dispensing-optometrist board members "could be called disinterested," because if prescribers "were prevented from practicing optometry in Georgia," many of those competitors' patients would likely "seek optometric services from" the board members. *Id.* at 188-189. The Supreme Court summarily affirmed. *Hardwick v. Wall*, 419 U.S. 888 (1974).

Tesla's due process claim falls squarely within this line of cases. The controlling majority of Commissioners "compete directly with Tesla," so the use of the Commission's "authority to bar a competitor plainly redounds to the … Commissioners' benefit." ROA.1638 (¶¶289-290). Moreover, Tesla is no ordinary competitor: Commissioners perceive Tesla as an existential threat to the

entire "franchised dealer model" on which the Commissioners depend.  ROA.1638 (¶291).  Thus, the Commissioners have particularly "strong incentives, including financial incentives, to keep Tesla from Louisiana consumers."  ROA.1591 (¶16). Unsurprisingly, Commissioners have used their power "to do what is 'good for the future'" of their businesses: exclude Tesla from the market, under the thin guise of "regulating."  ROA.1638 (¶293).

These are precisely the same interests present in *Gibson* and *Wall*.  Just as here, the optometrists had dual incentives to bar their competitors and to protect their professional model from a disruptive, commercial business model.  And just as here, they could not be trusted to neutrally decide the fate of their economic rivals.  Indeed, Tesla alleged not just structural incentives for partiality (as in *Gibson* and *Wall*), but concrete evidence that the Commissioners have joined with other private dealers in common purpose to exclude Tesla from the market.  *See supra* pp.23-24.

### B.     The District Court Erred By Dismissing Tesla's Claims As Implausible

In dismissing Tesla's allegations of bias as "implausible," the district court erroneously determined that the Commissioners had an incentive only to "exclude[] Tesla from the motor vehicle *sales* market"—not to "prevent Tesla from carrying out" "leasing and warranty repairs."  ROA.2372 (emphasis added).  But the complaint explained that leasing and servicing are critical parts of Tesla's

direct-to-consumer model that competes directly with the Commissioners'

franchise-dealer model.  Indeed, Tesla alleged that a controlling majority of the

Commission "directly compete[s] with Tesla in the market for vehicle sales,

*leasing, and servicing*," *e.g.*, ROA.1638 (¶47 (emphasis added)), and has "a

general interest in the franchised dealer model, under which manufacturers cannot

interact directly with consumers for any reason"—including for leasing and

servicing purposes, *e.g.*, ROA.1638 (¶291).  Tesla also alleged that its ability to

perform warranty servicing was essential to its business operations in Louisiana,

because "[a]bsent that ability, consumers would not purchase or lease Tesla

vehicles or would do so in substantially smaller numbers."  ROA.1608 (¶136).  As

noted (*supra* p.11), Tesla's ability to compete for sales or leasing would be

severely impeded if its customers were required to trek across state lines for every

service or repair appointment.  And of course, franchise dealers would happily take

the opportunity to make more money from warranty servicing themselves, in a

world where Tesla's customers have nowhere else to turn for those services.  This

is precisely why the Commissioners have been so eager to bar Tesla from offering

those services in Louisiana.  The Constitution, however, does not permit the

Commission to wield its administrative authority to advance its parochial

economic interests at competitors' expense.

The district court likewise erred in effectively requiring Tesla to negate possible defenses at the pleading stage. The court demanded a robust "record" of "actual partiality." ROA.2372. And it further demanded an explanation for the Commission's purported adoption of only the *second*-worst possible interpretation of the law for Tesla: namely, that Tesla may service leased, but not customer-owned, vehicles. ROA.2373. But again, while defendants may eventually argue, on a full record, that they were acting without bias and consistent with their good-faith interpretation of Louisiana law, "at the pleading stage, [plaintiffs] are not yet obliged to produce specific evidence to counter the [defendants'] merits arguments." *General Land Off. v. Biden*, 71 F.4th 264, 274 (5th Cir. 2023). And regardless, Tesla pleaded more than enough evidence of actual bias. As explained, the complaint alleged that the Commission is deliberately seeking to protect its members' financial interests by excluding Tesla from the market; that there are written communications supporting that purpose; and that the Commission is actively pursuing investigative measures to effectuate that purpose, while sidestepping the issue of its jurisdiction to conduct the investigation in the first place. *Supra* pp.9-13. Nothing more was required.

The district court also got the law wrong: There is no requirement that a plaintiff present evidence of actual partiality, because the *appearance* of partiality suffices to state a due process claim. *See, e.g., Marshall v. Jerrico, Inc.*, 446 U.S.

238, 242 (1980) ("The Due Process Clause … preserves both the appearance and reality of fairness[.]"); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *In re Murchison*, 349 U.S. 133, 136 (1955).

The district court's contrary legal rule is drawn from a line of inapposite cases that uniformly involve tenure and disciplinary proceedings at universities. *See* ROA.2371-2372.  They provide no guidance here.  First, the cases presented no structural cause for concern about bias whatsoever—they involved routine employment decisions, not self-interested actors' regulation of their economic competitors.  So, the cases say nothing about the level of additional proof (if any) required where, as here, there are overwhelming structural reasons to fear biased adjudication.  Second, these tenure cases all arose in procedural postures where a record had already been developed before the district court and it was thus sensible to probe that record for proof of partiality.  In *Megill v. Board of Regents of State of Florida*, for example, the plaintiff had "deposed seven Board members" and the evidentiary "record [was] complete" by the time the matter reached the court of appeals.  541 F.2d 1073, 1079-1082 (5th Cir. 1976).  *Duke v. North Texas State University* was likewise decided only after a hearing before the district court at which it received evidence and heard testimony.  469 F.2d 829, 839 (5th Cir. 1972).  And in all events, courts are uniquely "loathe to intrude into internal school affairs."  *Megill*, 541 F.2d at 1077; *see also Duke*, 469 F.2d at 834 ("[C]ourts

should not interfere with the day-to-day operations of schools[.]").  No similar skepticism exists for reviewing the acts of private parties whom the state has appointed as regulatory agents over their own industry.

### C.    Cases Permitting Industrial Self-Regulation Are Distinguishable

The district court also excused the Commission's unconstitutional bias by attempting to analogize to various factually inapposite cases in which courts have approved other forms of industrial self-regulation.  Those comparisons do not hold up to scrutiny.

### 1.    *Chrysler Corporation v. Texas Motor Vehicle Commission*

The district court relied on *Chrysler Corporation v. Texas Motor Vehicle Commission*, 755 F.2d 1192, 1199 (5th Cir. 1985), for the proposition that "an incentive to wield power to" a competitor's disadvantage "is not enough to state a claim under the Due Process Clause" against a regulatory entity.  ROA.2371.  But that elides a critical distinction between this case and *Chrysler*.

In *Chrysler*, an automobile manufacturer argued that a dealer-dominated commission was too biased to adjudicate warranty disputes between manufacturers and dealers—disputes that may arise from problems caused by manufacturing defects *or* by negligent dealer repair.  755 F.2d at 1198.  The dealer commissioners in *Chrysler* had at least as much incentive to take the side of a manufacturer against a rival dealer (with whom it competed for business) as they had to side with

a dealer against the manufacturer plaintiff. *Id.* at 1199. Thus, the Fifth Circuit

concluded that the "predictors of bias … point[ed] in opposite directions," meaning

that the adjudicator had no clear stake in the outcome of the proceedings before it.

*Id.* Here, by contrast, the "predictors of bias" point in a single direction—against

Tesla, whose direct-to-consumer model uniformly threatens the business model

used by all dealer Commissioners.

### 2. *Friedman v. Rogers*

The district court also relied on *Friedman v. Rogers* for the general—and

here, irrelevant—proposition that "regulatory boards are not unconstitutional

merely because they are composed of competitors of the entities they regulate."

ROA.2367 (citing *Friedman v. Rogers*, 440 U.S. 1, 18 (1979)). As the D.C.

Circuit has explained, the trouble in *Friedman* was that the "plaintiffs never

alleged the Board members would act out of self-interest instead of fairness, only

that the board's composition itself was unfair." *Amtrak III*, 821 F.3d at 35; *see*

*also Abramson v. Gonzalez*, 949 F.2d 1567, 1579 (11th Cir. 1992) (dismissing

claims under *Friedman* because "the plaintiffs' challenge focuses on the general

role of the [licensing board] in the profession, not any specific unfairness in a

disciplinary matter"). The *Friedman* plaintiffs, unlike their counterparts in *Gibson*

and *Wall*, identified no administrative action infected by bias—an action that

would enable the court "to examine in a particular context the possibility that the

members of the regulatory board might have personal interests that precluded a fair and impartial hearing." *Friedman*, 440 U.S. at 18.

By contrast, Tesla, like the *Gibson* and *Wall* plaintiffs, alleged that the Commissioners have and will continue to act out of self-interest to undermine Tesla's business and exclude it from the Louisiana market. *Supra* pp.38-39. That is very different from the situation in *Friedman*. Indeed, Tesla has even identified specific regulatory and investigative measures the Commission has *already* taken because of its bias. Those include the issuance of subpoenas, the Commission's refusal to continue its hearing, the adjudication of the motion to compel, the refusal of Tesla's request for a fleet owner determination, and the adjudication and denial of Tesla's motion for rehearing. ROA.1619-1624 (¶¶204-230).

### 3.    Traditional Industry Self-Regulation

Finally, the district court drew a false equivalence between organized cartels and the "common and accepted practice" of industrial self-regulation. *See* ROA.2368-2369 (quoting *New York State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n*, 198 F.3d 1, 13-14 (1st Cir. 1999)). But industrial self-regulation is permitted only when board members' pecuniary interest in the matters before them remains "slight." *Stivers v. Pierce*, 71 F.3d 732, 743 (9th Cir. 1995). By contrast, the Constitution prohibits industry boards from adjudicating matters in which their members have a "direct" and "substantial" interest. *Id.* Tesla alleged

the latter: Tesla directly threatens the Commissioners' business model, and the Commissioners expect to acquire Tesla's customers if they succeed in excluding the company from Louisiana. *See supra* pp.38-40.

Consider what a typical licensing board—the "common and accepted" sort the district court mentions—ordinarily looks like. Those boards, like the ones governing lawyers or doctors, usually address one-off licensing or disciplinary matters in a large market. With a board like that, the "level of attenuation" between the adjudicator's interest and any given proceeding is "remote." *New York State Dairy Foods*, 198 F.3d at 14. For instance, "it is unlikely that any attorney practicing in a city like Los Angeles would have a competitive interest sufficiently strong to require that he be disqualified from considering the licensing of an additional lawyer." *Stivers*, 71 F.3d at 743. But the danger of biased decision-making is far greater when a regulatory board can discipline a substantial portion of its competition at once, rather than just a tiny fraction. Indeed, "[a] lawyer in a one-lawyer town, for example, would probably have a 'direct' and 'substantial' pecuniary interest in the licensing of a competitor planning to hang a shingle across the street." *Id.* So too a barber who gets to decide whether his rival can open shop next door. *See Wilkerson v. Johnson*, 699 F.2d 325, 328 (6th Cir. 1983).

Here, just like the small-town lawyer, incumbent barber, or optometrists excluding a rival sect, the Commissioners can be confident that if they exclude Tesla from the market, the Commission's "individual members … would fall heir to [their competitors'] business." *Gibson*, 411 U.S. at 571. Tesla is no solo practitioner—it is a popular, growing automobile seller with a large existing and potential customer base. *See* ROA.1605 (¶¶121-122). If those customers cannot buy or lease from Tesla, they will turn instead to the Commission's members. And of equal significance, if the Commission fails in its mission to exclude Tesla from the market, its members will be exposed to the "substantial risk" that their "consumers will vote with their feet and choose Tesla vehicles and other direct to consumer automobile manufacturers" over vehicles sold via independent dealerships, threatening the dealerships' entire business model. ROA.1614 (¶172). Indeed, Tesla's entry into the market is routinely described by the press as an "existential" risk to the dealership model. *See, e.g.*, Weber, *How Tesla's Direct Sales Model Is Roiling The Car Dealership Industry*, The Week (June 21, 2023), https://theweek.com/us/1024416/tesla-vs-car-dealerships. It strains credulity to think that the Commission's members have only a "slight" pecuniary interest in preventing what has prominently been said to portend their economic extinction.

### III. TESLA PLAUSIBLY ALLEGED A VIOLATION OF THE EQUAL PROTECTION CLAUSE

Even if the Commission were capable of impartially enforcing the direct-sale and warranty-servicing laws, the laws' bans on non-franchising manufacturers directly selling vehicles or providing non-fleet warranty services independently violate the Equal Protection Clause.

#### A. Banning Non-Franchising Manufacturers From Directly Selling Or Performing Warranty Service Violates The Equal Protection Clause Because It Serves No Purpose But Protectionism

The Equal Protection Clause of the Fourteenth Amendment bars any government classification for which "no rational basis can or has been articulated." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 221 (5th Cir. 2013). "[A]lthough rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *Id.* at 223.

Banning non-franchising manufacturers from selling cars directly to customers and servicing customer-owned vehicles irrationally singles out those manufacturers for disfavored treatment. The laws treat similar parties differently by distinguishing non-franchising car manufacturers from franchise dealerships and independent service centers when it comes, respectively, to selling and servicing cars. And that distinction is irrational, as it serves no purpose other than pure protectionism.

As explained (*supra* pp.7-8), prior to 2017, state law merely barred car manufacturers from competing with their *own* franchise dealers. But in 2017, the State amended the law to prohibit non-franchising dealers—who have no franchises with whom they could possibly compete unfairly—from selling directly to customers. And at the same time, the Commission appears to have adopted the view that state law bans Tesla from performing warranty services on customer-owned vehicles—despite lacking any franchise dealers with which it might compete for warranty servicing. As Tesla alleged, "the only possible purpose behind" banning non-franchising dealers from direct sales and from non-fleet warranty servicing "is to protect Louisiana's local, in-State franchised auto dealers from economic competition." ROA.1642-1643 (¶¶323, 326). Indeed, Louisiana's laws are textbook examples of rent-seeking's triumph over rational economic regulation. *See, e.g.*, Kreps, *Microeconomics for Managers* §9.1, at p.202 (2d ed. 2019) (explaining that, with direct car sales permitted, the "manufacturer is better off" and "[t]he public is better off," but that "the retailer is unhappy").

This Circuit and others have squarely rejected the idea "that mere economic protection of a particular industry is a legitimate governmental purpose" capable of satisfying rational basis review. *St. Joseph Abbey*, 712 F.3d at 222; *see Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002); *Merrifield v. Lockyer*, 547 F.3d 978, 991 n.15 (9th Cir. 2008). The Constitution does not permit "the taking of wealth

and handing it to others … as 'economic' protection of the rulemakers' pockets."
*St. Joseph Abbey*, 712 F.3d at 226-227.  The Constitution accordingly bars both
laws at issue here.

Indeed, the direct-sale and warranty-servicing bans bear a striking
resemblance to the protectionist law this Court struck down in *St. Joseph Abbey*.
That case concerned a protectionist Louisiana law that "grant[ed] funeral homes an
exclusive right to sell caskets."  712 F.3d at 217.  It barred sales of caskets by any
persons or companies other than those favored middlemen.  This Court held that
the law denied equal protection to the plaintiffs—monks who wanted to sell
caskets directly to the public—because it could not be rationally justified on any
grounds other than "pure economic protection."  *Id.* at 221.

Though the state asserted other interests supporting its policy, those
rationales were so "nonsensical" as to be untenable bases for sustaining the
regulation.  *St. Joseph Abbey*, 712 F.3d at 226.  In reaching that conclusion, the
Court refused to adopt a policy of "blindness to the history of [the] challenged rule
[and] the context of its adoption."  *Id.*  The State's asserted interest in consumer
protection "obscure[d] the actual structure of the challenged law."  *Id*. at 223.
Beyond the irrational decision to confer "funeral industry control over intrastate
casket sales," Louisiana imposed no real requirements on the sale of caskets.  *Id*. at
223-225.  And the "grant of an exclusive right of sale add[ed] nothing to protect

consumers," and instead put "them at a greater risk of abuse including exploitative prices." *Id*. at 226. The court also rejected the state's public safety rationale. That asserted interest likewise "elide[d] the real[i]ties of Louisiana's regulation of caskets and burials," because other portions of Louisiana law did not impose health-and-safety requirements on casket sales by funeral directors—"Louisiana does not even require a casket for burial." *Id*.

As in *St. Joseph Abbey*, the "history" and "context" of the bans at issue here reek of "pure economic protection." 712 F.3d at 221, 226. The legislator introducing the amendment extending the direct sales ban to non-franchising dealers candidly admitted that he was pressing the amendment "on behalf of the Auto Dealers Association," ROA.1613 (¶168), following the group's intense lobbying efforts aimed at stamping out Tesla's business in Louisiana, ROA.1594 (¶35). LADA's president even referred to it as "our bill." ROA.1611 (¶149). And the investigation into Tesla under the warranty-servicing ban has been driven by the dealers, out of concern for their business and a desire to undermine Tesla. ROA.1615-1617 (¶¶177-191). Indeed, the fact that the direct-sale bans' extension and the warranty-servicing ban's enforcement appear to be "motivated by animus or ill-will" towards Tesla in particular makes them *especially* constitutionally suspect. *Johnson v. Bredesen*, 624 F.3d 742, 747 (6th Cir. 2010).

What is more, just as in *St. Joseph Abbey*, any alternative rationales for Louisiana's bans here cannot be reconciled with the rest of the statutory scheme. Louisiana permits *any* manufacturer to operate a dealership for (a) "a reasonable period, not to exceed two years," (b) or for two years if the dealership "is for sale", and (c) even longer if the manufacturer shares operation of the dealership with an independent investor who stands to eventually acquire ownership.  La. R.S. §32:1261(A)(1)(k)(i)(aa), (bb), (cc).  These arrangements cannot be squared with a claim that direct-to-consumer sales risk defrauding the public and endangering the public welfare.  But each is perfectly reconcilable with the economic interests of franchise dealers, who may wish to purchase a manufacturer's successful dealership after two years, or acquire it from a manufacturer partner.

The warranty-servicing ban likewise elides the realities of the regulatory scheme governing automobile servicing.  For one thing, the law gives manufacturers the authority to authorize fleet owners to perform warranty repairs, and gives those manufacturers "sole discretion" to decide what "special tools, technician certification, and training" are required for a fleet owner to do so.  La. R.S. §32:1261(A)(1)(t)(ii).  If manufacturers can be trusted to decide on the requirements for *others* to service their vehicles, it defies reason to think they cannot be trusted to service (their own) vehicles themselves.  Even more bizarrely, according to the Commission, the law permits Tesla to service leased vehicles, but

not customer-owned vehicles. *See supra* p.48. There is simply no explanation for why Tesla's ability to repair vehicles safely and consistently would turn on who holds the title to a vehicle brought in for service.

Precedent involving laws that (like Louisiana's before 2017) banned direct sales only by *franchising* manufacturers is inapposite. Those direct-sale bans were first introduced in the 1930s and 1950s to protect dealers from perceived abuses of the franchise relationship by manufacturers. *See* Crane, *Tesla, Dealer Franchise Laws, and the Politics of Crony Capitalism*, 101 Iowa L. Rev. 573, 578-580 (2016). That is the sole ground on which such laws are ever seriously defended, and the sole ground on which they have ever been upheld by this Court. In *Ford Motor Co. v. Texas Department of Transportation*, 264 F.3d 493 (5th Cir. 2001), and *International Truck & Engine Co. v. Bray*, 372 F.3d 717 (5th Cir. 2004), the Court upheld laws prohibiting car manufacturers who all sold vehicles via traditional third-party dealerships from also operating their own dealerships. That was because such an arrangement posed a very specific danger: since a manufacturer like Ford occupied a "superior market position to *its* dealers," it might "tak[e] advantage of [its] incongruous market position" at the dealers' expense. *Ford*, 264 F.3d at 503-504 (emphasis added); *see also International Truck*, 372 F.3d at 729 (rejecting similar challenge on the ground that the manufacturer "wields power" over its dealers).

Tesla and other non-franchising-manufacturers, by contrast, have no franchise dealers they could possibly take advantage of. Put differently, they lack the sole feature that has ever—indeed, *could* ever—justify a law like Louisiana's. The FTC has said just that: "Protecting dealers from abuses by manufacturers does not justify a blanket prohibition … which extends to all vehicle manufacturers, even those like Tesla … who have no interest in entering into a franchise agreement with any dealer." Lao et al., *Direct-to-consumer auto sales: It's not just about Tesla*, FTC (May 11, 2015), https://www.ftc.gov/enforcement/competition-matters/2015/05/direct-consumer-auto-sales-its-not-just-about-tesla. What Louisiana's law protects dealers from is *not* the abuse of market power, but competition. That is pure protectionism, and not a rational basis for public policy.

## B.    The District Court Erred In Dismissing Tesla's Equal Protection Claim On The Pleadings

The district court approved both the direct-sales ban and the warranty-servicing ban by offering up an unexplained laundry list of justifications. For the direct-sales ban, the court listed: "prevent[ing] frauds, impositions, and other abuses upon its citizens;" "protect[ing] the public against the creation or perpetuation of monopolies and practices detrimental to the public welfare;" and "prevent[ing] disruption of the system of distribution of motor vehicles … to the public." ROA.2378. And for the warranty-servicing ban, it offered a smaller, but similarly lightly-reasoned list: assuring all servicing entities meet "basic

requirements" for tools and training and (once again) "preventing 'the creation or perpetuation of monopolies.'" ROA.2383-2384.

To start, the district court erred in accepting these rationales on the pleadings, rather than permitting discovery so that they could be assessed on a complete record. Dismissal in this setting would be appropriate only if just a "'momentary reflection'" were required "to arrive at a purpose that is both legitimate beyond dispute and rationally related to" both bans. *Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 936 (5th Cir. 1988). As explained below, none of the asserted purposes here pass that test. At minimum, each is contestable, particularly as to "the 'fit' between the classification and the purpose." *Id.* at 933. And "the determination of the fit … —the search for rationality—may … require a factual backdrop." *Id.* at 937.

Indeed, *St. Joseph Abbey* itself was decided on a full record following trial, and this Court's decision relied on the plaintiffs' evidence in negating the asserted interests. 712 F.3d at 220, 223-226. Here, too, Tesla will be able to prove what it has pleaded: that the bans serve only to protect incumbent dealers, and are not rationally related to any legitimate state interest.

In any event, the pleadings alone make clear that the rationales the district court relied on cannot justify Louisiana's laws.

### 1.    The Direct-Sales Ban

The district court erred in unreflectively concluding that the direct-sale ban protects consumers.  A court must do more than just "hypothesize[]" a rational purpose—"the rational relationship" between that purpose and the challenged law "must be real."  *Mahone*, 836 F.2d at 937.  Here, however, the district court failed to provide more than an unadorned hypothesis about the law's purposes.  And when probed even slightly, it becomes clear that the connection between the direct-sale ban and consumer protection is "fantasy."  *St. Joseph Abbey*, 712 F.3d at 223. As already explained, the rest of the statutory scheme belies any consumer-protection explanation—manufacturers are allowed to operate dealerships for years at a time (risking, in defendants' telling, abuse and fraud of consumers) so long as they do so with an eye toward ultimately selling or transferring their dealership to a member of the Dealer Cartel.  *Supra* p.52.

Moreover, the universal economic and policy consensus is that direct-sales bans serve no consumer protection purpose.  *Supra* pp. 49, 54.  As the FTC has said in urging an end to direct-sales bans, these laws "operate as a special protection for dealers—a protection that is likely harming both competition and consumers."  Letter from FTC Directors of Bureaus of Economics and Competition and Office of Policy Planning to Michigan State Senator Darwin L.

Booher (May 7, 2015).[4]  Furthermore, because the same laws also completely
exclude carmakers, like Tesla, who rely on a direct-sales model to operate, they
significantly limit the options available to car purchasers.  They also make the
market "less responsive to consumer preferences and less innovative in
anticipating their evolving needs" by curbing the "essential mechanism that drives
markets—the interaction between the supply by manufacturers and the demands of
consumers." *Id.* at 8.  The resulting "system limits competition" and "deters
experimentation." *Id.* at 7-8.  And predictably, "consumers are paying the price."
*Id.* at 8.  That is not a system that can be rationally described as "protecting the
public" in any relevant respect.  It protects the public from only one thing: a
properly functioning market.

    The other ill-explained rationales on which the district court relied are
similarly irrational.  With respect to the "perpetuation of monopolies," ROA.2378,
the court offered no explanation for how non-franchising manufacturers pose any
threat of monopolizing the market—indeed, Tesla, the most successful company in
that category, accounts for less than 5% of car sales nationwide, *see* Muller,
*Tesla's Dominance Fades as EV Adoption Grows*, Axios (Apr. 5, 2023),

---

[4] Available at https://www.ftc.gov/system/files/documents/advocacy_documents/
ftc-staff-comment-regarding-michigan-senate-bill-268-which-would-create-
limited-exception-current/150511michiganautocycle.pdf.

https://www.axios.com/2023/04/05/tesla-ev-electric-vehicle-adoption.  And "preven[ting] disruption of the system of distribution of motor vehicles" is simply bald protectionism put in different words.  ROA.2378.  A state may not justify its decision to protect an incumbent industry with the tautological rationale that doing so will protect that industry.

Finally, the district court also erred in relying heavily on *Ford* and *International Truck* to uphold the direct-sales ban.  ROA.2379-2381.  As already explained, those cases considered only the rationality of a sales ban for *franchising* manufacturers—not a ban for *non*-franchising manufacturers like Tesla.  *Supra* p.53.  And their reasoning was focused exclusively on that question.  They thus do not answer the question presented here.  That is, indeed, precisely what a district court in this circuit recently concluded in a similar case.  *See Lucid Grp. USA, Inc. v. Johnston*, 2023 WL 5688153, at *5 (W.D. Tex. June 21, 2023) (*Ford*'s "rationale has little bearing in the context of [a] challenge … limited to [a] law's application against manufacturers that do not utilize independent dealers.").  Courts around the country have consistently reached the same conclusion in interpreting analogous state laws.  *See, e.g.*, *Tesla Inc. v. Delaware Div. of Motor Vehicles*, 297 A.3d 625, 634 (Del. 2023) (*Ford* and *International Truck* "are distinguishable" because in those cases "the manufacturers had their own dealers"); *Arizona Auto. Dealers Ass'n v. Arizona Dep't of Transp.*, 2017 WL

9753918, at *4 (Ariz. Super. Ct. Mar. 3, 2017) (similar); *Massachusetts State Auto.*

*Dealers Ass'n v. Tesla Motors, M.A., Inc.*, 15 N.E.3d 1152, 1155-1156 (Mass.

2014) (similar); *Greater New York Auto. Dealers Ass'n v. Department of Motor*

*Vehicles*, 969 N.Y.S.2d 721, 725-727 (Sup. Ct. 2013) (similar). *Ford* and

*International Truck* thus cannot make up for the irrationality of the bans' asserted

justifications.

## 2.    The Warranty-Servicing Ban

The district court speculated that the warranty-servicing ban "could help

assure that all entities providing these services meet 'the same basic level of

requirements for special tools, technician certification, and training.'" ROA.2383-

2384. But there is no rational relationship between that asserted objective and the

warranty-servicing ban. Tellingly, the ban contains no requirements at all for

tools, certification, or training. And the district court did not provide any

explanation for how a service facility's tools, certification, or training could

possibly be inferred from whether that facility is operated by a car manufacturer.

If anything, one would expect manufacturers to have more consistent training and

tools for servicing vehicles they designed and built, and a greater incentive to keep

their vehicles—the most prominent public emissaries of their brand—in top

working order. Indeed, Tesla has had to create training programs to address third-

party servicers' lack of familiarity with electric-vehicle repairs. *See* Carey et al.,

*EV Broken?  Finding a Technician to Fix It May Take a While*, Reuters (Sept. 6, 2023), https://www.reuters.com/business/autos-transportation/ev-broken-finding-technician-fix-it-may-take-while-2023-09-06/.  Yet such servicers—who depend *on Tesla* to figure out how to service the company's vehicles—are the sole entities Louisiana entrusts to service customer-owned vehicles in the state.  Furthermore, Tesla—unlike franchise dealerships—primarily compensates employees by the hour, eliminating the incentive dealerships have to rush services or upsell unnecessary "repairs."  ROA.1608 (¶137).

As explained above, Louisiana law elsewhere reflects the (obviously correct) understanding that manufacturers are entirely trustworthy when it comes to servicing and repairs of their vehicles.  The law entrusts manufacturers to unilaterally decide on the appropriate requirements for fleet-owner warranty-servicers.  *Supra* pp.52-53.  And the Commission appears to accept that the law permits Tesla to service its *leased* vehicles without issue.  *Supra* pp.52-53.  When the law confers on Tesla both the authority to declare the standards others must follow for repairs, and to repair *some* cars itself (inexplicably depending on the car's ownership status), it is incomprehensible that the law should nonetheless bar Tesla from servicing customer-owned vehicles.  The only explanation is that the law's purpose is not to ensure safe and reliable repairs, but instead to impede Tesla's operations in the State—to protect incumbent businesses.

The district court also held—without explanation—that the warranty-servicing ban "rationally relates to the Legislature's stated purpose of preventing 'the creation or perpetuation of monopolies' by manufacturers." ROA.2384. But permitting Tesla to compete with other mechanics to service its vehicles increases, rather than diminishes, competition. It is thus entirely unclear how the warranty-servicing ban relates to an objective in avoiding monopolies. And the district court, for its part, provided no explanation—just like with every other dubious justification proffered for Louisiana's anti-Tesla crusade.

## CONCLUSION

The judgment should be reversed.

Respectfully submitted.

/s/ Ari Holtzblatt

MARK R. BEEBE (#19487)
DIANA COLE SURPRENANT (#33399)
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139

ARI HOLTZBLATT
ANDRES C. SALINAS
ANDREW K. WAKS
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
ari.holtzblatt@wilmerhale.com

<div align="right">

DAVID GRINGER
TONY J. LEE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

*Counsel for Plaintiffs-Appellants*

</div>

October 12, 2023

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,989 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ Ari Holtzblatt
ARI HOLTZBLATT


October 12, 2023

# ADDENDUM

**ADDENDUM**
**TABLE OF CONTENTS**

U.S. Const. Amend. XIV, § 1 .............................................................Add.1

15 U.S.C. § 1 .....................................................................................Add.2

La. R.S. § 32:1253 .............................................................................Add.3

La. R.S. § 32:1261(A)(1) ...................................................................Add.7

## U.S. Const. Amend. XIV, § 1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**15 U.S.C. § 1**

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

### La. R.S. § 32:1253

A. The Louisiana Motor Vehicle Commission is hereby created within the office of the governor and shall be composed of eighteen members appointed by the governor, as follows:

(1) A chairman of the commission shall be appointed from the state at large. Fourteen members shall be appointed in such manner that at least one shall be from each of the commission districts as listed below:

(a) Commission District 1 shall consist of the following parishes: Orleans, Plaquemines, St. Bernard, St. Tammany, and Washington.

(b) Commission District 2 shall consist of the following parishes: Jefferson, St. Charles, St. John, St. James, and Tangipahoa.

(c) Commission District 3 shall consist of the following parishes: East Baton Rouge, West Baton Rouge, Iberville, Ascension, East Feliciana, West Feliciana, St. Helena, Livingston, Assumption, and Pointe Coupee.

(d) Commission District 4 shall consist of the following parishes: Richland, Franklin, Union, Lincoln, Jackson, Winn, Caldwell, Ouachita, Morehouse, West Carroll, East Carroll, and Madison.

(e) Commission District 5 shall consist of the following parishes: Caddo, Bossier, Webster, DeSoto, Red River, Bienville, Claiborne, and Sabine.

(f) Commission District 6 shall consist of the following parishes: Rapides, Grant, LaSalle, Catahoula, Concordia, Avoyelles, Vernon, Tensas, and Natchitoches.

(g) Commission District 7 shall consist of the following parishes: Beauregard, Allen, Calcasieu, Cameron, Jefferson Davis, Acadia, and Evangeline.

(h) Commission District 8 shall consist of the following parishes: Lafayette, St. Landry, St. Martin, St. Mary, Iberia, Terrebonne, Lafourche, and Vermilion.

(2) Each of the commissioners appointed under the provisions of Paragraph (1) of this Subsection shall have been an actively engaged licensee of the commission or its previous Louisiana licensing commission for not less than five consecutive years prior to such appointment, and be a holder of such a license at all times while a member of the commission. Being engaged in more than one such pursuit shall not disqualify a person otherwise qualified from serving on the commission. Of these members, one member shall be primarily engaged in the business of lease or rental, one member shall be primarily engaged in the business of heavy truck sales, one member shall be primarily engaged in the business of marine product sales, one member shall be primarily engaged in the business of motorcycle sales, one member shall be primarily engaged in the business of recreational vehicle sales, and one member shall be primarily engaged in the business of sales finance.

(3)

> (a) Each of the three remaining appointive members shall be a public member who is not a licensee under this Chapter and shall be appointed from the state at large. These three commissioners shall have the sole function of hearing and deciding matters concerning brokers and disputes between manufacturers, distributors, converters, motor vehicle lessor franchisors, or representatives and motor vehicle dealers, recreational products dealers, specialty vehicle dealers, motor vehicle lessors, and hearings pursuant to R.S. 32:1270.31 et seq.

> (b) This function shall be performed only when so requested in writing at the time of the filing of the initial protest or initial answer to the protest. If no party requests a hearing before these commissioners, the commissioners appointed pursuant to Paragraph (1) of this Subsection shall retain jurisdiction over the dispute. Should a consumer, broker, manufacturer, distributor, converter, motor vehicle lessor franchisor, representative, motor vehicle lessor, specialty vehicle dealer, recreational product dealer, or motor vehicle dealer make the request as set forth above, the commissioners appointed pursuant to Paragraph (1) of this Subsection shall not participate, deliberate, or in any way take part in the hearing.

> (c) The three commissioners shall elect among themselves a chairman to serve as presiding officer of the hearing.

(4) Each appointment to the commission by the governor shall be submitted to the Senate for confirmation. Each commissioner shall at the time of appointment be a resident of this state and shall be of good moral character.

B.

   (1) The members shall serve at the pleasure of the governor. In the event of the death, resignation, or removal of any person serving on the commission, the vacancy shall be filled in the manner of the original appointment.

   (2) The commission shall meet in Jefferson Parish and complete its organization immediately after the entire membership thereof has been appointed and has qualified.

   (3) The chairman and each member of the commission shall take and subscribe to the oath of office required of public officers.

C. The chairman and members of said commission shall receive fifty dollars per diem for each and every day necessarily spent in conducting the business of the commission, and shall be reimbursed for actual expenses incurred in the performance of their duties under this Chapter.

D. The commission shall appoint a qualified person to serve as executive director thereof, to serve at the pleasure of the commission and shall fix his salary and shall define and prescribe his duties. The executive director shall be in charge of the commission's office and shall devote such time to the duties thereof, as may be necessary. Said commission may employ such clerical and professional help and incur such expenses as may be necessary for the proper discharge of its duties under this Chapter. The commission shall maintain its office and transact its business in Jefferson Parish, and it is authorized to adopt and use a seal.

E. The commission is hereby vested with the powers and duties necessary and proper to enable it to fully and effectively carry out the provisions and objects of this Chapter, and is hereby authorized and empowered to make and enforce all reasonable rules and regulations and to adopt and prescribe all forms necessary to accomplish said purpose, and the enumeration of any power or authority herein shall not be construed to deny, impair, disparage, or limit any others necessary to the attainment thereof, provided no rule or regulation of the commission, including but not limited to Chapter 7 (Advertising) of Subpart 1 of Part V of Title 46, comprised of LAC 46:V:701 through 741, of the Louisiana Administrative Code, shall prohibit a dealer from making a monetary donation or contribution that does not directly involve the sale or lease of a motor vehicle in connection with an

advertising campaign. A copy of all rules and regulations adopted by the commission shall be published in the Louisiana Administrative Code, as they may be amended, modified, or repealed from time to time.

F. All fees and charges under the provisions of this Chapter shall be collected and received by the executive director of the commission and shall be disbursed by him at the direction of the commission in administering and enforcing the provisions of this Chapter.

G. All expenses incurred by the commission in carrying out the provisions of this Chapter, including but not limited to per diem, wages, salaries, rent, postage, supplies, bond premiums, travel and subsistence, and printing and utilities, shall be a proper charge against said fund.

H. The commission shall, in addition to the powers herein conferred, be constituted a body politic or political corporation, invested with the powers inherent in corporations, including but not limited to the power and authority to own immovable property. It may sue and be sued under the style of the commission, and all process against the commission shall be served on the chairman or executive director in person, and all suits on behalf of the commission shall be brought by the chairman. The domicile for the purpose of being sued shall be Jefferson Parish. No member of the commission, or the executive director, shall be subject to suit or be held liable as an individual in any suit against the commission.

## La. R.S. § 32:1261(A)(1)

A. It shall be a violation of this Chapter:

(1) For a manufacturer, a distributor, a wholesaler, distributor branch, factory branch, converter or officer, agent, or other representative thereof:

> (a) To induce or coerce, or attempt to induce or coerce, any licensee:
>
> > (i) To order or accept delivery of any recreational product, motor vehicle or vehicles, appliances, equipment, parts or accessories therefor, or any other commodity or commodities which shall not have been voluntarily ordered.
> >
> > (ii) To order or accept delivery of any vehicle with special features, appliances, accessories, or equipment not included in the list price of said vehicles as publicly advertised.
> >
> > (iii) To order for any person any parts, accessories, equipment, machinery, tools, appliances, or any commodity whatsoever.
> >
> > (iv) To assent to a release, assignment, novation, waiver, or estoppel which would relieve any person from liability to be imposed by law, unless done in connection with a settlement agreement to resolve a matter pending a commission hearing or pending litigation between a manufacturer, distributor, wholesaler, distributor branch or factory branch, or officer, agent, or other representative thereof.
> >
> > (v) To enter into a franchise with a licensee or during the franchise term, use any written instrument, agreement, release, assignment, novation, estoppel, or waiver, to attempt to nullify or modify any provision of this Chapter, or to require any controversy between a dealer and a manufacturer to be referred to any person or entity other than the commission, or duly constituted courts of this state or the United States, if such referral would be binding upon the dealer. Such instruments are null and void, unless done in connection with a settlement agreement to resolve a matter pending a commission hearing or pending litigation.
> >
> > (vi) To waive the right to a jury trial.

Add.7

(vii) To participate in an advertising group or to participate monetarily in an advertising campaign or contest or to purchase any promotional materials, showroom, or other display decorations or materials at the expense of such motor vehicle dealer or specialty dealer.

(viii) To adhere to performance standards that are not applied uniformly to other similarly situated motor vehicle dealers or specialty dealers. Any such performance standards shall be fair, reasonable, equitable, and based on accurate information. If dealership performance standards are based on a survey, the manufacturer, converter, distributor, wholesaler, distributor branch, or factory branch shall establish the objectivity of the survey process and provide this information to any motor vehicle dealer or specialty vehicle dealer of the same line make covered by the survey request. Each response to a survey used by a manufacturer in preparing an evaluation or performance-rating of a motor vehicle dealer shall be made available to that motor vehicle dealer, or it cannot be used by the manufacturer. However, if a customer requests that the manufacturer or distributor not disclose the consumer's identity to the dealer, the manufacturer may withhold the consumer's identity in providing the survey response to the dealer, and the manufacturer may use the response. Any survey used must have the following characteristics:

     (aa) It was designed by experts.

     (bb) The proper universe was examined.

     (cc) A representative sample was chosen.

     (dd) The data was accurately reported.

(ix) To release, convey, or otherwise provide customer information, if to do so is unlawful or if the customer objects in writing. This does not include information that is necessary for the manufacturer to meet its obligations to the dealer or consumers in regard to contractual responsibilities, vehicle recalls, or other requirements imposed by state or federal law. The manufacturer is further prohibited from providing any consumer information received from the dealer to any unaffiliated third party.

(x) To pay the attorney fees of the manufacturer or distributor related to hearings and appeals brought under this Chapter.

(b) To refuse to deliver to any licensee having a franchise or contractual arrangement for the retail sale of vehicles sold or distributed by such manufacturer, distributor, wholesaler, distributor branch or factory branch, any motor vehicle, publicly advertised for immediate delivery, within sixty days after such dealer's order shall have been received.

(c) To threaten to cancel any franchise or any contractual agreement existing between such manufacturer, distributor, wholesaler, distributor branch or factory branch and said dealer for any reason including but not limited to failure to meet performance standards.

(d) To unfairly, without just cause and due regard to the equities of such dealer, cancel the franchise of any licensee. Failure to meet performance standards based on a survey of sales penetration in a regional, national, territorial, or other geographic area shall not be the sole cause for cancellation of a franchise. The nonrenewal of a franchise or selling agreement with such dealer or his successor without just provocation or cause, or the refusal to approve a qualified transferee or qualified successor to the dealer-operator as provided for in the franchise or selling agreement, or solely for failure to meet performance standards based on a survey of sales penetration in a regional, national, territorial, or other geographic area, shall be deemed an evasion of this Paragraph and shall constitute an unfair cancellation, regardless of the terms or provisions of such franchise or selling agreement. However, at least ninety-days notice shall be given to the dealer of any cancellation or nonrenewal of a franchise except for a cancellation arising out of the financial default of the motor vehicle dealer or fraudulent activity of the dealer principal which results in the conviction of a crime punishable by imprisonment. The provisions of this Subsection relating to performance standards shall not apply to recreational products dealers.

(e) To refuse to extend to a licensee the privilege of determining the mode or manner of available transportation facility that such dealer desires to be used or employed in making deliveries of vehicles to him or it.

(f) To resort to or use any false or misleading advertisement in connection with his business as such manufacturer of motor vehicles, distributor, wholesaler, distributor branch or factory branch, or officer, agent, or other representative thereof.

(g) To delay, refuse, or fail to deliver motor vehicles in reasonable quantities relative to the licensee's facilities and sales potential in the relevant market area. This Subparagraph shall not be valid, however, if such failure is caused by acts or causes beyond the control of the manufacturer, distributor, or other such party.

(h) To ship or sell motor vehicles or recreational products to a licensee prior to the licensee having been granted a license by the commission to sell such vehicles.

(i) To unreasonably withhold consent to the sale, transfer, or exchange of the franchise to a qualified transferee capable of being licensed as a dealer in this state, provided the transferee meets the criteria generally applied by the manufacturer in approving new dealers and agrees to be bound by all the terms and conditions of the standard franchises.

(j) To fail to respond in writing to a written request for consent as specified in Subparagraph (i) of this Paragraph within sixty days of receipt of a written request on the forms, if any, generally utilized by the manufacturer or distributor for such purposes and containing the information required therein. Failure to respond shall be deemed to be consent to the request.

(k)

　　(i) To sell or offer to sell a new or unused motor vehicle directly to a consumer except when any one of the following conditions is met:

　　　　(aa) Operating an existing, licensed, and franchised motor vehicle dealership for a reasonable period, not to exceed two years.

　　　　(bb) Operating an existing, licensed, and franchised motor vehicle dealership which is for sale to any qualified independent person at a fair and reasonable price, not to exceed two years.

(cc) Operating in a bona fide relationship in which a person independent of a manufacturer has made a significant investment subject to loss in the dealership, and can reasonably expect to acquire full ownership of such dealership on reasonable terms and conditions.

(ii) After any of the conditions have been met under Subitems (aa) and (bb) of Item (i) of this Subparagraph, the commission may allow the manufacturer to continue operating an existing, licensed, and franchised motor vehicle dealership for longer than two years when, in the discretion of the commission, the best interest of the manufacturer, consuming public, and licensees are best served.

(l)

(i) To condition the renewal or extension of a franchise on a dealer's substantial renovation of a facility or premises, if the renovation would be unreasonable under the circumstances.

(ii) To require, coerce, or attempt to coerce a dealer or successor dealer to construct or substantially alter a facility or premises, if the construction or alteration would be unreasonable under the circumstances.

(iii) To require, coerce, or attempt to coerce a dealer or successor dealer to construct or substantially alter a facility or premises, if the same area of the facility or premises has been constructed or substantially altered within the last ten years and the construction or alteration was required and approved by the manufacturer as a part of a facility upgrade program, standard, or policy. The provisions of this Subparagraph shall not apply to any construction, alteration, or improvement made to comply with any state or federal health or safety law, a manufacturer's or distributor's health or safety requirement, or to accommodate the technology requirements necessary to sell or to service a motor vehicle. For the purposes of this Subparagraph, "substantially alter" means to perform an alteration that substantially impacts the architectural features, characteristics, or integrity of a structure or lot. The term shall not include routine maintenance reasonably necessary to maintain a dealership in attractive condition or any item directly protected by federal intellectual property rights of the manufacturer.

(aa) If a facility upgrade program, standard, or policy under which the dealer completed a facility construction or substantial alteration does not contain a specific time period during which the manufacturer or distributor shall provide payments or benefits to a participating dealer, the manufacturer or distributor shall not deny the participating dealer any payment or benefit under the terms of the program, standard, or policy as it existed when the dealer began to perform under the program, standard, or policy for the balance of the ten-year period, regardless of whether the manufacturer's or distributor's program, standard, or policy has been changed or canceled, unless the manufacturer and dealer agree, in writing, to the change in payment or benefit.

(bb) As part of any facility upgrade program, standard, or policy, the manufacturer or distributor shall agree, in writing, to supply the dealer with an adequate supply and marketable model mix of motor vehicles to meet the sales levels necessary to support the increased overhead incurred by the dealer by reason of the facility construction or substantial alteration.

(iv) To require, coerce, or attempt to coerce a dealer to purchase facility construction or maintenance goods or services for items not trademarked or otherwise directly protected by federal intellectual property rights of the manufacturer from a vendor that is selected, identified, or designated by a manufacturer, distributor, affiliate, or captive finance source when the dealer may obtain facility construction or maintenance goods or services for items not trademarked or otherwise directly protected by federal intellectual property rights of the manufacturer of the same quality, material, and design from a vendor selected by the dealer, provided the dealer obtains prior approval from the manufacturer, distributor, or affiliate, for the use of the dealer's selected vendor. The approval by the manufacturer, distributor, or affiliate shall not be unreasonably withheld.

(aa) If the manufacturer, distributor, or affiliate does not approve the vendor chosen by the dealer and claims the vendor cannot supply facility construction or maintenance goods or services for items not trademarked or otherwise directly protected by federal intellectual property rights of the manufacturer that are the same quality, material, and design, the dealer may file a protest with the commission.

(bb) If a protest is filed, the commission shall promptly inform the manufacturer, distributor, affiliate, or captive finance source that a protest has been filed. The commission shall conduct a hearing on the merits of the protest within ninety days following the filing of a response to the protest. The manufacturer, distributor, or affiliate shall bear the burden of proving that the facility construction or maintenance goods or services for items not trademarked or otherwise directly protected by federal intellectual property rights of the manufacturer chosen by the dealer are not of the same quality, material, or design to those required by the manufacturer, distributor, or affiliate.

(cc) For the purposes of this Subparagraph, "goods" shall include signs or sign components to be purchased or leased by the dealer that are not trademarked or otherwise directly protected by the federal intellectual property rights of the manufacturer or distributor. The term shall not include moveable displays, brochures, and promotional materials containing material subject to the intellectual property rights of a manufacturer or distributor, special tools as reasonably required by the manufacturer, or parts to be used in repairs under warranty or recall obligations of a manufacturer or distributor.

(m) To fail to compensate its dealers for the work and services they are required to perform in connection with the dealer's delivery and preparation obligations according to the terms of compensation. The commission shall find the compensation to be reasonable or the manufacturer shall remedy any deficiencies.

(n) To fail to designate and provide to the commission in writing either the community or territory assigned to a licensee. The provisions of this Subparagraph shall not apply to trailers.

(o) To fail or refuse to sell or offer to sell to all motor vehicle franchisees in a line make, every motor vehicle sold or offered for sale under a franchise to any motor vehicle franchisee of the same-line make, or to unreasonably require a motor vehicle dealer to pay an extra fee, purchase unreasonable advertising displays or any other materials, or to remodel, renovate, or recondition its existing facilities as a prerequisite to receiving a certain model or series of vehicles. However, the failure to deliver any such motor vehicle shall not be considered a violation of this Section if the failure is due to a lack of manufacturing capacity or to a strike or labor difficulty, a shortage of materials, a freight embargo or other cause of which the franchisor has no control. This Subparagraph shall not apply to recreational product manufacturers.

(p) To unreasonably discriminate among competing, similarly situated, same-line make dealers in the sales of vehicles, in the availability of such vehicles, in the terms of incentive programs or sales promotion plans, or in other similar programs.

(q) To terminate, cancel, or refuse to continue any franchise agreement based upon the fact that the motor vehicle dealer owns, has an investment in, participates in the management, or holds a franchise agreement for the sale or service of another make or line of new motor vehicles at a different dealership location, or intends to or has established another make or line of new motor vehicles in the same dealership facilities of the manufacturer or distributor.

(r) To demand compliance with facilities requirements that include any requirements that a motor vehicle dealer establish or maintain exclusive office, parts, service or body shop facilities, unless the requirements would be reasonable and justified by business considerations. The burden of proving that the requirements are reasonable and justified by business considerations is on the manufacturer. If the franchise agreement of the manufacturer or distributor requires the approval of the manufacturer or distributor for facility uses or modifications, the manufacturer or distributor shall approve or disapprove such a request in writing within sixty days of receipt of such request.

(s) To use any subsidiary, affiliate, or any other controlled person or entity, or to employ the services of a third party, to accomplish what would otherwise be illegal conduct under this Chapter on the part of the manufacturer or distributor.

(t)

(i) To operate a satellite warranty and repair center, to authorize a person to perform warranty repairs, including emergency repairs, who is not a motor vehicle dealer, fleet owner, or an emergency services company or emergency services related company, or to authorize a motor vehicle dealer to operate a satellite warranty and repair center within the community or territory of a same-line or make motor vehicle dealer. This Subparagraph shall not apply to recreational product manufacturers. For the purposes of this Subparagraph, "fleet owner" means a person, including a governmental entity, who is approved and authorized by a manufacturer to perform warranty repairs and owns or leases vehicles for its own use or a renting or leasing company that rents, maintains, or leases vehicles to a third party. For the purposes of this Subparagraph, "emergency services company or emergency services related company" means a person who operates any vehicle designated and authorized to respond to an emergency. An emergency vehicle includes but is not limited to police and security vehicles, fire and rescue vehicles, medical vehicles, and civil emergency vehicles, including public utility crews dealing with gas, electricity, or water, or the repair of defective equipment on a scene.

(ii) The manufacturer may authorize a fleet owner to perform warranty repairs if the manufacturer determines that the fleet owner has the same basic level of requirements for special tools, technician certification, and training that are required of a franchise dealer but only those as determined by the manufacturer, in its sole discretion, that are necessary to perform the specified limited type of warranty repairs on the makes and models of motor vehicles for which the fleet owner is authorized to perform warranty repairs.

(iii) A manufacturer who authorizes a fleet owner to perform warranty repairs shall give notification of the authorization to the dealer located in the same area of responsibility where the fleet owner intends to perform the authorized warranty repairs.

(iv) The provisions of Items (ii) and (iii) of this Subparagraph shall not apply to manufacturers who authorize fleet owners whose commercial vehicles are used for the movement of property, freight, or goods in intrastate or interstate commerce.

(v) The commission has no authority over a fleet owner or an emergency services company or emergency services related company with respect to the requirements of this Subparagraph.

(vi) A repair facility of a fleet owner authorized pursuant to this Subparagraph to perform warranty repairs shall not be deemed a satellite warranty and repair center as defined in R.S. 32:1252 and shall not be required to be licensed by the commission pursuant to R.S. 32:1254.

(u) To make a change in the area of responsibility described in the franchise agreement or sales and service agreement of a dealer, without the franchisor, converter, or manufacturer giving said dealer and the commission no less than sixty days prior written notice by certified or registered mail.

(v) To attempt to induce or coerce, or to induce or coerce, any motor vehicle dealer to enter into any agreement with such manufacturer, distributor, wholesaler, distributor branch or factory branch or representative thereof, or to do any other act unfair to said dealer.

(w)

(i) To coerce or attempt to coerce any retail motor vehicle dealer or prospective retail motor vehicle dealer to offer to sell or sell any extended service contract or extended maintenance plan or gap product offered, sold, backed by, or sponsored by the manufacturer or distributor or affiliate or sell, assign, or transfer any retail installment sales contract or lease obtained by the dealer in connection with the sale or lease by him of motor vehicles manufactured or sold by the manufacturer or distributor, to a specified finance company or class of finance companies, leasing company or class of leasing companies, or to any other specified persons by any of the following:

(aa) By any statement, promise, or threat that the manufacturer or distributor will in any manner benefit or injure the dealer, whether the statement, suggestion, threat, or promise is express or implied or made directly or indirectly.

Add.16

(bb) By any act that will benefit or injure the dealer.

(cc) By any contract, or any express or implied offer of contract, made directly or indirectly to the dealer, for handling the motor vehicle on the condition that the dealer shall offer to sell or sell any extended service contract or extended maintenance plan offered, sold, backed by, or sponsored by the manufacturer or distributor or that the dealer sell, assign, or transfer his retail installment sales contract on or lease of the vehicle, to a specified finance company or class of finance companies, leasing company or class of leasing companies, or to any other specified person.

(dd) Any such statements, threats, promises, acts, contracts, or offers of contracts, when their effect may be to lessen or eliminate competition.

(ii) Nothing contained in this Subparagraph shall prohibit a manufacturer or distributor from offering or providing incentive benefits or bonus programs to a retail motor vehicle dealer or prospective retail motor vehicle dealer who makes the voluntary decision to offer to sell or sell any extended service contract or extended maintenance plan offered, sold, backed, or sponsored by the manufacturer or distributor or to sell, assign, or transfer any retail installment sale or lease by him of motor vehicles manufactured or sold by the manufacturer or distributor to a specified finance company or leasing company.

(x) To charge back, deny vehicle allocation, withhold payments, or take any other adverse actions against a motor vehicle dealer because of a sale of a new motor vehicle that is exported from the United States, unless it is shown that the dealer knew or reasonably should have known on the date of the sale that the new motor vehicle was to be exported. A motor vehicle dealer shall be rebuttably presumed to have no knowledge of the export if the motor vehicle is sold by the dealer to a resident of the United States who titles and registers the motor vehicle in any state within the United States.

(y) To disqualify a manufacturer's sales or service satisfaction survey that pertains to a dealership employee's personal motor vehicle or specialty vehicle solely because it was mailed or communicated electronically from a dealership.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of October, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Ari Holtzblatt
ARI HOLTZBLATT