# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

TESLA, INCORPORATED; TESLA LEASE TRUST; TESLA FINANCE, L.L.C.,
*Plaintiffs-Appellants*,

*v.*

LOUISIANA AUTOMOBILE DEALERS ASSOCIATION, In itself and on behalf of its members, executive committee, and board of directors; GREGORY LALA, In his official capacity as Chairman of the Louisiana Motor Vehicle Commission;

**(caption continued on inside cover)**

On Appeal from the United States District Court
for the Eastern District of Louisiana, No. 2:22-cv-02982

## PETITION FOR REHEARING EN BANC

MARK R. BEEBE (#19487)
DIANA COLE SURPRENANT (#33399)
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139

ARI HOLTZBLATT
ANDREW K. WAKS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
ari.holtzblatt@wilmerhale.com

DAVID GRINGER
ANDRES C. SALINAS
TONY J. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

September 13, 2024

ALLEN O. KRAKE, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; V. PRICE LEBLANC, JR., In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; ERIC R. LANE, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; KENNETH MIKE SMITH, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; P.K. SMITH MOTORS, INCORPORATED; KEITH P. HIGHTOWER, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; KEITH M. MARCOTTE, In his Official Capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; WESLEY RANDAL SCOGGIN, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; SCOTT A. COURVILLE, In his Official Capacity as a Commissioner of the Louisiana Motor Vehicle Commission; DONNA S. CORLEY, In her Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and her private capacity; TERRYL J. FONTENOT, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; T & J FORD, INCORPORATED; MAURICE C. GUIDRY, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; GOLDEN MOTORS, L.L.C.; RANEY J. REDMOND, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission; JOSEPH W. WESTBROOK, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity, also known as Bill Westbrook; STEPHEN GUIDRY, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; JOYCE COLLIER LACOUR, In her Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission; THOMAS E. BROMFIELD, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission; EDWIN T. MURRAY, In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity; FORD OF SLIDELL, L.L.C., doing business as Supreme Ford of Slidell; GERRY LANE ENTERPRISES, INCORPORATED, doing business as Gerry Lane Chevrolet; HOLMES MOTORS, L.L.C., doing business as Holmes Honda; AIRLINE CAR RENTAL, INCORPORATED, doing business as Avis Rent-A-Car; SHETLER-CORLEY MOTORS, LIMITED; LEBLANC AUTOMOBILES. L.C., incorrectly named as Leblanc Automobiles, Inc.; MORGAN BUICK GMC SHREVEPORT, INCORPORATED, incorrectly named as Morgan Pontiac, Inc.; P.K. SMITH MOTORS, INCORPORATED, in his private capacity; COMMISSIONERS OF THE LOUISIANA MOTOR VEHICLE COMMISSION AND THEIR DEALERSHIPS; STEPHEN L. GUIDRY, JR,

*Defendants-Appellees.*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that members of this Court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellants | Counsel |
|---|---|
| Tesla, Incorporated<br>Tesla Lease Trust<br>Tesla Finance, L.L.C. | Ari Holtzblatt<br>David Gringer<br>Andres C. Salinas<br>Andrew K. Waks<br>Tony J. Lee<br>WILMER CUTLER PICKERING<br>  HALE AND DORR LLP<br><br>Mark R. Beebe<br>Diana Cole Surprenant<br>ADAMS AND REESE LLP |

| Defendants-Appellees | Counsel |
|---|---|
| Louisiana Automobile Dealers Association | Paul D. Clement<br>Matthew D. Rowen<br>Nicholas M. Gallagher<br>CLEMENT & MURPHY, P.L.L.C.<br><br>Jeanne C. Comeaux<br>Claude F. Reynaud, Jr.<br>BREAZEALE, SACHSE & WILSON,<br>L.L.P. |

| | |
|---|---|
| Gregory Lala<br>Allen O. Krake<br>V. Price LeBlanc, Jr.<br>Eric R. Lane<br>Kenneth Mike Smith<br>Keith P. Hightower<br>Keith M. Marcotte<br>Wesley Randal Scoggin<br>Scott A. Courville<br>Donna S. Corley<br>Terryl J. Fontenot<br>Maurice C. Guidry<br>Raney J. Redmond<br>Joseph W. Westbrook<br>Stephen L. Guidry, Jr.<br>Joyce Collier LaCour<br>Thomas E. Bromfield<br>Edwin T. Murray<br>*(In their official capacities as chairman or commissioners of the Louisiana Motor Vehicle Commission)* | Harry J. Philips, Jr.<br>TAYLOR, PORTER, BROOKS & PHILLIPS, L.L.P.<br><br>Timothy W. Hassinger<br>Patrick J. Schepens<br>GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, A.P.L.C. |
| Gregory Lala<br>Stephen L. Guidry, Jr.<br>*(In their private capacities)* | Lamont P. Domingue<br>VOORHIES & LABBÉ, A.P.L.C. |
| Allen O. Krake<br>*(In his private capacity)*<br>Ford of Slidell, L.L.C. (doing business as Supreme Ford of Slidell) | Chloe M. Chetta<br>Richard E. Sarver<br>Robert A. Waldrup<br>BARRASSO, USDIN, KUPPERMAN, FREEMAN & SARVER, L.L.C. |
| V. Price Leblanc, Jr.<br>Keith P. Hightower<br>Keith M. Marcotte<br>Wesley Randal Scoggin<br>Donna S. Corley<br>Terryl J. Fontenot<br>Maurice C. Guidry<br>*(In their private capacities)*<br>T & J Ford, Incorporated<br>Golden Motors, L.L.C. | Patrick S. McGoey<br>Andrea V. Timpa<br>SCHONEKAS, EVANS, McGOEY & McEACHIN, L.L.C. |

| | |
|---|---|
| Holmes Motors, L.L.C. (doing business as Holmes Honda)<br>Airline Car Rental, Incorporated (doing business as Avis Rent-A-Car)<br>Shetler-Corley Motors, Limited<br>Leblanc Automobiles. L.C.<br>Morgan Buick GMC Shreveport, Incorporated | |
| Eric R. Lane<br>*(In his private capacity)*<br>Gerry Lane Enterprises, Incorporated (doing business as Gerry Lane Chevrolet) | Colin D. Sherman<br>SHERMAN & LACEY |
| Kenneth Mike Smith *(In his private capacity)*<br>P.K. Smith Motors, Incorporated | W. Raley Alford, III<br>Patrick M. Bollman<br>STANLEY, REUTER, THORNTON & ALFORD, L.L.C. |

| Amici Curiae | Counsel |
|---|---|
| United States of America | Jonathan S. Kanter<br>Doha Mekki<br>Maggie Goodlander<br>David B. Lawrence<br>Jacobus van der Ven<br>Nickolai G. Levin<br>Stratton C. Strand<br>Matthew C. Mandelberg<br>Brandon Storm<br>U.S. DEPARTMENT OF JUSTICE ANTITRUST DIVISION |
| Legal and Economic Scholars (R. Warren Anderson, Christine P. Bartholomew, Roger D. Blair, Donald J. Boudreaux, Henry N. Butler, Steve Calandrillo, Daniel A. Crane, Floridan Ederer, Kenneth Elzinga, Eleanor M. Fox, James Grimmelmann, Robin Hanson, Herbert Hovenkamp, Francine Lafontaine, Robert H. Lande, Marina Lao, Mark A. Lemley, Stanley Liebowitz, Yekaterina Valerie | Thomas H. Reger II<br>FISH & RICHARDSON, P.C. |

| | |
|---|---|
| Litvak, Anup Malani, Geoffrey A. Manne, Doug Melamed, Mark. J. Perry, Edward A. Snyder, Michael E. Sykuta, Alex Tabarrok, Avishalom Tor, Alexander Volokh, Samuel N. Weinstein, Lawrence J. White, Abraham L. Wickelgren) | |
| Texas Automobile Dealers Association | Robert T. Mowrey<br>Thomas G. Yoxall<br>W. Scott Hastings<br>Daron L. Janis<br>LOCKE LORD LLP |

/s/ Ari Holtzblatt
_____
ARI HOLTZBLATT

*Attorney of Record for Plaintiffs-Appellants*

## INTRODUCTION AND RULE 35(B)(1) STATEMENT

Tesla disagrees with Appellees that *en banc* review is warranted as to the panel's due process and antitrust holdings, and is prepared to explain why should the Court request an opposition. If, however, the Court grants Appellees' petition, this petition explains why it should also reconsider the panel's erroneous equal protection decision.

The Fifth Circuit has long disclaimed "that mere economic protection of a particular industry is a legitimate governmental purpose." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 222 (5th Cir. 2013). Relying on that precedent, Tesla brought an equal protection challenge against Louisiana laws restricting non-franchising car manufacturers like Tesla from selling direct-to-consumer or directly providing warranty servicing to owners of their vehicles. Those laws serve a single, obvious purpose: to protect politically well-connected dealerships dependent on franchising from having to compete with a non-franchising business model that is better and more affordable for consumers. Under binding Fifth Circuit precedent, Tesla's challenge to these protectionist laws should have proceeded past the pleading stage.

In affirming the dismissal of Tesla's equal protection challenge, the panel contravened that precedent. Notably, the panel never explains why restricting non-franchising manufacturers from direct sales and servicing serves any purpose

beyond protectionism.  Instead, the panel upheld Louisiana's laws by lumping restrictions on *non-franchising* manufacturers together with restrictions on *franchising* manufacturers, which serve a different purpose:  preventing manufacturers from exploiting their own dealers, with whom they maintain a unique, asymmetrical relationship.  In so doing, the panel's opinion instructs legislatures that they may evade rational basis review through the simple expedient of combining irrationally protectionist laws with rational ones.  That erroneous rule is apparent in two facets of the decision.

First, the panel held that the sole relevant classification was the one "'created by the regulatory scheme,'" which the panel took to be a classification governing "manufacturers" as a whole.  Op. 23-24.  But Tesla did not challenge Louisiana's statutory scheme as a whole—it challenged a 2017 amendment applying specifically and only to *non-franchising manufacturers* like Tesla.  By refusing to analyze the rationality of that classification—the one Tesla challenged—the panel created a roadmap for legislatures to insulate protectionist laws from constitutional scrutiny.  So long as a legislature grafts protectionist amendments onto existing, otherwise-rational laws, they now pass constitutional muster.  That vitiates *St. Joseph Abbey* and creates a circuit split with the Sixth Circuit's holding that, where a legislature has "specifically amend[ed]" a law and thereby "specifically brought" an additional group "under the coverage of the"

statute for protectionist reasons, it is no defense that the "Act as a whole … provides some legitimate protection for consumers." *Craigmiles v. Giles*, 312 F.3d 220, 227 (6th Cir. 2002).

Second, the panel erred by holding that a rational basis challenge cannot be based on a legislature irrationally lumping unlike entities together under a single classification. That contravenes the principle that "the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). Courts have routinely relied on that principle to invalidate, on rational basis review, protectionist licensure schemes that irrationally "attempt[] to squeeze two" dissimilar groups "into a single, identical mold." *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1103 (S.D. Cal. 1999); *see also Brantley v. Kuntz*, 98 F. Supp. 3d 884, 893 (W.D. Tex. 2015) ("rather than logically connecting means and ends, [law] shoehorn[ed] two unlike" groups "'into a single, identical mold'"); *Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012) (similar). The Fifth Circuit has broken from that well-founded consensus and adopted an approach that would authorize the very law struck down in *St. Joseph Abbey*.

Accordingly, if the Court grants *en banc* review as to the panel's due process and antitrust holdings, it should also review the equal protection issue to resolve the conflict the panel created with this court's decision in *St. Joseph Abbey* and the

Sixth Circuit's decision in *Craigmiles*, and thereby "secure … uniformity of the court's decisions."  Fed. R. App. Proc. 35(a)(1).

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ..........................................................i

INTRODUCTION AND RULE 35(b)(1) STATEMENT ........................................v

TABLE OF AUTHORITIES ....................................................................................x

STATEMENT OF THE ISSUE..................................................................................1

STATEMENT OF FACTS AND PROCEEDINGS..................................................1

ARGUMENT ...............................................................................................................3

I.   THE PANEL ERRED BY RELYING ON THE RATIONALITY OF AN
     EXISTING LAW TO UPHOLD THE CONSTITUTIONALITY OF AN
     IRRATIONAL AMENDMENT ..............................................................................3

II.  THE PANEL ERRED BY HOLDING THAT A RATIONAL BASIS
     CHALLENGE CANNOT BE BASED ON A CLASSIFICATION
     IRRATIONALLY LUMPING UNLIKE ENTITIES TOGETHER....................................7

III. THE PANEL'S LEGAL ERROR WAS OUTCOME DETERMINATIVE ......................10

     A.    Direct-Sales Ban..................................................................................10

     B.    Warranty-Servicing Restrictions .........................................................14

CONCLUSION .........................................................................................................15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Anderson v. Winter*, 631 F.2d 1238 (5th Cir. 1980) ..............................8, 9

*Big Tyme Investments, LLC v. Edwards*, 985 F.3d 456 (5th Cir. 2021)...................9

*Brantley v. Kuntz*, 98 F. Supp. 3d 884 (W.D. Tex. 2015) .................................. vii, 8

*Clayton v. Steinagel*, 885 F. Supp. 2d 1212 (D. Utah 2012) ..............................vii, 8

*Cornwell v. Hamilton*, 80 F. Supp. 2d 1101 (S.D. Cal. 1999)........................ vii, 8

*Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002) ........................................ vii, 5, 8

*Ford Motor Co. v. Texas Department of Transportation*, 264 F.3d 493
      (5th Cir. 2001) ...........................................................................................12

*Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698
      (7th Cir. 1984) ...........................................................................................13

*Jenness v. Fortson*, 403 U.S. 431 (1971)........................................................ vii, 7

*St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013)........................v, 6, 9, 10

## STATUTES, RULES, AND REGULATIONS

2017 La. Act 45...................................................................................................4

1999 La. Acts 2268 .............................................................................................5

Fed. R. App. Proc. 35(a)(1)............................................................................ viii

La. R.S. §32:1261(A)(1) ................................................................................4, 15

Cal. Bus. & Prof. Code §7316(b)(1) ..................................................................8

## OTHER AUTHORITIES

Lao, Marina et al., *Direct-to-Consumer Auto Sales: It's Not Just
      About Tesla, FTC* (May 11, 2015), https://www.ftc.gov/
      enforcement/competition-matters/2015/05/direct-consumer-
      auto-sales-its-not-just-about-tesla................................................................12

Letter from FTC Directors of Bureaus of Economics and Competition and Office of Policy Planning to Michigan State Senator Darwin L. Booher (May 7, 2015), https://www.ftc.gov/ system/files/documents/advocacy_documents/ftc-staff- comment-regarding-michigan-senate-bill-268-which-would- create-limited-exception-current/150511michiganautocycle.pdf .................11

## STATEMENT OF THE ISSUE

Does the equal protection clause permit an irrationally protectionist classification when the legislature adds that classification to a broader, otherwise rational law?

## STATEMENT OF FACTS AND PROCEEDINGS

Tesla is an electric-vehicle manufacturer whose success has been achieved in part by providing sales, leasing, and warranty repair services directly to consumers. But Louisiana has largely barred Tesla from operating in the state by irrationally enacting laws that ban non-franchising manufacturers, like Tesla, from selling vehicles directly and restricting their ability to perform warranty servicing. Those laws originally applied only to franchising manufacturers, and aimed to prevent them from "induc[ing] their franchised dealer[s] to make significant investments in promoting the manufacturer's brand" only for the manufacturer to "open up its own retail store … and unfairly siphon off the benefits of the dealer's investment in the brand." Brief of Amici Curiae Legal and Economic Scholars ("Scholars Br.") at 8, Doc. 79. Tesla belongs to a distinct class of non-franchising dealers, and therefore has no franchisees it could exploit in this way—making it apparent that, when the legislature amended its direct-sales ban in 2017 to cover non-franchising manufacturers, the purpose was to protect dealers from competition, not exploitation.

Tesla filed suit alleging, among other things, that these restrictions violated the equal protection clause because they lacked any basis other than protectionism. The district court dismissed this and Tesla's other claims. Tesla appealed.

On appeal, a panel of this court (Judges Smith, Haynes, and Douglas) affirmed the district court's dismissal of Tesla's equal protection challenge to the direct-sales ban and warranty-servicing restrictions. The panel held that the sole relevant legislative classification was one covering "all vehicle manufacturers," rather than non-franchising manufacturers in particular, and that this classification was rational because it advanced the state's "legitimate interest in preventing firms from vertically integrating." Op. 23-25. The panel rejected Tesla's argument that the relevant classification covered non-franchising manufacturers, on the grounds that (1) the statutory scheme speaks of "manufacturers" generally, even though the enactment Tesla challenged (a 2017 amendment) pertained only to non-franchising manufacturers and (2) Tesla's request that the court analyze the rationality of this narrower classification amounted to a request for application of a "more rigorous standard of scrutiny." Op. 23-24.

Separately, the panel reversed the district court's dismissal of Tesla's due process challenge to the Louisiana Motor Vehicle Commission's actions to exclude Tesla from the market, and vacated the district court's dismissal of Tesla's antitrust challenge premised on the Commissioners' and their co-conspirators' efforts to

accomplish the same. Appellees have sought *en banc* rehearing of those aspects of the Court's decision. Tesla is prepared to explain why such review is not warranted should the Court request a response to Appellees' petition.

## ARGUMENT

The panel's equal protection analysis committed fundamental legal errors identifying the relevant legislative classification. It held that "[t]he legislative classification that we are examining is the class of all vehicle manufacturers." Op. 23. Consequently, the sole question the panel addressed was: "what rational basis could the legislature have for barring manufacturers from serving also as dealers?" Op. 24. It declined to consider what rational basis could justify barring *non-franchising* manufacturers' direct-to-consumer sales. But that is the sole relevant question, and the panel's contrary decision contravened Fifth Circuit precedent and triggered a circuit split. Because of that, and because the relevant classification lacks any rational justification save for protectionism, the *en banc* court should (if it grants Appellee's petition) take up the equal protection issue and reverse the panel's decision.

### I. THE PANEL ERRED BY RELYING ON THE RATIONALITY OF AN EXISTING LAW TO UPHOLD THE CONSTITUTIONALITY OF AN IRRATIONAL AMENDMENT

The panel's first justification for its narrow equal protection analysis was that it was required to examine the "'classification created by the regulatory

scheme,'" which the panel took to be a classification governing "manufacturers" as a general class.  Op. 23-24.

The problem is that Tesla is *not* challenging a law that governs all manufacturers.  Tesla challenges a 2017 amendment that newly barred direct sales by non-franchising manufacturers, and *only* non-franchising manufacturers. Before 2017, Tesla would have been permitted to directly sell its vehicles in Louisiana, because state law then only prohibited franchising manufacturers from competing with their own franchise dealers. 2017 La. Act 45 (S.B. No. 107) (Amendment Notes to 2017 Amendments, La. R.S. §32:1261).  That distinct group was the sole class regulated by the law, precisely because the law sought to address distinct problems emerging from such manufacturers' relationships with their dealers.  That is consistent with the rest of Louisiana's vehicle manufacturer laws, which overwhelmingly concern the relationship between franchisors and franchisees.  *See* La. R.S. §32:1261(A)(1).  But in 2017, the state legislature amended the law to specifically target non-franchising manufacturers like Tesla and ensure that they generally may not sell cars directly to consumers without using an in-state dealer.  La. R.S. §32:1261(A)(1)(k)(i).[1]  As Tesla's complaint

---

[1] It is irrelevant whether the 2017 amendment newly extended the direct-sales ban to non-franchising manufacturers, or instead clarified that the law already reached them.  *See* Op. 4.  Even if the amendment were a mere clarification, it clarified that *non-franchising manufacturers* in particular could not sell directly.  And even if

alleged, this was done "specifically to respond to Tesla's entrance into the market in Louisiana." ROA.1641.

Tesla's challenge thus tracks *Craigmiles v. Giles*, where the Sixth Circuit rejected the argument that a protectionist amendment could be upheld merely because "the Act as a whole … provides some legitimate protection." 312 F.3d 220, 227 (6th Cir. 2002). In *Craigmiles*, the "history of the legislation … reveal[ed] a different story than one of mere oversight" producing an overbroad statute. *Id.* Rather, the legislature (as here) had "specifically amend[ed] the" law (a funeral directing licensing scheme) in order to "br[ing] casket retailers under [its] coverage." *Id.* That was fatal to the state's argument that plaintiffs complained of mere "overinclusiveness." *Id.* at 226-227. As in *Craigmiles*, Appellees should not be permitted to defend the 2017 amendment simply because the amendment grafted an irrational ban onto an older, arguably rational law.

The panel's decision holds otherwise, splitting with the Sixth Circuit. It holds that even where a plaintiff challenges a legislative enactment specifically

---

defendants were correct that the statute already reached non-franchising manufacturers before 2017, that could only be because a 1999 amendment added a prohibition on "sell[ing] a … vehicle directly" to a statute that previously spoke only of competing with a manufacturer's own dealers. *See* 1999 La. Acts 2268, 2270 (S.B. No. 799). Thus, whether in 1999 or 2017, Louisiana specifically targeted non-franchising manufacturers when it expanded the direct-sales ban beyond franchising manufacturers.

singling out a narrow group, the rationality of that classification is legally irrelevant if the enactment folds its classification into an existing, broader legislative scheme. That vitiates *St. Joseph Abbey* and the Fifth Circuit's rule against purely protectionist statutes. If a protectionist law can be saved from rational basis challenge simply by attaching it to an existing, otherwise rational statute, legislatures can easily insulate the basest protectionism by doing just that.

Indeed, the Louisiana legislature could, under the panel's logic, now adopt the very restrictions struck down in *St. Joseph Abbey v. Castille*. *St. Joseph Abbey* struck down a protectionist Louisiana law that irrationally "grant[ed] funeral homes an exclusive right to sell caskets." 712 F.3d 215, 217 (5th Cir. 2013). It did so not by directly "mandat[ing] licensure requirements for casket retailers," but instead by providing that anyone engaged in "funeral directing" must be a licensed "funeral establishment," and defining "funeral directors" to include "casket retailers." *Id.* at 223-224.

Under the panel's rule, Louisiana could evade *St. Joseph Abbey* through an easy two-step. First, pass a law imposing licensure requirements on "funeral directors," defining that category to include only individuals for whom such requirements are rational—perhaps those engaged in "cleaning or dressing of dead human bodies" or "supervision of hearses or funeral cars." 712 F.3d at 224. And then Louisiana could pass an amendment adding casket-sellers to the category of

funeral directors—just as Louisiana added non-franchising manufacturers to its existing direct-sales law. According to the panel, since the general "'classification created by the regulatory scheme'" (Op. 23-24) is rational, it is immaterial whether the subsequent enactment irrationally singled out an additional group, be that casket-sellers or non-franchising manufacturers. For any legislature with a touch of patience and drafting skill, *St. Joseph Abbey* is now a dead letter. *En banc* review is necessary to correct that.

## II. THE PANEL ERRED BY HOLDING THAT A RATIONAL BASIS CHALLENGE CANNOT BE BASED ON A CLASSIFICATION IRRATIONALLY LUMPING UNLIKE ENTITIES TOGETHER

The panel adopted a second, even more sweeping—but equally mistaken—justification for refusing to consider the rationality of restricting non-franchising manufacturers' direct sales and warranty servicing activities. The panel reasoned that because "[i]mperfect" or "over-inclusive" laws "pass constitutional muster," a rational basis challenge cannot be based on irrationally treating two unlike groups alike. Op. 24 (alteration in original). In the panel's view, Tesla's challenge "border[ed] on asking [the Court] to apply a more rigorous standard of scrutiny." Op. 24.

That holding contravenes the principle that "the grossest discrimination can lie in treating things that are different as though they were exactly alike." *Jenness v. Fortson*, 403 U.S. 431, 442 (1971). Rational basis review relaxes this principle,

but does not eliminate it. Though rational basis review requires neither "perfection" nor "mathematical" precision, it still requires that the challenged law "bear[] a reasonable relationship to the accomplishment of" the asserted objective. *Anderson v. Winter*, 631 F.2d 1238, 1241 (5th Cir. 1980). And in applying that requirement, courts are particularly "suspicious of a legislature's circuitous path to legitimate ends when a direct path is available." *Craigmiles*, 312 F.3d at 227.

*Cornwell v. Hamilton* illustrates this principle. 80 F. Supp. 2d 1101 (S.D. Cal. 1999). There, a hairbraider challenged "cosmetology" licensing requirements encompassing anyone "[a]rranging, … beautifying, or otherwise treating by any means the hair of any person." Cal. Bus. & Prof. Code §7316(b)(1). The court invalidated the law—under rational basis review—because it irrationally "attempt[ed] to squeeze two" dissimilar groups (hairbraiders and cosmetologists) "into a single, identical mold" by defining "cosmetology" to encompass both. *Cornwell*, 80 F. Supp. 2d at 1103. District courts around the country—including in the Fifth Circuit—have followed the same approach. *See, e.g.*, *Brantley v. Kuntz*, 98 F. Supp. 3d 884, 893 (W.D. Tex. 2015) ("rather than logically connecting means and ends, [law] shoehorn[ed] two unlike" groups "'into a single, identical mold'"); *Clayton v. Steinagel*, 885 F. Supp. 2d 1212, 1215 (D. Utah 2012) (similar).

By contrast, the sole case the panel relied on, *Big Tyme Investments, LLC v. Edwards*, 985 F.3d 456 (5th Cir. 2021), shows only that a plaintiff may not demand individualized consideration because a classification is imperfect at the margins. That case involved COVID restrictions that identified bars based on their liquor license type, even though some bar-like businesses had restaurant licenses and therefore fell outside the state's closure order. *Id.* at 470. The plaintiffs did not argue that two well-defined, distinct groups had been irrationally treated alike. Instead, they demanded individualized consideration of whether their facilities could safely remain open.

The principle that rational basis review cannot force a state to conduct individualized determinations in lieu of applying reasonably well-formulated categorizations says nothing about whether rational basis review permits laws, like the ones here or in *Cornwell*, that irrationally lump together distinct and well-defined groups. As *Jenness*, *Craigmiles*, and *Cornwell* make clear, it does not—such laws lack a "reasonable relationship to the accomplishment of" their asserted objectives. *Anderson*, 631 F.2d at 1241.

Again, the panel's contrary approach would have upheld the very law challenged in *St. Joseph Abbey*. As explained, *see supra* 8, the law there did not "mandate[] licensure requirements for casket retailers." 712 F.3d at 223. Instead, it defined a broader classification: people or entities engaged in "funeral

directing." And it required that any such individual be a licensed "funeral establishment" and "comply with all the statutory requirements" that entailed. *Id.* at 223-224. Again, that was likely rational for many "funeral directing" entities, like cadaver-preparers and hearse-directors. The law's fatal defect was that it had *also* lumped casket-retailers with them, when the rational grounds for the policy did not apply. But the panel's decision here declares that this is no defect—that the very claim in *St. Joseph Abbey* was a mere overbreadth challenge, rather than a challenge to the deliberate, irrational choice to treat discrete, unlike categories as if they were the same. The panel's decision thus writes *St. Joseph Abbey* out of the law—and warrants the *en banc* court's attention.

## III.   THE PANEL'S LEGAL ERROR WAS OUTCOME DETERMINATIVE

Once these legal errors are resolved, the relevant question is clear: Is there a rational basis for preventing non-franchising car manufacturers from selling cars directly to consumers or providing warranty servicing for those vehicles? There is not.

### A.   Direct-Sales Ban

The universal consensus is that direct-sales bans serve no consumer protection purpose. *See* Scholars Br. 25-26 (there is "no basis in history, public policy, or economics" for construing "direct sales bans as consumer protection measures"). As the FTC has said in urging an end to direct-sales bans, these laws

"operate as a special protection for dealers—a protection that is likely harming both competition and consumers."  Letter from FTC Directors of Bureaus of Economics and Competition and Office of Policy Planning to Michigan State Senator Darwin L. Booher 1 (May 7, 2015).[2]  Furthermore, because these laws also exclude carmakers, like Tesla, who rely on a direct-sales model to operate, they limit the options available to car purchasers.  They also make the market "less responsive to consumer preferences and less innovative in anticipating their evolving needs" by curbing the "essential mechanism that drives markets—the interaction between the supply by manufacturers and the demands of consumers." *Id*. at 8.  The resulting "system limits competition" and "deters experimentation." *Id.* at 7-8.  And predictably, "consumers are paying the price."  *Id.* at 8.  That cannot be rationally described as "preventing firms from … abusing … consumers" in any relevant respect.  Op. 25.  It protects consumers from only one thing:  a properly functioning market.

Nor does a direct-sales ban on non-franchising dealers protect *dealers* from abuse.  As scholars supporting Tesla explained in their brief, franchising manufacturers' "superior power" over their franchised dealers cannot "support a

---

[2] https://www.ftc.gov/system/files/documents/advocacy_documents/ ftc-staff-comment-regarding-michigan-senate-bill-268-which-would-create-limited- exception-current/150511michiganautocycle.pdf.

prohibition on direct sales by manufacturers who do not employ franchised dealers at all." Scholars Br. 20. The FTC has said the same: "Protecting dealers from abuses by manufacturers does not justify a blanket prohibition … which extends to all vehicle manufacturers, even those like Tesla … who have no interest in entering into a franchise agreement with any dealer." Lao et al., Direct-to-Consumer Auto Sales: It's Not Just About Tesla, FTC (May 11, 2015).[3]

The panel reached a contrary decision by misreading *Ford Motor Co. v. Texas Department of Transportation*, 264 F.3d 493 (5th Cir. 2001). *Ford* considered only the rationality of a sales ban for *franchising* manufacturers—not for *non*-franchising manufacturers like Tesla. The court upheld a law prohibiting car manufacturers who sold vehicles via third-party dealerships from also operating their own dealerships. That was because this arrangement posed a specific danger: Since a manufacturer occupied a "superior market position to its dealers," it might "tak[e] advantage of [its] incongruous market position" at the dealers' expense—for instance, by forcing dealers to make expensive upfront investments and then immediately undercutting them. *Id.* at 503-504. *Ford* therefore does not articulate a rational interest applicable here.

---

[3] https://www.ftc.gov/enforcement/competition-matters/2015/05/direct-consumer-auto-sales-its-not-just-about-tesla.

Tellingly, the panel's decision does not try to explain what actual harm could flow from Tesla selling cars directly to customers.  Instead, the panel believed that this was irrelevant—that instead, the state has an "open-ended" interest in avoiding unspecified dangers of "vertical integration."  Op. 25.  That cannot be correct.  "Vertical integration is a universal feature of economic life," which it would be "absurd" to treat as inherently suspicious. *Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 710 (7th Cir. 1984).  Indeed, the economic literature is clear that vertical integration generally benefits consumers. *See id*.  That is certainly true in the car industry—by removing dealer middlemen from the picture, vertical integration eliminates dealer mark-ups, add-ons, and other unnecessary fees.  No wonder, then, that when the panel asserted that the "state has a legitimate interest in preventing firms from vertically integrating and abusing the resulting power" on "consumers," it did not even *attempt* to explain what "abuse" it had in mind, or how that abuse would come to pass.  Op. 25.

Again, the panel misread *Ford* to reach a contrary result.  *Ford* does not say that avoiding "vertical integration" is a rational end unto itself—instead, that decision rested on a specific danger (manufacturers exploiting their own dealers) that has no application here.  Perhaps recognizing as much, the panel invoked a different danger of vertical integration—that vertically integrated, non-franchising manufacturers might "abuse[] the[ir] resulting power [] on … other dealers."  Op.

25. But the panel cannot say what that means. How would Tesla exploit its power over a dealer with whom it lacked any commercial relationship? The only answer is that Tesla would "abuse" that dealer by providing a better product at a lower price, undercutting its profits. But protecting dealers from that kind of "abuse"— that is, protecting them from competition—is protectionism in its purest form. That is not a rational basis capable of sustaining Louisiana's classification on non-franchising manufacturers.

### B.    Warranty-Servicing Restrictions

The panel opinion says hardly anything about what rational basis justifies Louisiana's warranty-servicing restrictions, instead just briefly reiterating its concern over vertical integration. Op. 26. The district court had speculated that the restrictions "could help assure that all entities providing these services meet 'the same basic level of requirements for special tools, technician certification, and training.'" ROA.2383-2384. But there is no rational relationship between that asserted objective and the warranty-servicing restrictions. Tellingly, the restrictions contain no requirements for tools, certification, or training. And neither the district court, nor the court of appeals, nor Appellees have ever explained why a vehicle's manufacturer would be *categorically unqualified* to maintain the proper tools, certification, and training to service its own vehicles.

Demonstrating just how untenable this supposed justification is, Louisiana law elsewhere reflects the understanding that manufacturers are entirely trustworthy when it comes to servicing and repairs of their vehicles. The law entrusts manufacturers to unilaterally decide on the appropriate requirements for fleet-owner warranty servicers. La. R.S. §32:1261(A)(1)(t)(ii) (giving manufacturers "sole discretion" to decide what "special tools, technician certification, and training" are required for a fleet owner to perform warranty repairs). And the Commission appears to accept that the law permits Tesla to service its leased vehicles without issue.

When the law confers on Tesla both the authority to declare the standards others must follow for repairs, and to repair some cars itself (inexplicably depending on the car's ownership status), it is incomprehensible that the law should bar Tesla from servicing customer-owned vehicles. The only explanation is that the law serves not to ensure safe and reliable repairs, but instead to impede Tesla's operations in the State—to protect incumbent businesses.

## CONCLUSION

If the court grants rehearing as to the panel's due process or antitrust holdings, it should also grant rehearing as to its equal protection holding.

Respectfully submitted.

MARK R. BEEBE (#19487)
DIANA COLE SURPRENANT (#33399)
ADAMS AND REESE LLP
701 Poydras Street, Suite 4500
New Orleans, LA 70139

/s/ Ari Holtzblatt

ARI HOLTZBLATT
ANDREW K. WAKS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 663-6000
ari.holtzblatt@wilmerhale.com

DAVID GRINGER
ANDRES C. SALINAS
TONY J. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007

*Counsel for Plaintiffs-Appellants*

September 13, 2024

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 3,899 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Ari Holtzblatt
ARI HOLTZBLATT

September 13, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Ari Holtzblatt
ARI HOLTZBLATT

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 26, 2024

Lyle W. Cayce
Clerk

No. 23-30480

Tesla, Incorporated; Tesla Lease Trust; Tesla Finance, L.L.C.,

*Plaintiffs—Appellants,*

*versus*

Louisiana Automobile Dealers Association, *In itself and on behalf of its members, executive committee*, and Board of Directors; Gregory Lala, *In his official capacity as Chairman of the Louisiana Motor Vehicle Commission*; Allen O. Krake, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; V. Price Leblanc, Jr., *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; Eric R. Lane, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; Kenneth Mike Smith, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; P.K. Smith Motors, Incorporated; Keith P. Hightower, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; Keith M. Marcotte, *In his Official Capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; Wesley Randal Scoggin, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; Scott A. Courville, *In his Official Capacity as a Commissioner of the Louisiana Motor Vehicle Commission*; Donna S. Corley, *In her Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and her private capacity*; Terryl J. Fontenot, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; T & J Ford, Incorporated; Maurice C.

Guidry, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; Golden Motors, L.L.C.; Raney J. Redmond, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission*; Joseph W. Westbrook, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity, also known as Bill Westbrook*; Stephen Guidry, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; Joyce Collier LaCour, *In her Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission*; Thomas E. Bromfield, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission*; Edwin T. Murray, *In his Official capacity as a Commissioner of the Louisiana Motor Vehicle Commission and his private capacity*; Ford of Slidell, L.L.C., *doing business as* Supreme Ford of Slidell; Gerry Lane Enterprises, Incorporated, *doing business as* Gerry Lane Chevrolet; Holmes Motors, L.L.C., *doing business as* Holmes Honda; Airline Car Rental, Incorporated, *doing business as* Avis Rent-A-Car; Shetler-Corley Motors, Limited; Leblanc Automobiles. L.C., *incorrectly named as* Leblanc Automobiles, Inc.; Morgan Buick GMC Shreveport, Incorporated, *incorrectly named as* Morgan Pontiac, Inc.; P.K. Smith Motors, Incorporated, *in his private capacity*; Commissioners of the Louisiana Motor Vehicle Commission and their Dealerships; Stephen L. Guidry, Jr.,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:22-CV-2982

---

No. 23-30480

Before Smith, Haynes,[*] and Douglas, *Circuit Judges*.
Jerry E. Smith, *Circuit Judge*:

Louisiana law generally prohibits automobile manufacturers from selling directly to consumers or performing warranty services for cars that the manufacturers do not own. The Commission, which by law is composed of market incumbents, is tasked with enforcing those provisions.

Plaintiffs are three Tesla entities (together, "Tesla"). Defendants are Commissioners of the Louisiana Motor Vehicle Commission in their private and official capacities, the Louisiana Automobile Dealers' Association ("LADA"), and dealerships owned by the Commissioners. Tesla challenged the aforementioned law, alleging, *inter alia*, violations of (1) federal antitrust law, (2) its federal due process rights, and (3) its federal equal protection rights. The district court dismissed, and Tesla appeals. We reverse the dismissal of the due process claim, vacate and remand the dismissal of the antitrust claim, and affirm the dismissal of the equal protection claim.

## I.

Tesla began manufacturing cars in 2008. Its business model has several distinct features. Most relevant is that it exclusively markets, sells, and leases its cars directly to consumers and through a network of stores that it owns and operates. It does not do so through third-party dealers.

Louisiana passed the first rendition of its dealership-regulation regime in 1954. *Benson & Gold Chevrolet, Inc. v. La. Motor Vehicle Comm'n*, 403 So. 2d 13, 16 (La. 1981). Before 2017, that law provided that no manu-

---

[*] Judge Haynes concurs in full in the affirmance of the dismissal of the equal protection claim and concurs in the judgment only as to the reversal of the dismissal of the due process claim and the vacatur and remand of the antitrust claim.

facturer (save for a few exceptions) may "sell or offer to sell a new or unused motor vehicle directly to a consumer." La. Rev. Stat. Ann. § 32:1261-(A)(1)(k)(i) (2016)).

In 2017, Louisiana amended the statute. 2017 La. SB 107. Tesla avers that, before the amendment, it would have been allowed to sell because "state law then only prohibited franchising manufacturers from competing with their own franchise dealers." Defendants disagree. LADA notes that "Tesla has *never* lawfully sold its cars directly to consumers in Louisiana." (Emphasis added.) The Commission avers that though "[t]here is no pre-2017 caselaw interpreting [the relevant] language," direct-to-consumer sales by a manufacturer would have violated the law "full stop." Either way, there is no dispute that after the amendment, Tesla would not be permitted to sell directly to consumers except through an in-state dealer. Tesla contends that that change was made "at the behest of Tesla's competitors."[1] LADA concedes that it successfully lobbied the legislature to, as they put it, "clarify" the law. Tesla says that because of that change, "if Tesla wishes to participate in the market for automobiles in the State of Louisiana, Tesla must forgo its successful (and necessary) business model."

Though Tesla does have a license to lease vehicles in Louisiana, it has not sought a license to sell vehicles there. Tesla posits, however, that there is an exception in Louisiana law that allows it to perform warranty repairs in

---

[1] Tesla limits the scope of its challenge to the 2017 amendment:

Plaintiffs do not challenge the enactment of this law as part of their antitrust or unfair trade practice claims. Nevertheless, a plaintiff may properly include evidence of immune lobbying activity in its antitrust allegations insofar as that evidence serves to illustrate the context and motive underlying the alleged anticompetitive conduct.

(Cleaned up.)

the state—namely, though Louisiana law generally prohibits "a manufacturer . . . [from] operat[ing] a satellite warranty and repair center," there is an exception for "fleet owner[s]." La. Rev. Stat. Ann. § 32:1261-(A)(1)(t). Tesla maintains that, through its entities, it is a fleet owner.

As of early 2023, there were "thousands of registered Tesla vehicles in Louisiana" even without direct sales. It currently provides warranty services at its New Orleans service center. Tesla worries that the Commission threatens this practice by being able, as Tesla puts it, "improperly [to] construe" the "fleet-owner provision . . . to exclude Tesla."

Tesla avers that its "competitors have pursued every avenue to bar Tesla from the market," including "block[ing] Tesla from local markets altogether by promoting protectionist legislation and by coopting state regulatory authority." Tesla avers that the loss of its ability to perform warranty repairs in the state would make it unable to compete in that market. Tesla sees the 2017 restrictions on direct sales as one example of interference by competitors. It also avers that competitors in the state have coopted the Commission.

The Commission is the body charged with enforcing much of state law governing "distribution and sale of motor vehicles." La. Rev. Stat. Ann. §§ 32:1251, 32:1253(E). And it is given broad powers to do so. *Id.* § 32:1253(E). The Executive Director of the Commission "has the authority to issue all licenses upon receipt of applications that comply with the statutes and rules of the commission." La. Admin. Code tit. 46 § V.105(A). He or she also has subpoena power. *Id.* § V.303(B). "The commission has the responsibility to consider and determine the action necessary upon all charges of conduct which fail to conform to" the laws the Commission is charged with enforcing. *Id.* § V.301(A).

According to Tesla, competing dealerships "comprise[] a controlling

majority of the government" Commission.  Tesla adds that the Commission seeks to "drive Tesla from the . . . market" by interpreting existing Louisiana law in a way that would bar Tesla's leasing and warranty repair activity in the state.  The Commission has also used its power to "initiate a costly investigation of Tesla."

The Commission is composed of 18 members, 15 of whom exercise the power relevant here.  *See generally* La. Rev. Stat. Ann. § 32:1253.[2] Each of those 15 members must be a licensee of the Commission.  *Id.* § 32:1253(A)(2).  Nine of those 15 are associated with competitor dealerships and defendants in this case.[3]  They are also all members of defendant LADA—which "represent[s] nearly 350 new motor vehicle car and heavy truck dealers in Louisiana."  At least one commissioner has served on the board of LADA.  LADA met with the Commission numerous times over the course of five years to urge it to revise its interpretation of Louisiana law in a way not favorable to Tesla.

Once Tesla announced that it would be opening a New Orleans service center in 2018, there was a flurry of activity.  The former Chairman of the Commission and a member of LADA, Ray Brandt, forwarded an article about the announcement to the Commission's Executive Director, Lessie House, who responded "I am on it."  Another member of LADA, Matt Baer, also raised the issue with House, to which House responded, "We are on top of this."  Paul Stroed, a member of Louisiana's largest dealer group, said, in an email ultimately forwarded to House, that it "[was] not good for the future

---

[2] *See also id.* § 32:1253(A)(3)(a) (laying out a more limited role for 3 of the 18 members of the Commission who are appointed from the state at large).  The Commission agrees with Tesla that those members' responsibilities are not relevant to this case.

[3] The other 6 commissioners are involved in the motor vehicle industry but are not direct competitors with Tesla, though they might associate with direct competitors.

of our business if the state lets" Tesla open the center.  House responded, "On top of it."[4]  And LADA admits that it "lobb[ied] the Commission . . . to rule that Tesla could not do as it planned."

Much later, in March 2020, LADA wrote a letter to the then-Chairman, Allen Krake, suggesting ways to impede Tesla's ability to open the service center.  In June of that year, a state representative, Phillip Devillier, requested a formal opinion from the Attorney General of Louisiana about the lawfulness of Tesla's activities and suggested that LADA's answers were correct.  The Attorney General turned to the Commission, which sided with Tesla.  The Commission's opinion was quite clear:

> (1) "It is not a violation of law for a manufacturer or distributor to lease new vehicles directly to consumers."

> (2) "[A] manufacturer . . . may perform warranty services directly without using a dealer . . . when the manufacturer . . . is a fleet owner and performs warranty work on its own fleet."

Tesla took issue with the fact that the Commission's answer was based on the implicit assumption that Tesla was a "fleet owner"—a determination made by the Commission.  But the opinion also plainly states that the "definition [of 'fleet owner'] applies to Tesla Lease Trust."  The Commission also referenced its discussions with LADA and expressed concerns about potential antitrust liability for itself and its members.  Though LADA had tried numerous times "to convince [the Commission] to revise its interpretations," the Commission "has always openly held (and directly stated to LADA) that it would issue a license to Tesla if Tesla met the statutory guidelines."  In fact, it had done just that, approving a motor vehicle

---

[4] None of Brandt, House, Baer, or Stroed is a defendant.

No. 23-30480

lessor license for Tesla Lease Trust in 2019. Nevertheless, in August 2020, the Attorney General sided with LADA and against the Commission.

Five days before the Attorney General's opinion was published, the Commission began an investigation of Tesla and issued a subpoena to Tesla Lease Trust ("TLT").[5] LADA avers that that subpoena was motivated by the "complaints [to the Commission] that Tesla was skirting the law by performing warranty repairs on vehicles not titled to TLT." TLT responded to this first subpoena. Tesla says that it responded because it was "[u]naware of the illegal conspiracy" and because the subpoena had a "narrow scope."

A month later, the Commission issued a second subpoena, which was withdrawn, for records stretching back to 2013. In February 2021, the Commission issued a third subpoena "for any records identifying vehicles leased in Louisiana by Tesla Lease Trust and identifying and/or referencing warranty service and/or warranty repair performed on any and all motor vehicles in Louisiana from June 1, 2019, to the present" (cleaned up). In Tesla's words, "This third subpoena expressly targeted Tesla Lease Trust over Tesla's performance of warranty repairs in alleged violation of La. Stat. § 32:1261(A)(l)(t)(i), under a strained interpretation of 'fleet owner' by the Commission." The Commission characterizes the subpoena differently: "[T]he commission asked Tesla Lease Trust, as a 'fleet owner,' to identify its 'fleet' and then identify whether it was performing warranty repairs on cars beyond its fleet—which would be unlawful" (footnote omitted).

Tesla objected, stating that it was a "fleet owner" and therefore outside the authority of the Commission. In continuing to press the subpoena, Tesla alleges that the Commission has revealed "it intends to adopt the view that Tesla is not a fleet owner." In April, the Commission filed a motion to

---

[5] The subpoena was issued by House, who again is not a defendant.

compel Tesla to respond to the subpoena in proceedings before the Commission. Tesla asked for a continuance and for a determination of whether it was a fleet owner. The Commission denied the continuance and ordered Tesla to respond to the subpoena. But it also stayed Tesla's obligation to respond while Tesla sought judicial review. Tesla asked for rehearing on the motion to compel, which was denied. Tesla's direct competitors participated in those votes.[6]

Tesla sought review of those decisions in state court. Those proceedings are ongoing. Tesla has continued to perform warranty repairs in Louisiana. The Commission avers this service extends to "vehicles beyond Tesla Lease Trust's fleet" (footnote omitted).

Tesla filed this lawsuit in August 2022. As relevant here, the first amended complaint asserts (1) a violation of federal antitrust law, (2) a violation of Tesla's due process rights under the Fourteenth Amendment, and (3) a violation of its equal protection rights under the Fourteenth Amendment.

The district court dismissed each claim with prejudice. On antitrust, it reasoned that the private defendants were immune from liability under the Sherman Act, and that Tesla had not plausibly pleaded a Sherman Act violation against the governmental defendants under *Twombly*. On due process, it decided that there was insufficient probability of actual bias to rise to the level of a constitutional violation. On equal protection, the district court ruled that the regulations passed rational-basis review.

---

[6] For the purposes of our proceedings, "Tesla does not ask this Court to enjoin those proceedings or to issue any declaration on the requirements of state law. Rather, Tesla asks this Court to declare that—whatever the proper construction of state law—the Commission as currently structured is not constitutionally fit to answer those questions consistent with Due Process."

## II.

Our standard of review is well established:

> We review a Rule 12(b)(6) dismissal de novo. . . . Although we accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal conclusions are not accepted as true.

*Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir. 2024) (cleaned up).

## III.

Tesla's sense that there is something wrong with this scheme is vindicated by its due process claim. We reverse the dismissal of that claim.

*The Gibson-Wall Framework.* The seminal due process case on industry self-regulation is *Gibson v. Berryhill*, 411 U.S. 564 (1973). It involved the Alabama Board of Optometry, which was composed only of independent optometrists. *See id.* at 567. That board sought to revoke the licenses of non-independent optometrists. *See id.* That attempt was enjoined by a three-judge district court. *Id.* at 570.[7] "For the District Court, the inquiry was not whether the Board members were 'actually biased but whether, in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him.'" *Id.* at 571 (citation omitted).

The Supreme Court affirmed the district court, which had found, in part, that where the composition of the board meant that "success in the Board's efforts would *possibly* redound to the personal benefit of members of the Board, sufficiently so that in the opinion of the District Court the Board was constitutionally disqualified from hearing the charges filed." *Id.* at 578

---

[7] And appealed directly to the Supreme Court. 411 U.S. at 572.

No. 23-30480

(emphasis added). And the Court did so quite explicitly: "[W]e affirm, only on the . . . ground of *possible* personal interest." *Id.* at 579 (emphasis added). The Court concluded that "those with substantial pecuniary interest in legal proceedings should not adjudicate . . . disputes" governing revocation of a competitor's license to practice in the relevant industry. *Id.* at 579.[8]

More color is provided by *Wall v. American Optometric Association*, 379 F. Supp. 175, 178–79 (N.D. Ga.), *aff'd mem.*, 419 U.S. 888 (1974).[9] There, the district court stopped a board composed of mainly "dispensing" optometrists from exercising "complete control over who may enter the optometry profession in Georgia." *Id.* at 179. That includes control over "prescribing" optometrists who distribute their products to customers in a different way. *Id.* at 178.[10]

*Tesla need not plead actual bias.* Tesla maintains that actual bias is not a pleading requirement.[11] Tesla criticizes the actual-bias requirement used by the district court and drawn in part from *Megill v. Board of Regents*,

---

[8] "This fundamental right applies equally to proceedings before an administrative agency." *Ford Motor Co. v. Tex. DOT*, 264 F.3d 493, 511 (5th Cir. 2001) (citing *Gibson*, 411 U.S. at 569).

[9] At least in some contexts, summary affirmances by the Supreme Court can be "highly persuasive—if not controlling." *Rios v. Dillman*, 499 F.2d 329, 334 n.8 (5th Cir. 1974). Such affirmances are particularly salient where the Supreme Court has later relied on the summarily affirmed case. *See Friedman v. Rogers*, 440 U.S. 1, 18 (1979) (discussing "*Gibson* and *Wall*.")

[10] The Commission fails to distinguish *Wall*. It places undue emphasis on the district court's observation that "every current incumbent member of the board [was] a member of the" trade association. 379 F. Supp. at 188. That cannot be fairly read to say that a plaintiff can obtain relief only where *every* member of a board is financially interested. Is there any reason to believe that a board skewed 99-1 would not be a problem, but a board skewed 100-0 would?

[11] *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (noting that the Due Process Clause "preserves both the appearance and reality of fairness." (citation omitted)).

541 F.2d 1073, 1079 (5th Cir. 1976), as having been "drawn from a line of inapposite cases that uniformly involve tenure and disciplinary proceedings at universities." Those cases are different, says Tesla, because (1) the adjudicators do not have the same sort of structural economic incentives for bias, (2) those cases were further along in the litigation process when there was enough evidence to adjudicate actual bias, and (3) "federal courts should be loath to intrude into internal school affairs." *Megill*, 541 F.2d at 1077. Tesla also notes that in *Megill*, pecuniary bias does not seem to have been alleged. *See id.* at 1079.[12]

The Commission points to *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) as a "good example of why Tesla entities' due-process claim fails." There the Court upheld what the Commission sees as a lawful investigation by an agency. As the Commission describes it, in *Withrow* the "Court then rejected the plaintiff's claim that the board was unconstitutionally biased because its investigatory efforts allegedly dictated how it would adjudicate potential discipline." As Tesla notes, that's not so much about regulating direct competitors but is, instead, about the negative effects of the "combination of the investigative and adjudicative functions." *Id.* That is not the issue here.

Moreover, it is true that *Withrow* uses the language "actual bias" three times. But in two of those instances—spoken about in the immediate context of pecuniary interest—the Court used the phrases "probability of actual bias" and "risk of actual bias." *Withrow*, 421 U.S. at 47. There is no apparent daylight between "risk of actual bias" and "possible bias."[13] The third instance is in a footnote that discusses an issue not reached by the dis-

---

[12] Though the procedural posture of *Megill* is unclear, it also seems to be at a stage other than the motion to dismiss. *See id.*

[13] Risk is the "*possibility* of . . . injury." *Risk*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/risk (emphasis added).

trict court and is apparently about bias based on deeply held ethical differences. *See id*. at 54 n.21.

Tesla is right that there is no need for it to plead actual bias, for at least three reasons. First, *Gibson* and *Wall* do not impose a showing of actual bias; rather, the most natural reading strongly suggests that possible bias is sufficient. *See, e.g.*, *Gibson*, 411 U.S. at 579 (affirming on a "ground of *possible* personal interest."). Second, for the reasons Tesla advances, neither *Megill* nor *Withrow* adds such a requirement. Finally, it is hard to imagine what a pleading of actual bias at the motion-to-dismiss stage would even mean. What is "plausible actual bias" other than "possible bias?"[14]

*We need not wait longer to intervene if there is a due process violation.* The Commission points out that the district court in *Wall* initially withheld relief when the plaintiffs made a claim just based on the board's composition. *See Wall*, 379 F. Supp. at 180. Only once the board levied a disciplinary action against an optometrist did the court act. *See id.* In *Gibson*, "disciplinary proceedings had been instituted against the plaintiffs." *Friedman*, 440 U.S. at 18. Here, the Commission posits that "the commission has not taken any disciplinary or enforcement action against any Tesla entity." Any such action is—at this point— merely potential.

Tesla responds that the Court intervened in *Gibson* and *Wall* only after hearings had been noticed but before the actual hearings. *Gibson*, 411 U.S.

---

[14] Were we to reach whether Tesla has plausibly pleaded actual bias, we should still reverse. At the motion-to-dismiss stage, it is impermissible to do the sort of weighing that the Commission and LADA want us to do. *Cf. Gen. Land Office of Tex. v. Biden*, 71 F.4th 264, 274 (5th Cir. 2023) ("[A]t the pleading stage, they are not yet obliged to produce specific evidence to counter the . . . defendants' merits arguments."). Tesla has alleged that various dealers reached out to the Commission and received responses along the lines of "We're on it." The Commission subsequently started investigating Tesla for regulatory violations. That is plausible actual bias based on well-pleaded facts.

No. 23-30480

at 569; *Wall*, 379 F. Supp. at 180. The court in *Gibson* found that the fact "that the administrative body itself was unconstitutionally constituted" rendered it "not entitled to hear the charges filed against the appellees." 411 U.S. at 577.

In other words, there is no need to wait for the unconstitutional hearing to occur; notice of intent is sufficient. Tesla is right on this point. The Commission has already begun exercising power over Tesla at the very least by issuing subpoenas to TLT.[15]

*Friedman*, 440 U.S. at 18, does not indicate otherwise. That decision foreclosed pre-enforcement challenges to regulatory authority based on the composition of the regulatory body alone. *See id.* It held that a plaintiff "ha[d] no constitutional right to be regulated by a Board that is sympathetic" to his preferred business model. *Id.* The Court distinguished *Gibson*, saying that in that case "courts were able to examine in a particular context the possibility that the members of the regulatory board might have personal interests that precluded a fair and impartial hearing of the charges." *Id.* On the other hand, "the *Friedman* plaintiffs never alleged the Board members would act out of self-interest instead of fairness, only that the board's composition itself was unfair." *Ass'n of Am. R.R.s*, 821 F.3d at 35.

In short, Tesla does not have a right to a specific Commission composition, but it does have a "right to a fair and impartial hearing." *Friedman*, 440 U.S. at 18. Tesla reads *Friedman* as standing at most for the proposition

---

[15] One might draw a line between adjudicative and executive—here, investigatory—power. In this context, that is a distinction without a difference. It would be odd to suggest that a board which cannot constitutionally adjudicate a claim because of bias could investigate and prosecute that claim. Prosecutors and judges alike recuse when they are personally biased. There is reason to believe that authorities with rule-making power differ. *See Ass'n of Am. R.R.s v. U.S. Dep't of Transp.*, 821 F.3d 19, 27 n.3 (2016). But this clearly falls on the adjudicative/executive rather the rulemaking side.

that "*some* action must be taken against a plaintiff before suing." Tesla is correct. *Friedman* supports the earlier requirement that some action must be taken. That criterion is met here.

Gibson *and* Wall *control this case.* Ultimately, we must determine whether Tesla's claim falls within the *Gibson* and *Wall* line of cases. Tesla avers that it does, pointing to allegations that members of the Commission compete directly with Tesla, that they have a general interest in the franchised-dealer model, and that Commissioners have strong financial incentives to keep Tesla out of Louisiana. Tesla also notes that dealers have made statements to the effect that its entry into Louisiana is "not good for the future of our business." Tesla points to examples of what it sees as "concrete evidence that the Commissioners have joined with other private dealers in the common purpose to exclude Tesla from the market," including

- votes against Tesla,
- issuance of subpoenas,
- further votes to enforce those subpoenas,
- numerous meetings between LADA and the Commission to try to get the Commission interpretively to exclude Tesla from the market,
- an email from a dealer to Executive Director House complaining about Tesla's entry, and House's response that he was "[o]n top of it," and
- the Commission's determination that the fleet-owner exception does not allow warranty repairs on sold vehicles.

LADA avers that these concrete examples are insufficient because the Commission sided with Tesla against LADA and the attorney general.[16]

---

[16] Tesla responds that even if it were proper to consider the siding of the Commission against the Attorney General at this stage of the pleading, it is still not dispositive. After all, the Commission's decision letter suggests that the Commission may have been driven by fear of antitrust liability rather than neutral interpretation of the law. Tesla avers that the Commission would obviously not adopt what it sees as a "facially absurd" legal interpretation where then are other more perceptibly neutral ways to achieve its anti-competitive goals, such as barring Tesla from servicing sold vehicles and discouraging other

No. 23-30480

LADA defends the subpoenas as lawfully issued and urges that the only way to demonstrate that they were the products of bias is to show that they were completely off-base legally.  In defendants' view, the Commission was just acting as the enforcer of Louisiana law.  That's especially apparent when "the subpoenas are a logical outgrowth of the Commission's decision to side with Tesla in determining that TLT could lease and service cars in the state if it complied with the terms of the fleet exception."

The Commission expands on the context relevant here, adding that

- the Commission has never taken action based on the Direct Service Ban,
- the Commission advocated in favor of Tesla and against the Attorney General regarding the applicability of the warranty services ban, and
- the Commission has not adopted any rules or regulations to enforce the attorney general's interpretation.

As a result, the Commission thinks that the only conduct relevant here is the issuance of the subpoenas, which it sees as a lawful use of investigatory power.  After all, in its view, the subpoenas are a logical outgrowth of the Commission's decision to *side with Tesla* in determining that TLT could lease and service cars in the state if it complied with the terms of the fleet exception.

Ultimately, Tesla is right that this falls within the unconstitutional mire that *Gibson* and *Wall* proscribe, for two reasons.  *First*, these cases do not require a showing of actual bias.  *See supra.*  Even if LADA is one hundred percent right that this investigation is completely above board legally, that is not the problem at which *Gibson* and *Wall* take aim.  They stand for a much broader proposition: "[T]hose with substantial pecuniary interest in legal

---

direct-to-consumer models.

proceedings should not adjudicate disputes" governing revocation of a competitor's license to practice in the relevant industry, *Gibson*, 411 U.S. at 579—even if that authority is otherwise lawfully exercised.

*Second*, even if these cases did require a showing of actual bias, Tesla has pleaded enough to survive a motion to dismiss. Of particular concern are the emails from the Executive Director of the Commission to Tesla's competitors assuring them that Tesla's entry into the market would be dealt with. Even if in one instance—going against the Attorney General's interpretation, the Commission did not take a maximally anti-Tesla view, Tesla has pleaded enough specific facts to demonstrate *plausible* actual bias.

*Remaining objections.* There are a few more unpersuasive objections to Tesla's due process claim. First, the district court objected to Tesla's claims about the bias of the Commission for at least one more reason: that, in the court's view, the Commission had an incentive to compete with Tesla only in the *sales* market but not the *leasing and warranty services* market. But the complaint alleges that Tesla does compete with the members of the Commission in the leasing and warranty-servicing market, and that there are spillover effects into the sales market as well.

Second, LADA contends that the Commission is not the ultimate decisionmaker with respect to its rulings against Tesla because the legislature can change the laws and Tesla can get review in the courts. But the ability to petition the legislature and seek review in the courts does not obliterate Tesla's due process rights before the executive.[17]

---

[17] *See Gibson*, 411 U.S. at 577 n.16 (recognizing that Alabama courts had provided *de novo* review of licensing decisions); *cf. Ward v. Monroeville*, 409 U.S. 57, 61 (1972) ("Nor, in any event, may the State's trial court procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication.").

No. 23-30480

Nor does *Chrysler Corp. v. Texas Motor Vehicle Commission*, 755 F.2d 1192 (5th Cir. 1985), resolve this claim against Tesla. That case involved a dealer-majority commission that resolved "warranty-related disputes between the purchasers of new vehicles and automobile manufacturers." *Id.* at 1195. The court found that "the predictors of bias . . . point in opposite directions." *Id.* at 1199.

Here, however, the bias is predictable. The Commission will always be incentivized to exclude new business models from entering the market.[18] Moreover, *Chrysler* supports the idea that the *possibility* of bias is a sufficient showing—at least where there is a pecuniary interest. *See id.* at 1199.[19]

Finally, LADA advances that none of these due process concerns arises where members of a regulatory scheme "function subordinately" to a governmental actor such that the governmental actor makes the market-

---

[18] Look at how *Chrysler* described the key dynamic:

> Perhaps the dealers on the Commission will be unsympathetic to manufacturers who contend that a claimed defect was only an inept repair effort by a dealer. Yet, we can equally speculate, if we are to speculate, that a dealer will be quick to find fault with his direct competitor—the dealer. Moreover, it is also possible that a dealer member of the Commission would tend to be biased in favor of manufacturers of his own make of car so that the brand he sells will not develop a reputation as a "lemon."

755 F.2d at 1199. That dynamic is not at play here.

[19] In delineating the line of cases culminating in *Gibson*, our court described the holding in *Tumey v. Ohio*, 273 U.S. 510 (1927) as follows:

> The Court adopted an objective test, not set by ". . . men of the highest honor and the greatest self-sacrifice . . ." but that of whether the procedure "offers a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true. . . ."

*Chrysler*, 755 F.2d at 1198. Of course, *Tumey* a criminal case. But we read this passage as expressing one standard's being passed from *Tumey* to *Ward* and *Gibson*.

No. 23-30480

impacting determinations that there is no due process violation. *See Sunshine Antracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). Tesla correctly retorts that this is a "brand-new rule [taken] from irrelevant private nondelegation cases." In context, the language about subordinate functioning concerns whether "Congress has delegated its legislative authority to the industry." *Sunshine Antracite*, 310 U.S. at 399. Decisions that "sound in . . . due process . . . have little bearing" in the private-delegation context. *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,* 53 F.4th 869, 890 (5th Cir. 2022). The inverse is also true.

Because Tesla has pleaded a due process claim in line with *Gibson* and *Wall*, we reverse the dismissal of the due process claim.[20]

## IV.

We vacate and remand the dismissal of Tesla's antitrust claim because our due process ruling fundamentally alters the grounds on which Tesla's alleged antitrust injury was based.

---

[20] The brief treatment of the due process claim in *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415, 420 (5th Cir. 2024), does not call our analysis into question. In that case, we "agree[d] that HISA does not violate the Due Process Clause by putting financially interested private individuals in charge of competitors." *Id.* But our holding was predicated on two bases not present here.

First, the challenged regime had conflict-of-interest provisions that screened out "individuals with financial interests in, or who provide goods or services to, covered horses; officials, officers, or policy makers for an equine industry; and employees, contractors, or immediate family members of the prior individuals." *Id.* at 436 (citation omitted). Second, based on the facts established at a bench trial, the plaintiffs in that case "relied only on the committee members' biographical information but adduced no other evidence showing their adverse interests, financial or otherwise." *Id.* (citation omitted).

The present case is at a very different stage of litigation. At the motion to dismiss, Tesla need only plead enough specific facts plausibly to allege a "substantial pecuniary interest in [the] legal proceedings" such that members of the commission "should not adjudicate [this] dispute[]." *Gibson*, 411 U.S. at 579 (citations omitted).

No. 23-30480

A.

Antitrust law has its own threshold for standing. Indeed, "an antitrust plaintiff must do more than meet the requirements of Article III to establish its standing to bring suit." *Sanger Ins. Agency v. Hub Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015) (citation omitted). In turn, such a plaintiff must show "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Id.* (citation omitted).

The parties contest only antitrust injury, which requires a demonstration of "injury to [a plaintiff's] business or property." *Hawaii v. Stand. Oil Co.*, 405 U.S. 251, 261 (1972) (cleaned up). In more detail,

> The Supreme Court has defined antitrust injury as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful .... The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation. Typical anticompetitive effects include increased prices and decreased output. This circuit has narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition.

*Anago, Inc. v. Tecnol Med. Prods.*, 976 F.2d 248, 249 (5th Cir. 1992) (cleaned up). This court has rejected the idea that "the competitor of a monopolist always has standing to challenge the monopolistic conduct forcing it from the market." *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 100 (5th Cir. 1988). For example, a court cannot "grant relief if there is simply a significant probability that the merger will adversely affect competition in the market in which the plaintiff must compete." *Id.* (cleaned up).

On the other hand, where a competitor can show that it has been "squeezed out of the market because [another market participant] exploits

No. 23-30480

its dominance to impose supra-competitive prices on [some of its customers] and simultaneously undercut competitors' . . . fees," it has shown "textbook antitrust injury." *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491 (5th Cir. 2022).

Though the "threat of decreased competition" is not enough to establish antitrust injury, *Anago*, 976 F.2d at 249, "competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 n.14 (1977). For example, where "[p]roof that a plaintiff *will be* adversely affected by [a] merger" and "the injuries are related to the anticompetitive effects of the merger," an upcoming merger might provide an antitrust injury. *Anago*, 976 F.2d at 251 (emphasis added).

### B.

Tesla's alleged antitrust injury is based entirely on the pending investigation by the Commission that would exclude it from the warranty-servicing and leasing markets. In Tesla's words,

> . . . Tesla plausibly alleged quintessential antitrust injury: It alleged that defendants' agreement (1) would exclude Tesla from Louisiana by eliminating its leasing and warranty-service activities; and (2) has deterred other direct-to-consumer manufacturers from entering Louisiana.[21]

Defendants are wrong to suggest that there is a *per se* bar on pointing to pending actions to allege antitrust injury. *See Anago*, 976 F.2d at 251; *cf.*

---

[21] Though this language in itself is vague, it is apparent that Tesla is referring to the actions taken by the Commission. *See, e.g.*, Appellants' Reply Br. at 11 ("The Dealer Cartel is (through the Commission) admittedly seeking to exclude Tesla from the warranty service market by preventing Tesla from servicing sold vehicles."); *id.* at 12 (contrasting the "direct-sales ban," which Tesla does not challenge, with "the Commissioners' investigation" which is the subject of Tesla's challenge).

*Brunswick*, 429 U.S. at 489 n.14.  Importantly, here the pending action is an investigation that we declare unlawful.  Given that our ruling substantially alters the grounds on which Tesla pleads antitrust injury, we vacate and remand the dismissal of the antitrust claim for further evaluation in light of our conclusion that Testa has pleaded a valid due process claim.

## V.

Tesla challenges two regulations under the Equal Protection Clause: (1) the direct sales ban and (2) the warranty services ban.  We reject each of those attacks.

Because Tesla concedes that it "is not a member of a protected class and the" regulation at issue here "does not infringe upon a fundamental right . . . we apply a rational basis review."  *WalMart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 945 F.3d 206, 225 (5th Cir. 2019) (citation omitted).  "Under this standard, a legislative classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Glass v. Paxton*, 900 F.3d 233, 244–45 (5th Cir. 2018) (cleaned up).  That analysis typically breaks into two parts: (1) a legitimate state purpose and (2) rational relationship between the regulation and the legitimate state purpose:

> [R]ationality analysis requires more than just a determination that a legitimate state purpose exists; it also requires that the classification chosen by the state actors be rationally related to that legitimate state purpose. Although the legitimate purpose can be hypothesized, the rational relationship must be real.

*Mahone v. Addicks Util. Dist.*, 836 F.2d 921, 937 (5th Cir. 1988) (citation omitted).

As to (1), "[p]arties attacking the presumption of validity extended to legislative classifications have the burden to negative every conceivable basis

which might support it." *Glass*, 900 F.3d at 245 (cleaned up and emphasis added). That is, "rational basis review places no affirmative evidentiary burden on the [state]." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223 (5th Cir. 2013).

As to (2), a regulation passes muster where "a reasonable legislator could have believed [it] would further . . . legitimate interests. " *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 728 (5th Cir. 2004) (describing *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 504 (5th Cir. 2001)).

Our review is deferential in a lot of ways. "[A]rguments [that] relate to the economic efficacy of the statute . . . are misdirected to this Court." *Ford*, 264 F.3d at 503. Even so, despite "[t]he great deference due state economic regulation," the court may consider "the history of [the] challenged rule [and] the context of its adoption" and may refuse "to accept nonsensical explanations for regulation." *St. Joseph Abbey*, 712 F.3d at 226.

Taken together, this yields a high bar for a successful challenge.

## A.

We will turn to the rationales that justify Louisiana's laws. But first, a threshold question: What is the legislative classification at issue?

The legislative classification that we are examining is the class of all vehicle manufacturers. The text of the law plainly begins, "It shall be a violation of this Chapter for *a* manufacturer . . . ." 2018 La. SB 2017 (emphasis added).

Tesla wants us to view the challenged provisions as a classification of only non-franchising car manufacturers. We reject that suggestion for three reasons.

First, what is at issue is the "legislative classification." *Glass*, 900 F.3d at 244. In other words, we examine "classification created by the

regulatory scheme." *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 139 (5th Cir. 2009).

Second, Tesla's request borders on asking us to apply a more rigorous standard of scrutiny even though in this context "[i]mperfect classifications that are underinclusive or over-inclusive pass constitutional muster." *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 470 (5th Cir. 2021).

Finally, our decision in *Ford* undermines Tesla's view. There, we apparently refused to consider, as a class, manufacturers that were selling *pre-owned* vehicles. *See Ford*, 264 F.3d at 510 (rejecting the argument that "there is no rational basis for classifying manufacturers differently than dealers because manufacturers do not have disproportionate power in the *pre-owned* vehicle market." (Emphasis added.)). That should push us to accept a broader reading of the legislative classification here.

## B.

So, what rational basis could the legislature have for barring manufacturers from serving also as dealers? The answer is that preventing vertical integration or analogous consolidations of monopoly power is a sufficient rational basis to uphold both the warranty-services ban and the direct-sales ban.

Preventing vertical integration is a legitimate state interest and is one of the interests that the district court relied upon. In *Ford*, we upheld a statutory provision prohibiting Ford from selling cars directly to consumers online. 264 F.3d at 498. The court recognized a legitimate interest in "prevent[ing] vertically integrated companies from taking advantage of their incongruous market position." *Id.* at 503. And that is not even the broadest language that this court used: "[W]e have no hesitancy in concluding that [the regulation] bears a reasonable relationship to the State's legitimate purpose in controlling the automobile retail market." *Id.* at 510 (cleaned up).

No. 23-30480

The court rejected Ford's argument that "manufacturers do not have disproportionate power in the preowned vehicle market." *Id.*

Tesla avers that *Ford* upheld a regime that prevented manufacturers from competing with *their own* dealerships. *See, e.g., Ford*, 264 F.3d at 504 (expressing concern that "Ford seems to remain in a superior market position to *its* dealers" (emphasis added)). Scholarly *amici* point out that *Ford* "was decided long before a single mass-market electric vehicle was sold in the United States and at a time when every car manufacturer sold through franchised dealers." Neither of those factors is present here.[22]

The crucial element of *Ford* was not abuse of one's own dealers but the "prevent[ion of] vertically integrated companies from taking advantage of their incongruous market position and . . . frauds, unfair practices, discrimination, impositions, and other abuses of our citizens." *Id.* at 503. That language is broad. And taken in the context of even broader language, *see id.* at 510, *Ford* readily controls this case.

Tesla insists that defendants must explain why vertical integration is bad for consumers. That is a bridge too far. It is contrary to *Ford*, which sets out an open-ended array of possible harms of vertical integration that are not limited to specific consumer harms. *See id.* at 503. Instead, we can assume that the state has a legitimate interest in preventing firms from vertically integrating and abusing the resulting power not only on its own dealers, but other dealers, and yes even consumers down the run. It is Tesla's burden, not defendants', to dispel the notion that fear of vertical integration is not a *conceivable* rational basis.

In short, even if we accept Tesla's and scholarly *amici*'s reading of

---

[22] And at least one district court has drawn this distinction. *See Lucid Group USA, Inc. v. Johnston*, 2023 WL 5688153 at *5 (W.D. Tex. 2023).

No. 23-30480

*Ford* that it was principally concerned with abuse of power by a manufacturer against its dealers, *Ford* also has clear language indicating broader concerns with vertical integration, monopoly power, and state control of the automobile industry more broadly. All of these constitute legitimate state interests.

Both the warranty-services ban and the direct-sales ban find a rational basis in this broader language. There is hardly a more quintessential example of vertical integration than a manufacturer's extending itself into distribution. And extension into the provision of auxiliary services (here, in the warranty-services context) evokes sufficiently similar concerns.

\* \* \* \* \*

For the reasons explained, we REVERSE the dismissal of Tesla's due process claim, VACATE the dismissal of its antitrust claims, AFFIRM the dismissal of its equal protection claim, and REMAND. We place no limitation on the proceedings that the district court may undertake on remand, and we intimate no view on what decisions it should reach.

No. 23-30480

Dana M. Douglas, *Circuit Judge*, dissenting in part and concurring in part:

Tesla's complaint that the makeup of the Commission violates due process is meritless. In deciding in Tesla's favor, the majority opinion misconstrues the fundamentals of due process and contravenes well-settled precedent. The majority's decision also reflects a sea change for state regulations and how courts interpret them. Thus, I must respectfully dissent as to Parts II, III, and IV.[1]

## I

A Rule 12(b)(6) motion to dismiss is an "important mechanism for weeding out meritless claims." *Fifth Third Bankcorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). A plaintiff's complaint must do more than "stat[e] facts merely consistent with liability"; it "must instead state a 'plausible claim for relief.'" *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "A claim is merely conceivable and not plausible if the facts pleaded are consistent with both the claimed misconduct and a legal and 'obvious alternative explanation.'" *United States ex rel. Integra Med Analytics, L.L.C. v. Baylor Scott & White Health*, 816 F. App'x 892, 897 (5th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)). While we accept a plaintiff's allegations as true, we do not blindly accept "'conclusory allegations, unwarranted factual inferences, or legal conclusions as true.'" *Hodge v. Engleman*, 90 F. 4th 840, 843 (5th Cir. 2024) (quoting *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023)).

---

[1] As to Part V, I concur in the judgment only.

No. 23-30480

Tesla brought each of its three constitutional claims pursuant to 42 U.S.C. § 1983. "To state a Fourteenth Amendment due process claim under § 1983, a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (internal quotation marks and citation omitted). In procedural due process claims, "the deprivation by state action of a constitutionally protected interest in life, liberty, or property is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (internal quotation marks and citations omitted); *accord Calhoun v. Collier*, 78 F.4th 846, 852 (5th Cir. 2023), *as revised* (Aug. 31, 2023). "[A] fair trial in a fair tribunal is a basic requirement of [procedural] due process." *Withrow v. Larkin*, 421 U.S. 35, 46 (1976) (internal quotation marks and citations omitted). This applies to courts and administrative agencies alike. *See Gibson v. Berryhill*, 411 U.S. 564, 579 (1973); *see also Baran v. Port of Beaumont Nav. Dist. Jefferson Cnty. Tex.*, 57 F.3d 436, 444 (5th Cir. 1995); *Wall v. American Optometric Assn.*, 379 F. Supp. 175 (N.D. Ga.), *summarily aff'd sub nom.*, *Wall v. Hardwick*, 419 U.S. 888 (1974).

II

The majority opinion declared the Commission's investigative subpoenas as "unlawful" under the Due Process Clause. Op. at 21. In so doing, the majority opinion contends that Tesla has plausibly alleged a due process violation because *Gibson* and *Wall* broadly indicate that "those with substantial pecuniary interest in legal proceedings should not adjudicate disputes" even if that authority is lawfully exercised. Op. at 16. Specifically, the majority opinion agrees with Tesla that the "Commission will always be incentivized to exclude new business models from entering the market." Op. at 17-18. Such allegation is conceivable, but conclusory and not plausible. But

critically, it is also foreclosed by this court and the Supreme Court's precedent.

In Part A, I address the due process standard and how it applies in the context of Tesla's case. Then, in Part B, I address Tesla's anti-trust claim. Throughout, I highlight multiple pitfalls to the majority's conclusion.

## A

To begin, this court and the Supreme Court's precedent on due process is well-settled. But today's decision upends that.

### 1

As to this court's precedent regarding *Gibson* and its progeny, the majority opinion misconstrues the holding in *Chrysler Corporation v. Texas Motor Vehicle Commission,* 755 F.2d 1192, 1198-99 (5th Cir. 1985). Specifically, the majority opinion suggests that a due process violation exists when "bias is predictable." Op. at 17-18. That is opposite to the holding in *Chrysler*. There, Chrysler alleged that certain disputes resolved by the Texas Commission of Motor Vehicles violated due process because dealers adjudicating disputes related to car defects had a financial incentive to lay blame on manufacturers. *Id.* at 1198. This court explained that although it was possible that the dealer-commissioners would align against manufacturers in resolving disputes, it was also possible that "a dealer [would] be quick to find fault with his direct competitor—the dealer." *Id.* at 1199. Moreover, the "suggestion of possible temptation . . . ignores the fact that four of the nine members of the commission are not dealers," which was "relevant to the possible bias of the full decisionmaker—the Commission." *Id.* Ultimately, the court held that "in a system of peer review, with arbiters drawn from the same industry as the disputants, possibilities of improper motive can always be imagined . . . however, we cannot find that the decisionmaker is impermissibly biased in the constitutional sense." *Id.* at 1198-99.

No. 23-30480

*Chrysler* mirrors the case at bar. Tesla challenges the Commission's composition by suggesting that nine of the fifteen commissioners compete with Tesla, and that dynamic violates due process. As in *Chrysler*, Tesla's argument "rests on the assertedly antagonistic relationship" between it and the dealer-commissioners. *Id.* at 1197. "Perhaps the dealers on the Commission will be unsympathetic to manufacturers who" use a different business model, but "if we are to speculate . . . [such] dealer will be quick to find fault with his direct competitor—the dealer." *Id.* at 1199. It "is also possible that a dealer member of the Commission would tend to be biased in favor of manufacturers of his own make of car . . . ". *Id.* at 1199. But the laws enforced by the Commission apply across the board. Thus, the "predictors of bias here point in opposite directions." *Id.* Any "possible temptation" here also "ignores the fact that" six of the fifteen members of the Commission are not Tesla's competitors. *Id.* Further, the Commission is not the ultimate "decisionmaker" for most (if not all) of the hypothetical actions that the Commission could take against Tesla. *Id.* Louisiana's legislature is the source of the laws that Tesla challenges, not the Commission. Accordingly, Tesla fails to plausibly allege that the Commission violates due process.

The Supreme Court has clarified that regulatory boards are not unconstitutional merely because they are composed of competitors of the entities they regulate. *See Friedman v. Rogers*, 440 U.S. 1, 18–19 (1979). In *Friedman v. Rogers,* the plaintiff argued that he was deprived of due process because he was "subject to regulation by a Board composed primarily of members of the professional faction." *Friedman*, 440 U.S. at 6. The Court rejected the *Friedman* plaintiff's arguments because it was a generalized challenge to the board, and he had "no constitutional right to be regulated by a Board that is sympathetic to the commercial practice of optometry." *Id.* at 18-19. The majority opinion's attempts to distinguish *Friedman* here fails.

No. 23-30480

The *Friedman* plaintiffs alleged "that the board's composition itself was unfair." Op. at 14. Tesla did the same, alleging that the Commission violates due process because some of the commissioners include its competitors. That allegation is conclusory at best.[2] It is insufficient to merely suggest that members of the Commission directly compete with or have a financial interest against Tesla. Indeed, Tesla has "no constitutional right to be regulated by" any agency "that is sympathetic" to its business model. *Friedman*, 440 U.S. at 18-19. In a similar vein, this court found no due process violation where the government placed "financially interested private individuals in charge of competitors." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 107 F.4th 415 (5th Cir. 2024).[3] Thus, contrary to the majority opinion, there is no "per se rule disqualifying administrative hearing bodies" and absent plausible allegations, the court "must assume . . . that the administrative hearing body acted independently and properly." *Megill v. Bd.*

---

[2] It is commonplace for trade associations and government entities to work collectively in regulating an industry. *See Chrysler*, 755 F.2d at 1199; *N.Y. State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n*, 198 F.3d 1, 13-14 (1st Cir. 1999) (explaining that industry representation on regulatory boards is a "common and accepted practice."); *Stivers v. Pierce*, 71 F.3d 732, 743 (9th Cir. 1995) ("[T]he system of industry representation on governing or licensing bodies is an accepted practice throughout the nation."). The Due Process Clause does not inhibit that. *See Reyes v. North Texas Tollway Auth.*, 861 F.3d 558, 566 (5th Cir. 2017) (holding that "the Due Process Clause's role" is not "to fine tune" regulatory systems as a substitute for the political process). Thus, the majority decision cannot be squared with any precedent or common practice.

[3] To be clear, as LADA explains, the present case is not one in which the government has given private parties regulatory power. It is a case in which a state legislature has created a multimember executive agency and required that some of the agency's members be licensed by it. The Supreme Court has held that involving economically self-interested private actors in a regulatory scheme does not violate due process where the private actors "function subordinately" to a government agency. *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). Thus, even at the pleading stage, the conclusory allegations asserted by Tesla do not plausibly allege a violation of due process.

No. 23-30480

*of Regents of Fla.*, 541 F.2d 1073, 1079 (5th Cir. 1976).[4] As discussed further below, Tesla's assertion that the subpoenas are sufficient "action" to establish a due process violation is a red herring.

In determining whether a due process violation exists, *Friedman*, *Gibson*, and *Wall* require that we consider the "particular context" of the case. Yet the majority opinion is void of any context. *Friedman*, 440 U.S. at 18–19. The Defendants highlighted what Tesla prefers that we ignore:

- Tesla does not allege that Louisiana's laws or direct sales ban violate due process.
- Tesla does not allege that the Commission has ever charged Tesla with violating the direct sales ban.
- The Commission has neither adopted rules or regulations to enforce state law against Tesla, nor voted on any rules or enforcement actions regarding the direct sales ban against Tesla.
- The Commission has never charged Tesla with violating the warranty repair ban as interpreted by the Attorney General.
- Nor has the Commission adopted any rules or regulations to enforce that ban, despite Tesla's ongoing operation of a warranty service center in New Orleans.
- Tesla does not contend that the Commission is responsible for preventing Tesla from implementing its business because

---

[4] *See also Withrow*, 421 U.S. at 49 (explaining that nothing warrants "imposing upon administrative agencies a stiffer rule, whereby [agency] examiners would be disentitled to sit because they ruled strongly against a party in the first hearing.") (internal quotation marks and citations omitted).

No. 23-30480

> Tesla concedes that Louisiana's laws regulate the sale and service of vehicles, not the Commission.

Accordingly, the "particular context" of this case is cabined only to the Commission's investigative subpoenas.

Contrary to the majority's opinion, "'the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare.'" *N. Dakota State Bd. of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 165 (1973) (quoting *Lincoln Fed. Lab. Union No. 19129, A.F. of L. v. Nw. Iron & Metal Co.*, 335 U.S. 525, 536-537 (1949)). "The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be . . . out of harmony with a particular school of thought." *Williamson v. Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 488 (1955). Indeed, as the district court explained, if Tesla had a claim under these facts, any entity regulated by its peers could ask federal courts to dismantle state regulatory boards.

2

Now that I have addressed the particular context of Tesla's due process claim, I will turn back to the issue of whether the investigative subpoenas violate due process.

As Tesla concedes, the subpoenas are a "legal and 'obvious alternative explanation'" for the Commission's conduct. *Baylor Scott & White Health*, 816 F. App'x at 897 (quoting *Ashcroft*, 556 U.S. at 682). "The commission is empowered to conduct investigations to determine compliance with the laws and rules and regulations it administers," so "[t]he executive director . . . may issue a subpoena prior to the filing of charges if, in the opinion of the executive director subpoena is necessary to investigate any

No. 23-30480

potential violation or lack of compliance with [the Motor Vehicle Commission Law]." La. Admin Code, tit. 46, pt. V, § 303(B). There is no basis to conclude that Tesla plausibly alleged that the Commission's investigative subpoenas violate due process.

To determine if a regulated entity is operating in compliance with a statutory exception that the Commission itself recognized over serious opposition is plainly a valid government objective. As a result, the only way the subpoenas could be evidence of bias would be if the construction of state law underlying them were objectively baseless. But Tesla has *explicitly disclaimed* any challenge here to the "construction of state law" underlying the subpoenas. Tesla does not even argue that the subpoenas are unduly burdensome. *See* Fed. R. Civ. P. 45.

Nonetheless, the majority opinion suggests that we need not wait until the Commission commences a proceeding against Tesla, or consider "actual partiality," to find a due process violation. The majority opinion avers that we may speculate that Tesla may be subject to future disciplinary action. Op. at 14. "Where the speculations tumble against each other, however, we cannot find that the decisionmaker is impermissibly biased in the constitutional sense." *Chrysler*, 755 F.2d at 1199. Importantly, our precedent provides that mere "possibilities of improper motive" do not *ipso facto* create a due process violation. *Chrysler*, 755 F.2d at 1199. And to establish a due process violation, Tesla must allege that a "governmental action resulted in a deprivation of" its life, liberty, or property. *Gentilello*, 627 F.3d at 544. Tesla has failed to do so.

All we are left with, then, is the allegation that the issuance and enforcement of legally proper subpoenas subject to judicial review constitutes evidence of illicit bias so severe that it violates dues process. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738

No. 23-30480

(2013). For these reasons, Tesla has failed to plausibly allege that the Commission's makeup, and investigative subpoenas, violate due process.

## B

Strangely, after concluding that the investigative subpoenas violate due process, the majority opinion raised sua sponte whether that erroneous conclusion "fundamentally alters the grounds on which Tesla's alleged antitrust injury was based." Op. at 19. In so doing, the majority opinion conflates two separate doctrines and vacates and remands the district court's decision on Tesla's anti-trust claim. But the opinion does not (and cannot) explain how due process laws merge with anti-trust laws. Neither does it explain how this impacts the various parties who filed a total of seven motions to dismiss.

Again, the only due process issue Tesla presents is the investigative subpoenas. According to the complaint, Tesla's due process claim is only against the commissioners in their official capacity. Meanwhile, Tesla's anti-trust claim is against LADA, LADA members, dealers, and the commissioners in their official and private capacities. Thus, for the due process claim, we cannot rely on allegations concerning efforts by LADA, the dealers, or the commissioners in their private capacities. We also cannot rely on the subpoenas to conclude that the district court erred in assessing the anti-trust claim. It should go without saying that we also cannot rely on the due process legal standard to assess an anti-trust claim.

Worse, the majority opinion credits the anti-trust allegations, failing to address their implausibility.[5] For example, Tesla mentions several emails

---

[5] Tesla's claim is also paradoxical. A federal court recently held that Tesla's customers plausibly alleged that Telsa's approach to selling, leasing, and servicing vehicles is anti-competitive behavior. *Lambrix v. Tesla, Inc.*, No. 23-CV-01145-TLT, 2024 WL 3403777 (N.D. Cal. June 17, 2024) (denying Tesla's motion to dismiss a putative class

that the Executive Director of the Commission received from LADA members regarding Tesla's plans to open a service center in New Orleans. But this court has clarified that "one-sided complaint[s] [are] just not a suitable basis for an inference of conspiracy." *Abraham & Veneklasen*, 776 F.3d at 333. Moreover, there are no specific factual allegations supporting an inference that the commissioners agreed with LADA to take any action that would keep Tesla out of the market. [6] *See Twombly*, 550 U.S. at 557 (noting the "threshold requirement" of "allegations plausibly suggesting (not merely consistent with) agreement").

The only plausible inference from Tesla's allegations is that despite being asked to agree with LADA's position, the Commission repeatedly refused to yield to LADA's requests. *See Golden Bridge Technology, Inc. v. Motorola, Inc.*, 547 F.3d 266, 272 (5th Cir. 2008). Indeed, some of Tesla's allegations directly show that the Commission favored Tesla's continued business operation in Louisiana. Nonetheless, the majority opinion appears to consider arguments Tesla, itself, has not made.

## III

The majority opinion misses the forest for the trees. The issue is whether a company can change the composition of a state's regulatory commission because it merely disagrees with state law which the commission

---

action as to Sherman Act claims). These are the same strategies that Tesla claims are now being stifled by the Commission.

[6] *See, e.g.*, *Veritext Corp. v. Bonin*, 417 F. Supp. 3d 778, 786 (E.D. La. 2019) ("While plaintiff alleges that members of the [agency] were simultaneously members of the [private industry association], that alone does not result in a finding that both associations are engaged in an unlawful conspiracy."); *see also Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993)("The mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred.").

No. 23-30480

is required to enforce. But Tesla cannot use this court as an end-run around the legislative process.[7] Because Tesla has not plausibly alleged that the Commission has violated due process, I would affirm the district court. Therefore, I respectfully dissent.

---

[7] *See, e.g.*, *Hopkins v. Watson*, 108 F.4th 371 (5th Cir. 2024) (en banc) ("In other words: go and convince the State legislatures. Do the hard work of persuading your fellow citizens that the law should change.").